**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| FEDERATED ADMINISTRATIVE SERVICES and FEDERATED HERMES, INC., | : : : | C.A. No. 2:23-cv-01239-WSS |
| Plaintiffs, | : : | |
| v. | : : | |
| ENDURANCE AMERICAN INSURANCE COMPANY and CONTINENTAL CASUALTY COMPANY, | : : : : | |
| Defendants. | : : | |

---

**ENDURANCE AMERICAN INSURANCE COMPANY'S MEMORANDUM OF LAW IN
OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

---

**HANGLEY ARONCHICK
SEGAL PUDLIN & SCHILLER**

Ronald P. Schiller (Pa. 41357)
Michael R. Carlson (*admitted pro hac vice*)
Lily K. Huffman (*admitted pro hac vice*)
Christopher J. Mauro (*admitted pro hac vice*)

Counsel for Defendant Endurance American
Insurance Company

## TABLE OF CONTENTS

I.    INTRODUCTION ................................................................................................ 1

II.   UNDISPUTED MATERIAL FACTS .............................................................. 4

III.  ARGUMENT ...................................................................................................... 4

      A.    The standard of review compels summary judgment in
            Endurance's favor. ................................................................................. 4

      B.    Federated is not entitled to judgment as a matter of law on its
            breach of contract and declaratory judgment counts. ........................ 4

            1.    The "alternative settlements" payments to the shareholders
                  are not Loss "resulting from" a Claim. ....................................... 4

            2.    The "alternative settlement" payments are not Loss because
                  no Federated Hermes entity was "legally obligated to pay,"
                  or "financially liable" for, those amounts. ................................. 6

      C.    Federated's mere execution of a settlement agreement does not
            create a "legal obligation to pay" where it had no legal obligation
            or financial liability in the first instance. ........................................... 9

            1.    The "alternative settlement" payments are not insurable loss. ................ 12

            2.    Endurance did not waive, and is not estopped from raising,
                  any other defenses to coverage. ................................................ 19

            3.    The windfall payment to shareholders was not reasonable. ..................... 21

      D.    Federated is not entitled to judgment as a matter of law on its claims
            for breach of the implied covenant of good faith and fair dealing and bad faith
            under 42 Pa.C.S. § 8371 ....................................................................... 22

IV.   CONCLUSION .................................................................................................. 34

# TABLE OF AUTHORITIES

**Cases**                                                                     **Page(s)**

*A. Scott Enterprises, Inc. v. City of Allentown,*
    142 A.3d 779 (Pa. 2016) ................................................................................32

*Alexander v. CNA Insurance Co.,*
    657 A.2d 1282 (Pa. Super. Ct. 1995) ...........................................................12

*Alfaro v. E.F. Hutton & Co.,*
    606 F. Supp. 1100 (E.D. Pa. 1985) ................................................................7

*American International Underwriters Corp. v. Zurn Industries, Inc.,*
    771 F.Supp. 690 (W.D.Pa. 1991) ..................................................................21

*Anderson v. Liberty Lobby, Inc.,*
    477 U.S. 242 (1986) .........................................................................................4

*Antone v. New Amsterdam Casualty Co.,*
    6 A.2d 566 (Pa. 1939) ....................................................................................21

*Bank of the West v. Superior Court,*
    833 P.2d 545 (Cal. 1992) ...............................................................................18

*Beckwith Machinery Co. v. Travelers Indemnity Co.,*
    638 F.Supp. 1179 (W.D.Pa. 1986) ...............................................................19

*Bernstein v. Geico Casualty Co.,*
    No. 19-1899, 2020 WL 1308226 (E.D.Pa. March, 19, 2020) .....................25

*Bishop of Charleston v. Century Indemnity Co.,*
    225 F. Supp. 3d 554 (D.S.C. 2016) .........................................................10, 11

*Camico Mutual Insurance Co. v. Heffler, Radetich & Saitta, LLP,*
    587 Fed.Appx. 726 (3d Cir. 2014) ................................................................12

*Capitol Bus Co. v. Blue Bird Coach Lines, Inc.,*
    478 F.2d 556 (3d Cir. 1973) .............................................................................9

*Central Dauphin School District v. American Casualty Co.,*
    426 A.2d 94 (Pa. 1981) ..................................................................................18

*Chemical Bank v. Dippolito,*
    897 F.Supp. 221 (E.D.Pa. 1995) ...................................................................20

*Detroit Water Team Joint Venture v. Agricultural Insurance Co.,*
    371 F.3d 336 (6th Cir. 2004) .........................................................................11

*Fedance v. Harris*,
　1 F.4th 1278 (11th. Cir. 2021) ...................................................................7

*Gemini Insurance Co. v. Meyer Jabara Hotels LLC*,
　231 A.3d 839 (Pa. Super. Ct. 2020)...........................................................21

*Higman v. State Farm Mutual Automobile Insurance Cos*,
　2018 WL 5255221 (W.D. Pa. Oct. 22 2018) .............................................22

*Kunsman v. Metropolitan Direct Property and Casualty Co.*,
　No. 17-4619, 2018 WL 3097013 (E.D. Pa. June 26, 2018).......................24

*Merchants Mutual Insurance Co. v. Artis*,
　907 F.Supp. 886 (E.D.Pa. 1995) ...............................................................20

*Metz v. United Counties Bancorp*,
　61 F. Supp. 2d 364 (D. N.J. 1999) ..............................................................7

*Moss Signs, Inc. v. State Automobile Mutual Insurance Co.*,
　No. 08-167, 2008 WL 892032 (W.D.Pa. Apr. 2, 2008)..............................24

*Nationwide Mutual Insurance Co. v. Regional Electrical Contractors, Inc.*,
　680 A.2d 547 (Md. Ct. Spec. App. 1996) ..........................................11, 12

*NVR, Inc. v. Motorists Mutual Insurance Co.*,
　371 F. Supp. 3d 233 (W.D. Pa. 2019).......................................................23

*Oehlmann v. Metropolitan Life Insurance Co.*,
　644 F.Supp.2d 521 (M.D. Pa. 2007).....................................................24, 25

*Pell v. Weinstein*,
　759 F.Supp. 1107 (M.D. Pa. 1991).............................................................7

*Permasteelisa CS Corp. v. Columbia Casualty Co.*,
　377 F. App'x 260 (3d Cir. 2010) ............................................................5, 11

*Post v. St. Paul Travelers Insurance Co.*,
　691 F.3d 500 (3d Cir. 2012).....................................................................22

*Purcell v. State Farm Mutual Automobile Insurance Co.*,
　No. 11-7004, 2012 WL 425005 (E.D. Pa. Feb. 10, 2012) .......................24

*Real Estate Management Advisors, LLC v. U.S. Liability Insurance Co.*,
　283 A.3d 380 (Pa Super. 2022)...................................................................5

*Rice Enterprises, LLC v. RSUI Indemnity, Inc.*,
　705 F.Supp. 3d 460 (W.D. Pa. 2023).......................................................23

*Rosen v. Fidelity Fixed Income Trust*,
    No. CIV.A. 95-2365, 1995 WL 560037 (E.D. Pa. Sept. 20, 1995) ............................................7

*Rowe v. Nationwide Insurance Co.*,
    6 F. Supp. 3d 621 (W.D. Pa. 2014), *aff'd*, 234 F.3d 1265 (3d Cir. 2000) ..............................25

*Sadel v. Berkshire Life Insurance Co. of America*,
    No. 09-612, 2011 WL 292239 (E.D.Pa. Jan. 31, 2011)........................................................24

*SAPA Extrusions, Inc. v. Liberty Mutual Insurance Co.*,
    939 F.3d 243 (3d Cir. 2019)......................................................................................................11

*SEC v. Cavanagh*,
    445 F.3d 105 (2d Cir. 2006)......................................................................................................17

*Segall v. Liberty Mutual Insurance Co.*,
    No. 99-6400, 2000 WL 1694026 (E.D. Pa. Nov. 9, 2000) .....................................................25

*Selective Way Insurance Co. v. MAK Services, Inc.*,
    232 A.3d 762 (Pa. Super. Ct. 2020).........................................................................................19

*Stevanna Towing, Inc. v. Atlantic Specialty Insurance Co.*,
    No. 15-cv-01419, 2021 WL 2434589 (W.D. Pa. June 15, 2021) ...........................................21

*The Frog, Switch & Manufacturing Co. v. Travelers Insurance Co.*,
    193 F.3d 742 (3d Cir. 1999)......................................................................................................23

*TIG Insurance Co. v. Tyco International Ltd.*,
    919 F. Supp.2d 439 (M.D. Pa. 2013)........................................................................................19

*USX Corp. v. Liberty Mutual Insurance Co.*,
    444 F.3d 192 (3d Cir. 2006)......................................................................................................23

*Wasilko v. Home Mutual Casualty Co.*,
    232 A.2d 60 (Pa. Super. Ct. 1967).....................................................................................20, 21

*Whole Enchilada, Inc. v. Travelers Property Casualty Co. of America*,
    581 F.Supp.2d 677 (W.D. Pa. 2008).........................................................................................10

*Wigand v. Flo-Tek, Inc.*,
    609 F.2d 1028 (2d Cir. 1979)......................................................................................................7

*Williams v. Hartford Casualty Insurance Co.*,
    83 F. Supp. 2d 567 (E.D. Pa. 2000).........................................................................................25

*Willow Inn, Inc. v. Public Service Mutual Insurance Co.*,
    399 F.3d 224 (3d Cir. 2005)......................................................................................................17

*Zuckerman v. National Union Fire Insurance Co.*,
   495 A.2d 395 (N.J. 1985)..................................................................................21

**Statutes**

42 Pa.C.S. § 8371..............................................................................................22

15 U.S.C § 77................................................................................................7, 8

Securities Act of 1933................................................................................ *passim*

Unfair Insurance Practices Act ....................................................................24, 25

**Other Authorities**

Fed. R. Civ. P. 56............................................................................................4, 35

## I.     INTRODUCTION

Federated Administrative Services ("FAS") and Federated Hermes, Inc. ("Federated Hermes") (collectively, "Federated") filed this litigation against its insurers[1] to recover more than $17.9 million in interest refunded to three shareholders to "remedy" an "administrative oversight." As Federated has alleged in its complaint, and in every single communication with the insurers until now, the administrative oversight involved FAS's "fail[ure] to register shares issued by" a third Federated Hermes entity, the Federated Hermes Project and Trade Finance Tender Fund (the "Tender Fund").[2] Under the terms of Federated's settlement agreements with the shareholders, the interest payments were to "put [each shareholder] in a substantially similar financial position to what [they] would have been in had the Fund conducted a rescission offer [under the Securities Act of 1933]…while also permitting [them] to stay invested in the Fund"[3] Whether the failure to register shares is a "big deal" to the Securities and Exchange Commission or to Congress, as Federated contends, is irrelevant. The issue is whether Federated's "alternative settlement" payments to the shareholders are covered "**Loss**"[4] under the Manuscript Primary Professional and Management Liability Insurance Policy Endurance issued to Federated Hermes. As Endurance establishes in its motion for summary judgment, those payments are not covered because, among other things:

- The "alternative settlement" payments are not **Loss** "resulting from a "**Claim**," as the claims-made policy requires—Federated offered its rescission remedy, and then the

---

[1] The insurers are defendants Endurance American Insurance Company ("Endurance") and Continental Casualty Company ("Continental").

[2] Federated Compl. ¶ 61.

[3] Endurance Statement of Undisputed Material Fact ("Endurance's SUMF") ¶95.

[4] Terms in bold are defined in the Endurance Policy.

"alternative settlement" payments, to the shareholders *before* Federated or the Tender Fund ever received any written "demands" from the shareholders.

- The "alternative settlement" payments are not **Loss** under the policy because they do not reflect amounts that any Federated Hermes entity was "legally obligated to pay" under the Securities Act, or otherwise.

- Under Pennsylvania law, and basic common sense, an insured that is merely returning funds it improperly received cannot recover those restitutionary payments from its insurer.

In its own motion for summary judgment, Federated maintains that it has nevertheless satisfied its burden to prove coverage as a matter of law. Contrary to Federated's assertions, however, its mere execution of collusive settlement agreements with shareholders does not create a "legal obligation to pay." The undisputed facts establish, as a matter of law, that there was no legal obligation or financial liability in the first instance. But even if Federated could prevail on that argument—and it cannot—it cannot overcome the simple fact that the "alternative settlement" payments are uninsurable loss under Pennsylvania law.

In a telling acknowledgment that its prior coverage position rests upon a flimsy foundation, Federated now contends—for the very first time—that its demand for coverage involves *two* separate coverage parts under the policy: the Professional Liability coverage part *and* the Management Liability coverage part. In contrast to the Professional Liability coverage part, the Management Liability coverage part defines **Loss** to prohibit the insurers from asserting that certain **Loss** under the Securities Act of 1933 is uninsurable. Federated apparently now prefers the Management Liability coverage part's definition to the extent it forecloses Endurance's argument that the "alternative settlement" payments are uninsurable under Pennsylvania law. Yet even the first paragraph of Federated's complaint characterizes this coverage dispute as one arising from "*a*

*professional liability **Loss***."[5] Even more telling, Federated conflates the two **Loss** definitions to misleadingly suggest that both coverage parts bar Endurance from raising insurability as a defense. But of course the Professional Liability coverage part's "will not assert" language only applies to "civil penalties," which are not at issue here.

In any event, the Management Liability coverage part does not apply. According to Federated's latest argument, the Tender Fund is entitled to coverage under the Management Liability coverage part's Fund Coverage insuring agreement. But the Tender Fund is not a party to this litigation, did not pay any amount, *and* is adverse to Federated in the underlying matter that supposedly prompted the settlement payments in the first place. Even if Federated could recover on the Tender Fund's behalf for a payment the Tender Fund never made, various exclusions would bar coverage under that coverage part.

Federated's bad faith claims fare no better. Contrary to Federated's barrage of baseless attacks, Endurance has not unreasonably delayed its investigation, conducted an inadequate investigation, failed to maintain an adequate claim file, or issued a "litigation-driven denial." Nor did it "pivot" to litigation at any time before Federated filed its complaint in this Court. This last attack is particularly ironic since it was Federated, not Endurance, that delegated its insurance claim to litigation counsel from the outset. Endurance only reluctantly retained coverage counsel, as it had every right to do, after Federated's counsel fired off what this Court has characterized as its "fighting words" email. Because there is no evidence—let alone clear and convincing evidence—that Endurance's conclusions or conduct were unreasonable under the circumstances, let alone that it recklessly disregarded the supposed lack of a reasonable basis, Endurance has moved for summary judgment on the bad faith counts as well. For the reasons outlined in that

---

[5] Federated Compl. ¶ 1 (emphasis added).

brief, and as further addressed below, this Court should deny Federated's motion for summary judgment and grant Endurance's motion.

## II.    UNDISPUTED MATERIAL FACTS

Endurance incorporates by reference the statement of undisputed facts in its memorandum of law in support of its motion for summary judgment and its opposition to Federated's statement of undisputed facts.

## III.    ARGUMENT

### A.    The standard of review compels summary judgment in Endurance's favor.

Federal Rule of Civil Procedure 56(a) provides that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The materiality of a fact is determined by "the substantive law" applicable to the case, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "[T]he determination of whether a given factual dispute requires submission to a jury must be guided by the substantive evidentiary standards that apply to the case." *Id.* at 255. Federated has failed to establish that there is no genuine dispute as to any material facts and that it is entitled to judgment as a matter of law.

### B.    Federated is not entitled to judgment as a matter of law on its breach of contract and declaratory judgment counts.

#### 1.    The "alternative settlements" payments to the shareholders are not Loss "resulting from" a Claim.

Contrary to Federated's assertions, the undisputed record does not show that it has satisfied its burden to prove coverage as a matter of law. As an initial matter, the Professional Services coverage part requires, among other things, **Loss** *resulting from* a covered **Claim**:

- 4 -

> If during the **Policy Period** . . . any **Claim** is made against the **Insured** for **Wrongful Acts** committed or alleged to have been committed by the **Insured** or by persons for whose **Wrongful Acts** the **Insured** is or is alleged to be legally responsible (including **Employees** acting within the scope of their employment) the Insurer agrees to pay on its behalf **Loss** resulting from such **Claim**.[6]

Federated determined and offered the amount of the alleged **Loss**—the amount it contends it was "legally obligated to pay" under the Securities Act of 1933 "to put [each shareholder] in a substantially similar financial position to what [they] would have been in had the Fund conducted a rescission"[7] —before any **Claim** was asserted against any Federated Hermes entity.[8] Indeed, by the time the shareholders had finally asserted their supposed demands on May 12 and 15, 2023, Federated and the Tender Fund had already (1) proactively filed the April 10 N-2 Registration Statement offering rescission[9] and (2) offered the "alternative settlement" payments based on that rescission offer.[10] In other words, the shareholders only purported to assert a written demand against Federated *after* Federated had offered what it characterized as the "statutory remedy."[11] Therefore, even if the shareholders' so-called demands could constitute **Claims**, the "alternative settlement" payments are not "**Loss** *resulting from* [a] **Claim**."[12] Rather, the **Claims** that Federated purported to resolve came after it had already offered the "alternative settlement" payments to the shareholders. *See Real Estate Mgt. Advisors, LLC v. U.S. Liability Ins. Co.*, 283 A.3d 380 (Pa Super. 2022) (non-precedential decision) ("Because no third-party had asserted a claim against [insured] and [insured] had not become legally obligated to pay any third-party, [insurer] had no duty to [insured] under the Policy."); *see also Permasteelisa CS Corp. v. Columbia Cas. Co.*, 377

---

[6] Endurance's SUMF" ¶ 7.
[7] Federated's Statement of Undisputed Material Facts ("Federated's SUMF") ¶¶ 56, 62.
[8] Endurance's SUMF ¶¶ 83-84, 87.
[9] Federated's SUMF ¶ 19.
[10] Endurance's SUMF's ¶¶ 59-61.
[11] Endurance's SUMF's ¶¶ 59-61, 83-84, 87.
[12] Endurance's SUMF ¶7 (emphasis added).

F. App'x 260 (3d Cir. 2010) (finding no pre-claim coverage for insured's voluntary remediation efforts). Therefore, the settlements with the shareholders are not **Loss** resulting from a **Claim**.

> **2.** **The "alternative settlement" payments are not Loss because no Federated Hermes entity was "legally obligated to pay," or "financially liable" for, those amounts.**

Even if the "alternative settlement" payments to the shareholders had resulted from a **Claim**—and they did not—they are not **Loss** under the policy because no Federated Hermes entity was "legally obligated to pay," or "financially liable" for, those amounts. The policy defines **Loss**, in relevant part, as follows:

> **Loss** means the total amount which an **Insured** becomes legally obligated to pay on account of each and every **Claim**, . . . made against them for **Wrongful Acts** for which coverage applies, including, but not limited to, damages, punitive damages, exemplary damages, the multiple portion of any multiplied damage award, judgments, any award of pre-judgment and post judgment interest, settlements, and **Defense Costs**. . .

> **Loss**, other than **Defense Costs**, does not include:

> 1.    any amount for which the **Insured** is not financially liable, or which is without legal recourse to an **Insured**; . . . [13]

In other words, the policy only covers valid and enforceable liabilities that the **Insured** is "legally obligated to pay," but not hypothetical obligations or business accommodations.

Federated seeks coverage for the $17.9 million FAS paid to Tender Fund shareholders to resolve purported allegations arising out of its failure to register the Tender Fund's securities based on the remedy under the Securities Act of 1933.[14] Under 12(a)(1) of the Act, if a person sells securities without registering them (in violation of Section 5) the purchaser is entitled to recover

---

[13] Endurance's SUMF ¶¶ 11, 14.

[14] *See* Federated Compl. ¶ 22 ("FAS entered into settlement agreements with the Tender Fund's affected shareholders, in the aggregate amount of $17,898,929.67, to resolve the liabilities."); *id.* ¶ 22 ("FAS failed to register under the Securities Act certain shares issued by the Tender Fund due to an administrative oversight.") *id.* ¶ 61.

(1) consideration for the security (rescission) *or* (2) damages if he or she no longer owns the security. 15 U.S.C § 77*l*(a)(1). In short, the remedy under the Act turns on whether the shareholder still owns the unregistered security or not. Section 12(a)(1) allows "no choice of remedy," meaning that "[i]f plaintiff owns the stock, he is entitled to rescission but not damages," but "[i]f plaintiff no longer owns the stock, he is entitled to damages but not rescission." *Wigand v. Flo-Tek, Inc.*, 609 F.2d 1028, 1035 (2d Cir. 1979).[15] Here, FAS agreed to pay the shareholders what it characterized as the "statutory remedy" even though they elected to keep the securities.[16] Indeed, the shareholders had suffered no damages[17] and were not interested in rescission,[18] except to the extent it might create an "arbitrage opportunity."[19] Thus, even if FAS, Federated Hermes, or the Tender Fund had been "legally obligated to pay," or "financially liable" for, the rescission remedy, none of those entities had a statutory obligation where the shareholders opted to keep the securities.

But even if the shareholders had elected the statutory remedy for rescission, a significant portion of any liability would have been barred under the applicable statute of limitations. Section 77m of the Securities Act of 1933 provides that no action can be filed to seek civil liability under the Act "unless brought within one year after the violation upon which it is based" and "[in] no event . . . more than three years after the security was bona fide offered to the public."[20] The date of the violation is the later of the offer, sale or delivery of the security. *Pell v. Weinstein*, 759

---

[15] *Rosen v. Fid. Fixed Income Tr.*, No. CIV.A. 95-2365, 1995 WL 560037, at *7 (E.D. Pa. Sept. 20, 1995) (citing *Wigand*); *Alfaro v. E.F. Hutton & Co.*, 606 F. Supp. 1100, 1112 (E.D. Pa. 1985); *see also Metz v. United Ctys. Bancorp*, 61 F. Supp. 2d 364, 378-79 (D. N.J. 1999) (denying claim under Section 12 where shareholders failed to tender their securities).

[16] Endurance's SUMF ¶¶ 57-61.

[17] Endurance's SUMF ¶ 55.

[18] Endurance's SUMF ¶¶ 54-56.

[19] *Id.*

[20] 15 U.S. Code § 77m. The one-year bar on claims under section 12(a)(1) is a statute of limitations that runs from the date of the offer, sale or delivery of the security. *Fedance v. Harris*, 1 F.4th 1278, 1284-85 (11th. Cir. 2021).

F.Supp. 1107, 1111 (M.D. Pa. 1991). Neither the discovery rule nor equitable tolling applies to the one-year limitations period for filing a section 77*l*(a)(1) claim. *Id.*[21] Here, the vast majority of unregistered shares were sold more than one year before the Tender Fund's April 10, 2023 recission offer.[22] If Federated had applied its hypothetical rescission calculation methodology for the "alternative settlement" payments—*i.e.,* aggregate original price, plus simple interest through May 15, 2023, less the May 15, 2023 value of covered shares and DRIP shares received—to shares issued within the one-year statute of limitations, it would have resulted in a negative amount: -$100,679, as Endurance has addressed in more detail in its summary judgment brief.[23] Stated differently, Federated is seeking reimbursement for amounts it had no legal obligation to pay.

To the extent Federated contends that FAS's "alternative settlement" payments to the shareholders were simply to indemnify the Tender Fund for its own statutory obligations to the shareholders, FAS had no obligation to do so. Under FAS's services agreement with the Tender Fund, FAS was not "liable for any error or judgment or mistake of law for any loss suffered by [the Tender Fund] in connection with the matters to which this Agreement relates"[24] and, instead, **the Tender Fund was to indemnify FAS** "for any action taken or thing done by it in performing"

---

[21] In an effort to overcome this statute-of-limitations issue, Federated argues for the first time that the so called **Claims** involved "material misstatements in prospectuses" Federated Br. at 9. Until now, however, Federated has always characterized this as an "administrative error" involving the failure to register securities. *See* Federated Compl. ¶¶ 4-6, 29, 65, 73-74, 76, 95, 105, 110-11, 113, 115-118, 124, 132, 138. Indeed, that is how Federated's complaint characterizes the issue and that is how every letter from Reed Smith characterized the issue as an administrative error or oversight. *Id.*; *see also* Endurance's Appx. Ex. 27 (April 10, 2023 electronic mail), Ex. 29 (April 20, 2023 letter), Ex. 31 (April 27, 2023 letter and timeline). Moreover, the shareholders all testified that they never raised an issue regarding misrepresentation. *See* Endurance's SUMF ¶92. Because there was no **Claim** for misrepresentation it follows that there was no **Loss** "resulting from" a **Claim** for misrepresentation.

[22] Endurance's SUMF ¶¶30-31.

[23] *See* Endurance's Memorandum of Law in Support of its Motion for Summary Judgment at 25.

[24] Endurance's SUMF ¶¶ 11, 14.

administrative services, "except a loss resulting from willful misfeasance, bad faith or gross negligence on its part in the performance of its duties…."[25] Nothing in the record supports a conclusion that FAS's "administrative oversight"[26] involved willful misfeasance, bad faith or gross negligence. Instead, under the undisputed facts of record, FAS had no legal obligation to indemnify the Tender Fund for its failure to register the shares. Therefore, Federated's motion for summary judgment should be denied. As a matter of law, Federated has failed to meet it burden to prove **Loss** because the "alternative settlement" payments were not amounts that it was legally obligated to pay.

### C.    Federated's mere execution of a settlement agreement does not create a "legal obligation to pay" where it had no legal obligation or financial liability in the first instance.

Federated incorrectly contends that a mere legal obligation to perform a settlement contract itself somehow satisfies the policy's "legally obligated to pay" requirement. As stated above, the policy defines **Loss**, in pertinent part, as "the total amount which an **Insured** becomes *legally obligated to pay* on account of each and every **Claim** . . . made against them for **Wrongful Acts** for which coverage applies, including, but not limited to, . . . settlements. . ."[27] Thus, the policy lists "settlements" as an example of what can constitute **Loss**. But the introductory clause—"the total amount which the **Insureds** become legally obligated to pay on account of each and every **Claim** . . . made against them for **Wrongful Acts**"—controls. Under standard rules of contract interpretation (the specific governs the general, and introductory clauses limit illustrative lists), a settlement is covered only if the insured was legally obligated to pay the damages or settlement in the first instance. *See, e.g.*, *Capitol Bus Co. v. Blue Bird Coach Lines, Inc.*, 478 F.2d 556, 560 (3d

---

[25] Endurance's SUMF ¶25.
[26] Federated Compl. ¶ 61.
[27] Endurance's SUMF ¶¶ 11, 14.

Cir. 1973) ("while a contract's provisions must be interpreted with reference to the whole[,] the specific controls the general; and a contract should be construed so as to give effect to its general purpose.") In short, the policy language imposes a causal limitation: Endurance's indemnity obligation is limited to the amount the **Insured** is legally obligated to pay because of a covered **Wrongful Act**—not because of a voluntary business accommodation to buy peace.

Two examples illustrate this point. In the first example, an insured settles a **Claim** for a **Wrongful Act** for $2 million, but was only legally obligated to pay $1 million (because the extra $1 million was to avoid bad publicity or to satisfy an unhappy customer), the excess $1 million is not "on account of" the **Wrongful Act** and is therefore not "**Loss**." The insured's promise in the settlement agreement to pay $2 million is a new contractual obligation, but it is not an obligation "on account of" the underlying **Wrongful Act** unless the underlying claim had merit up to that amount. In the second example, involving a scenario closer to the one in this case, an insured decides, for business reasons, to pay a settlement for a **Claim** for a **Wrongful Act** barred under the applicable statute of limitations. Obviously, there was no legal obligation to pay a **Claim** for that **Wrongful Act**. Permitting coverage for the value above actual legal exposure would incentivize over-settling at the carrier's expense. Because "**Loss**" is defined as the amount the insured is legally obligated to pay on account of the **Wrongful Act** itself, and not the amount it contractually promises in a settlement agreement, the insurer is liable only for the portion of any settlement that reflects the insured's actual legal exposure for the covered claim.

Courts interpreting similar language have held that this phrase requires a legal liability imposed by law, not a purely voluntary business accommodation. [28] In *Bishop of Charleston v.*

---

[28] *See, e.g., Whole Enchilada, Inc. v. Travelers Prop. Cas. Co. of Am.*, 581 F.Supp.2d 677, 704 (W.D. Pa. 2008) (statutory damages were not covered because "no [actual] damage is alleged that would subject Travelers to coverage under the terms of its policies."); *see also*

*Century Indem. Co.*, 225 F. Supp. 3d 554, 560–62 (D.S.C. 2016), for example, a federal district court in South Carolina concluded that settlements, where there was no legal exposure, did not create a "legal obligation to pay" under the terms of the policy. There, the insured agreed to pay plaintiffs damages for, among other things, spousal and filial consortium claims even though the relevant jurisdiction did not recognize those claims. The court held that, despite the settlement agreement, the insured was not "legally obligated to pay" the settlement amounts:

> The [insured] was told that South Carolina did not recognize filial consortium claims by the judge who approved the settlement of filial consortium claims against the [insured]. This Court understands that the [insured] may have had good reason nonetheless to settle those claims (for relatively small amounts), but [the insurer] is not liable to indemnify claims that the [insured] was not liable to pay.

*Bishop of Charleston*, 225 F. Supp. 3d at 561.

The same principle applies here. The policy's **Loss** definition requires legal liability "on account of" a **Wrongful Act**. Although a settlement may create a contractual obligation to pay, that is not the same thing as a legal obligation to pay an amount arising from a covered **Wrongful Act**. A court "must take care not to 'violate the cardinal principle of interpretation that an insurance policy must be construed in such a manner as to give effect to all of its provisions.'" *SAPA Extrusions, Inc. v. Liberty Mut. Ins. Co.*, 939 F.3d 243, 257 (3d Cir. 2019) (*quoting Mut. of Omaha Ins. Co. v. Bosses*, 237 A.2d 218, 220 (Pa. Super. 1968)). "'[N]o provision of a contract should be treated as surplusage or redundant if any reasonable meaning consistent with other parts of the

---

*Permasteelisa CS Corp. v. Columbia Cas. Co.*, 377 F.App'x 260, 267 (3d Cir. 2010) (applying New Jersey law to conclude "legally obligated to pay" does not include remediation work done by a subcontractor done to fulfill its contractual obligation); *see also Detroit Water Team Joint Venture v. Agric. Ins. Co.*, 371 F.3d 336, 339-41 (6th Cir. 2004) (costs the insured contractor incurred to fix damages caused by a negligent subcontractor were not amounts the contractor was "legally obligated to pay"); *Nationwide Mut. Ins. Co. v. Reg'l Elec. Contractors, Inc.*, 680 A.2d 547, 550-51 (Md. Ct. Spec. App. 1996) (costs of voluntary repairs were not amounts the insured became "legally obligated to pay.").

agreement can be given to it.'" *Camico Mut. Ins. Co. v. Heffler, Radetich & Saitta, LLP*, 587 Fed.Appx. 726, 730 (3d Cir. 2014) (*quoting Wyo. Valley W. Sch. Dist. v. Nw. Sch. Dist.*, 695 A.2d 949, 953 (Pa. Commw. Ct. 19978). Federated's interpretation would render the "legally obligated to pay" and "financially liable for" clauses mere surplusage.[29]

### 1.    The "alternative settlement" payments are not insurable loss.

In a flailing effort to overcome Endurance's separate argument that Federated's restitutionary payments to the shareholders are uninsurable under Pennsylvania law, Federated relies on the Management Liability coverage part's **Loss** definition. Until now, Federated has never argued—and its complaint does not allege—that the purported claims trigger the Management Liability coverage part. On the contrary, it has consistently argued that this matter involves a professional services error triggering the policy's Professional Liability coverage part.[30]

> **a.    Only the Management Liability coverage part's Loss definition provides that the insurer "will not assert" that settlements constitute uninsurable Loss due to the alleged violations of Section 11 or Section 12 of the Securities Act of 1933.**

---

[29] Federated relies on a single Pennsylvania case to support its argument, *Alexander v. CNA Ins. Co.*, 657 A.2d 1282 (Pa. Super. Ct. 1995)). But the insureds in that case settled viable legal claims asserted against them—which were the subject of ongoing and active litigation—"prior to trial." *Id.*, 657 A.2d at 1283.

[30] *See* Appendix in Support of Endurance's Motion for Summary Judgment ("Endurance Appx.") Ex. 29 (Federated's April 10, 2023 letter) ("The administrative services provided by Federated Administrative Services…constitute 'Professional Services' under the Policy. . . . Accordingly, the Insureds tender the Written Demand to Endurance for coverage under the Professional Liability Coverage Part . . . ."); Ex. 31 (Federated's April 27, 2023 letter) ("I have recorded each of your questions below regarding the alternative means to compensate the entities affected by the professional liability errors in question…"); Ex. 49 (Federated's June 30, 2023 letter)("FAS entered into the settlement agreements with the Tender Fund's affected shareholders to address the shareholders' written demands to the Tender Fund, and the Tender Fund's written demand to the Insureds, to be made whole for all statutory damages to which they were entitled as a consequence of FAS' professional services error…").

Although Federated's memorandum of law assiduously avoids addressing the issue, the Professional Liability and Management Liability coverage parts contain different **Loss** definitions. To be sure, the **Loss** definitions in both coverage parts include common terms.[31] But in contrast to the Professional Liability coverage part's **Loss** definition, only the Management Liability coverage part's definition includes what Federated characterizes as the following "will not assert" language:

> the insurer will not assert that the portion of **Defense Costs**, settlement, or judgment in a **Claim** arising from an initial or subsequent public offering of an **Insured Entity's** securities constitutes uninsurable **Loss** due to the alleged violations of Section 11 and/or 12 of the Securities Act of 1933 as amended (including alleged violations of Section 11 and/or 12 of the Securities Act by a **Controlling Person**).[32]

In other words, *if* the Management Liability coverage part applies—*and* FAS paid the Tender Fund shareholders to resolve a **Claim** arising from an initial or subsequent public offering of an **Insured Entity's** securities due to the alleged violations of Section 12 of the Securities Act—Endurance would be precluded from asserting that the "alternative settlements" are uninsurable **Loss**.[33] But the "will not assert" language is irrelevant if the Management Liability coverage part does not apply.

---

[31] *See* Endurance Appx. Ex. 1, Endurance Policy, Management Liability Coverage Part § II(N); Professional Liability Coverage Part § II(D).

[32] *See id.* § II(N)(3)(a).

[33] Contrary to Federated's contention, Endurance's Head of Financial Lines did not confirm that "this provision is common in the market. Federated Br. at 19. In response to counsel's leading question regarding whether the provision was "common in the market," Mr. Santiago responded that "I think it's something that is asked for in the market." *See* Plaintiffs' Ex. 42, Tr. of Dep. of R. Santiago at 132:23-133:16.

### b.  The Management Liability coverage part does not apply.

Federated's memorandum of law contends that both insuring agreements—and thus, apparently, both **Loss** definitions—apply. According to Federated, the Tender Fund's April 19 demand to Federated triggers the Professional Liability coverage part and the shareholders' purported May 12 and May 15 demands trigger the Management Liability coverage part. For that latter position, Federated relies upon the Management Liability's Fund Coverage insuring agreement, which provides that the insurer " will pay on behalf of a **Fund** [i.e., the Tender Fund] all **Loss** which it becomes legally obligated to pay on account of any **Claim** first made against it during the **Policy Period** . . .".[34]

Federated's last-minute attempt to invoke the Management Liability's Fund Coverage insuring agreement fails for several reasons. **First**, it was FAS, not the Tender Fund, that paid the purported **Loss** for which the plaintiffs in this litigation seek coverage.[35] What amount could the Tender Fund possibly seek to recover from Endurance when the Tender Fund never paid a cent? **Second**, the Tender Fund is not a party to this lawsuit, which makes sense because it paid nothing toward the settlement and was not a party to those agreements. Even under Federated's argument, the Tender Fund was not "legally obligated to pay" any amount. Indeed, it would be extraordinarily odd for Federated to seek coverage on behalf of the very entity that has asserted a demand against it. **Third**, Federated's own complaint purports only to seek coverage under the Professional Liability coverage part. As the complaint's first paragraph alleges, "[t]his is an action for breach of contract, declaratory judgment, and bad faith arising from the Defendant Insurers' wrongful

---

[34] Federated Br. at 9; *see also* Endurance Policy, Management Liability Coverage Part, § I(F).
[35] Endurance's SUMF ¶¶ 93-94.

refusal to pay or reimburse the Insureds for *a professional liability Loss*."[36] There is no allegation in the complaint concerning an alleged Management Liability loss.

**Finally**, even if Federated could establish that the Tender Fund is entitled to Fund Coverage under the Management Liability coverage part, other policy provisions would bar coverage, notwithstanding the so-called "will not assert" language (relating solely to insurability of restitution damages under the Securities Act). In addition to the defenses Endurance asserts in its motion for summary judgment—that the "alternative settlement" amounts were not amounts that Federated (or the Tender Fund) were "legally obligated to pay" under the statutory scheme and in light of the statute-of-limitations, for example—at least two policy exclusions would preclude Fund Coverage here. The first such exclusion is the Investment in Securities Exclusion, which bars Fund Coverage for **Loss** on account of any **Claim** based upon, arising out of, or resulting from, investment in securities issued by an **Insured Entity**:

> The insurer shall not be liable under Insuring Agreement F. FUND COVERAGE of this Coverage Part for that portion of Loss on account of any **Claim**:.
>
> 5.        based upon, arising out of, or resulting from any actual or alleged investment in securities issued by an **Insured Entity**.[37]

As Federated alleges, the Tender Fund is an **Insured Entity**.[38] That **Insured Entity** issued the Tender Fund securities to the shareholders.[39] The shareholders' purported demands—even if they were made on Federated's instructions after it already had offered the "alternative settlement" payments—were based upon, arise out of, or result from their investment in those securities.[40]

---

[36] Federated Compl. ¶ 1 (emphasis added).

[37] *See* Endurance Appx.  Ex., 1, Endurance Policy, Management Liability Coverage Part, § III(B)(5).

[38] Plaintiffs' SUMF ¶¶ 102-103.

[39] Plaintiffs' SUMF ¶ 10.

[40] Endurance's SUMF ¶¶ 83-84, 87.

The second such exclusion barring Fund Coverage, at least if Federated's characterization of this case until now is correct, is the Professional Services Exclusion, which bars coverage for **Loss** on account of a **Claim** "for rendering of or failure to render services, including, but not limited to, **Professional Services**."[41] Again, as the first paragraph of Federated's complaint alleges, this dispute involves what Federated characterizes as "***a professional liability Loss***."[42] In short, if Fund Coverage did apply—and it does not for the reasons outlined above—the express terms of the policy exclusions would bar coverage. At the very least, these issues present material issues of disputed fact. Therefore, Federated's motion for summary judgment should be denied.

> ### c. Federated purposely conflates the two Loss definitions, failing to note that Professional Liability coverage part's "will not assert" language applies only to "civil penalties."

In a cursory dismissal of Endurance's arguments, Federated suggests that the Professional Liability coverage part precludes Endurance from asserting that restitution **Loss** under the Securities Act is uninsurable. As noted above, Federated contends that the Professional Liability coverage part applies to the Tender Fund's April 19 demand against Federated. Although Federated had always maintained, until now, that this was the only coverage part at issue, it obviously prefers the Management Liability's **Loss** definition because it contains what it characterizes as the "will not assert" language. Yet Federated misleadingly suggests that the Professional Liability coverage part includes the same language.[43] That is incorrect.

In contrast to the Management Liability coverage part's **Loss** definition, the Professional Liability coverage part's "will not assert" language is far narrower: it states that matters

---

[41] Endurance Appx. Ex., 1, Endurance Policy, Management Liability Coverage Part, § III(B)(7).

[42] Federated Compl. ¶ 1 (emphasis added).

[43] Federated Br. at 19 ("[T]he Primary policy's express "will not assert" language independently precludes that defense.")

uninsurable under the law are not **Loss** "provided that the Insurer shall not assert that *civil penalties* assessed against any **Insured** for non-knowing or non-willful conduct are uninsurable **Loss**."[44] "A 'civil penalty' is a 'fine assessed for a violation of a statute or regulation,' and as such are paid to the government, not to the opposing party or their counsel." *Willow Inn, Inc. v. Public Serv. Mut. Ins. Co.*, 399 F.3d 224, 237 (3d Cir. 2005) (quoting Black's Law Dictionary 1168 (8th ed. 2004)). Civil penalties are obviously not the same thing as uninsurable restitution or disgorgement. FAS did not pay anything to the government, let alone a civil penalty. Instead, it paid the "alternative settlement" amounts to Tender Fund shareholders in lieu of the statutory recission remedy under Section 12 of the Securities Act, based upon payments allegedly due under that remedy.[45] *See also SEC v. Cavanagh*, 445 F.3d 105, 117 (2d Cir. 2006) (explaining that disgorgement and rescission are remedial because they "simply deprive the wrongdoer of ill-gotten gains," where as a civil penalty is punitive). Therefore, the Professional Liability coverage part's "will not assert" provision is irrelevant here and Federator's motion for summary judgment should be denied.

### d. FAS's "alternative settlement" payments to the Tender Fund shareholders are uninsurable under Pennsylvania law.

Federated further argues that, in any event, there is "no basis in Pennsylvania public policy to recast" FAS's alleged "negligent performance of a professional engagement" as uninsurable.[46] But this wholly ignores the nature of the "alternative settlement" payments—whether or not Federated made them on the Tender Fund's behalf to avoid what would have been a baseless claim under the administrative services agreement. As addressed at length in Endurance's motion for summary judgment brief, under Pennsylvania law, and as a matter of common sense, rescission

---

[44] Endurance Appx. 1, Professional Liability Coverage Part § II(D) (italics added).
[45] Endurance's SUMF ¶¶ 60-61.
[46] Federated Br. at 19.

payments under Section 12 of the Securities Act—whereby Federated would have, in return for the securities previously issued, refunded monies improperly received from the shareholders—are not insurable damages. *See Central Dauphin School District v. American Casualty Co.*, 426 A.2d 94, 96 (Pa. 1981) (school district's return of tax money to its taxpayers collected by an unlawful tax was uninsurable); *see also Bank of the West v. Superior Court*, 833 P.2d 545, 554 (Cal. 1992) (there is no indemnity coverage where "[t]he [insured] is asked to return something he wrongfully received; he is not asked to compensate the plaintiff for injury suffered as a result of his conduct.").[47]

In this case, because the shareholders elected to keep their shares, the rescission remedy was not available, but Federated's rescission-remedy-based calculation resulted in FAS paying a portion of interest that would have accrued on the original consideration. Indeed, Federated represented that the "alternative settlement" payments reflected the statutory remedy."[48] Obviously, the return of the purchase price (to buy back the securities at the original price under a rescission remedy) would have been uninsurable because it simply returned the parties to their original position, as if the transaction had never occurred. Because any interest payments FAS or the Tender Fund would have been obligated to pay under the Securities Act were to disgorge or return the time-value-of-money benefits they realized in holding the shareholders' funds, those payments are likewise uninsurable. *See Central Dauphin School District*, 426 A.2d at 96. As a matter of law, Federated has failed to meet its burden to prove **Loss** because the "alternative settlement" payments were comprised of amounts uninsurable under the law pursuant to which the

---

[47] Endurance's SUMF ¶63-68.
[48] Endurance's SUMF ¶¶ 60-61.

Endurance Policy is construed and, therefore, Federated's motion for summary judgment should be denied.

### 2. Endurance did not waive, and is not estopped from raising, any other defenses to coverage.

Contrary to Federated's assertion, other than the policy's consent provision, which it agreed to waive, Endurance has not waived, and is not estopped from asserting, any coverage defenses. First, Endurance had no obligation to immediately assert each and every coverage defense it may assert. As the court held in *TIG Insurance Co. v. Tyco International Ltd.*, 919 F. Supp.2d 439, 458 (M.D. Pa. 2013), "it is the duty to defend that gives rise to the duty to reserve rights when defense of a claim is undertaken, and without such a duty an insurer has no obligation to issue a reservation of rights letter." *Id.*[49] Indeed, every case Federated cites to support its waiver/estoppel argument involves the duty to defend. It is undisputed, however, that Endurance had no duty to defend under the policy and did not assume the defense. Therefore, Endurance's supposed failure to state its coverage position to Federated's satisfaction cannot result in waiver.

Second, Federated cannot establish estoppel in any event. To prove estoppel, Federated must establish the following elements by "clear, precise and unequivocal evidence:"

(1) an inducement, whether by act, representation, or silence when one ought to

---

[49] *See, e.g., Beckwith Mach. Co. v. Travelers Indem. Co.*, 638 F.Supp. 1179, 1187 (W.D.Pa. 1986) ("It is hornbook law that *if an insurer assumes the insured's defense* without sending the insured a reservation of rights letter or bringing a declaratory relief action, the insurer will later be precluded from denying coverage") (emphasis added). In *Selective Way Ins. Co. v. MAK Servs., Inc.*, 232 A.3d 762 (Pa. Super. Ct. 2020), for example, the court determined that an insurer waived an exclusion after it defended the insurer **for eighteen months** before attempting to invoke the policy exclusion for the first time. As the court explained, an "insured loses substantial rights when he surrenders, as he must, to the insurance carrier the conduct of the case[,]" so an insurer may "be estopped from asserting a policy exclusion where it has lulled the insured into a sense of security to his detriment." *Id.* at 771, 771 n.7 (internal quotation marks omitted); *see also id.* ("Had [the insured] been fully and fairly informed, it could have at a minimum declined [the insurer's] empty offer to defend and retained representation to safeguard its own interests." (internal quotation marks omitted)).

speak, that causes one to believe the existence of certain facts;

(2) justifiable reliance on that inducement; and

(3) prejudice to the one who relies if the inducer is permitted to deny the existence of such facts.[50]

Federated has not identified and cannot identify *any* evidence, let alone "clear, precise and unequivocal evidence," to support its assertion that it somehow "relied on coverage."

Even assuming, *arguendo*, that Federated could establish inducement, Federated's reliance would not have been justifiable. That is because Endurance did not defend Federated and did, in fact, reserve rights. Nor can Federated establish that it was prejudiced by the supposed delay in issuing a coverage position, as discussed further below. Endurance agreed to waive consent as a defense to coverage so that Federated could protect its interests as it saw fit. In any event, the general rule is that "*prejudice may not be presumed*, it must be conclusively established in order to effect an estoppel." *Merchants Mut. Ins. Co. v. Artis*, 907 F.Supp. 886, 892 (E.D.Pa. 1995) (emphasis added).

Finally, and in any case, "the doctrine of waiver or estoppel cannot create an insurance contract where none existed."[51] "The rule is well established that conditions going to the coverage or scope of a policy of insurance, as distinguished from those furnishing a ground of forfeiture,

---

[50] *Chemical Bank v. Dippolito*, 897 F.Supp. 221, 224 (E.D.Pa. 1995) (citing *Zivari v. Willis*, 611 A.2d 293, 295 (Pa. Super. Ct. 1992); *see also Rock-Epstein v. Allstate Ins. Co.*, No. 07-2917, 2008 WL 4425059, at *4 (E.D. Pa. Sept 29, 2008); *Prime Medica Assocs. v. Valley Forge Ins. Co.*, 970 A.2d 1149, 1157 (Pa. Super. 2009); *Wasilko v. Home Mut. Cas. Co.*, 232 A.2d 60, 63 (Pa. Super. Ct. 1967) ("To work an estoppel, there must be such conduct on the part of the insurer as would, if the insurer were not estopped, operate as a fraud on some party who has taken or neglected to take some action to his own prejudice in reliance thereon. Accordingly, an insurer is not estopped to deny liability on a policy where the plaintiff was not misled by the defendant's conduct.") (*quoting* 16 Appleman, Insurance Law § 9088 at 626)).

[51] *See Wasilko*, 232 A.2d at 63 (citing *Donovan v. New York Cas. Co.*, 94 A.2d 570 (Pa. Super. 1953).

may not be waived by implication from the conduct or action of the insurer."[52] In other words, "[t]he doctrine of implied waiver is not available to bring within the coverage of an insurance policy, risks that are expressly excluded therefrom."[53] The **Loss** definition goes to the scope of coverage. Therefore, Federated's assertion that supposed waiver or estoppel entitle it to unbargained-for expansion of coverage, *gratis*, fails as a matter of law.[54]

### 3. The windfall payment to shareholders was not reasonable.

Even if the restitutionary payments to the shareholders were covered **Loss**—and they are not—Federated cannot meet its burden to establish on summary judgment that the settlements were reasonable as matter of law. To determine that a settlement is acceptable, the court must "satisfy [itself] that the negotiations were 'done in good faith and the settlement was fair and reasonable.'" *American Intern. Underwriters Corp. v. Zurn Industries, Inc*., 771 F.Supp. 690, 701 (W.D.Pa. 1991) (*quoting Alfiero v. Burks Mut. Leasing Co*., 500 A.2d 169, 172 (Pa. Super. 1985)). Federated cannot meet that burden here, for the reasons addressed at length above, because: (1) the shareholders had suffered no damages, were pleased with the Tender Fund's performance, and were not interested in rescission, except as an "arbitrage opportunity"[55]; (2) the statute of limitations barred any recovery under the rescission remedy[56]; (3) FAS, which purportedly paid the shareholders on the Tender Fund's behalf, had no obligation to do so under the Services

---

[52] *See Antone v. New Amsterdam Cas. Co.*, 6 A.2d 566 (Pa. 1939); *see also Stevanna Towing, Inc. v. Atl. Specialty Ins. Co.*, No. 15-cv-01419, 2021 WL 2434589, at *3 (W.D. Pa. June 15, 2021) ("In Pennsylvania, the doctrine of waiver or estoppel cannot create coverage where none existed. Thus, the doctrine of estoppel may not be used to affirmatively expand coverage under the insurance policies where none existed."); *Gemini Ins. Co. v. Meyer Jabara Hotels LLC*, 231 A.3d 839, 851 (Pa. Super. Ct. 2020).

[53] *Wasilko*, 232 A.2d at 63 (citation omitted).

[54] *Zuckerman v. Nat'l Union Fire Ins. Co.*, 495 A.2d 395, 406 (N.J. 1985).

[55] Endurance's SUMF ¶¶ 55-56.

[56] Endurance's SUMF ¶¶ 24-25.

Agreement with the Tender Fund[57]; and (4) in a collusive effort to manufacture coverage, FAS instructed the shareholders to make the written "demands" to trigger coverage. FAS's substantial payment well beyond any possible liability under the law was a business accommodation to minimize further embarrassment for its administrative error, which resulted in no harm to its customers. At the very least, taking all facts and inferences in the light most favorable to Endurance as the non-moving party, this issue presents disputed issues of material fact for the jury.[58] Therefore, Federated's motion for summary judgment should be denied.

### D. Federated is not entitled to judgment as a matter of law on its claims for breach of the implied covenant of good faith and fair dealing (Count III) and bad faith under 42 Pa.C.S. § 8371 (Count IV).

Federated has not even remotely established by clear and convincing evidence that Endurance acted in bad faith as a matter of law. On the contrary, as addressed in Endurance's motion for summary judgment brief, Federated's claims for bad faith fail as a matter of law. To prevail on bad faith, an insured "must show by clear and convincing evidence that the insurer (1) did not have a reasonable basis for denying benefits under the policy and (2) knew or recklessly disregarded its lack of a reasonable basis in denying the claim." *Post v. St. Paul Travelers Ins. Co*., 691 F.3d 500, 522 (3d Cir. 2012) (emphases added) (quoting *Condio v. Erie Ins. Exch*., 899 A.2d 1136, 1143 (Pa. Super. Ct. 2006)).[59] *See* 42 Pa.C.S. § 8371. More than "mere negligence or bad judgment," a finding of bad faith "**requires evidence so clear, direct, weighty and convincing**

---

[57] Endurance's SUMF ¶¶ 83-84, 87.

[58] Federated references the report of its SEC expert, Andrew Donahue. Federated Br. at 16. Endurance's securities expert, Andrew Jennings, has explained why the Securities Act far from compelled the resolution here under the circumstances. *See* Endurance Supp. Appx. 2, Report of Andrew Jennings at 18.

[59] The "clear and convincing" standard applies to claims for breach of the covenant of good faith and fair dealing, too. *Higman v. State Farm Mutual Auto. Ins. Cos*, 2018 WL 5255221 at *8 (W.D. Pa. Oct. 22 2018).

as to enable a clear conviction, without hesitation, about whether or not the defendants acted in bad faith." *NVR, Inc. v. Motorists Mut. Ins. Co.*, 371 F. Supp. 3d 233, 255 (W.D. Pa. 2019) (citing *Post*, 691 F.3d at 523 (emphasis added)).

Federated cannot establish by clear and convincing evidence that Endurance's coverage position is unreasonable, let alone that it knew of or recklessly disregarded the supposed unreasonableness of its position. Indeed, if this Court concludes that Endurance's "denial" of coverage was correct, there can be no bad faith as a matter of law. *See USX Corp. v. Liberty Mut. Ins. Co.*, 444 F.3d 192, 202 (3d Cir. 2006) ("[W]e will affirm the grant of summary judgment in favor of [insurer] . . . because [insured's] bad faith claim necessarily fails in light of our determination that [insurer] correctly concluded that there was no potential coverage under the policy."); *see also The Frog, Switch & Mfg. Co. v. Travelers Ins. Co.*, 193 F.3d 742, 751 n. 9 (3d Cir. 1999) (affirming district court which held that, under Pennsylvania law, "bad faith claims cannot survive a determination that there was no duty to defend, because the court's determination that there was no potential coverage means that the insurer had good cause to refuse to defend."); *Rice Enterprises, LLC v. RSUI Indemnity, Inc.,* 705 F.Supp. 3d 460, 470 (W.D. Pa. 2023) ("Resolution of a coverage claim on the merits in favor of the insurer requires dismissal of a bad faith claim premised on the denial of coverage, because under the circumstances the insurer necessarily has a reasonable basis for denying benefits.") (*quoting Gold v. State Farm and Cas. Co.*, 880 F.Supp.2d 587, 597 (E.D. Pa. 2012), *aff'd* 2025 WL 1248813 (3d. Cir. April 30, 2025).

Even if Endurance's coverage determination was unreasonable—and it was not—there is no evidence, clear and convincing or otherwise, that it knew, or recklessly disregarded, its unreasonableness. As addressed at length in Endurance's motion for summary judgment,

Federated's demands for coverage involved voluntary payments arising out of a novel and unusual transaction involving complex areas of securities law.

On that basis alone, this Court should deny Federated's motion for judgment as matter of law. Yet, to support its position that the undisputed record—even when viewed in the light most favorable to Endurance—somehow establishes evidence "so clear, direct, weighty, and convincing as to enable a clear conviction, without hesitation" that Endurance acted in bad faith, Federated alleges that Endurance's claims-handling practices violated the Unfair Insurance Practices Act ("UIPA") and the Unfair Claim Settlement Practices Regulations ("UCSP"). According to Federated, those alleged violations arose because Endurance's investigation and responses were too slow.

As an initial matter, violations of the UIPA and UCSP, "which are designed to be implemented and enforced by the Insurance Commissioner of Pennsylvania," are irrelevant to the two-part test set forth above. *Oehlmann v. Metropolitan Life Ins. Co.*, 644 F.Supp.2d 521, 531 (M.D. Pa. 2007) ("that an insurer may have allegedly violated a regulatory standard is irrelevant to our analysis.") (citing *Dinner v. United States Auto. Ass'n Case. Ins. Co.*, 29 Fed.Appx 823 (3d Cir. 2002)); *see also Kunsman v. Metropolitan Direct Property and Cas. Co.,* No. 17-4619, 2018 WL 3097013, *4 (E.D. Pa. June 26, 2018) ("This two-pronged test effectively replaced the court's analysis of UIPA or UCSP to determine bad faith."); *Sadel v. Berkshire Life Ins. Co. of Am.*, No. 09-612, 2011 WL 292239, at *12 n. 11 (E.D.Pa. Jan. 31, 2011) ("[T]he United States District Courts in Pennsylvania have held that references to standards under UIPA are irrelevant in … Pennsylvania where the Pennsylvania Superior Court has established a definitive two prong test for determining bad faith . . . ."); *see also Purcell v. State Farm Mut. Auto. Ins Co*., No. 11-7004, 2012 WL 425005 (E.D. Pa. Feb. 10, 2012) ("[I]nsofar as Plaintiffs' claim for bad faith is based

upon alleged violations of the UIPA, it fails as a matter of law."); *Moss Signs, Inc. v. State Auto. Mut. Ins. Co.*, No. 08-167, 2008 WL 892032, at *5 (W.D.Pa. Apr. 2, 2008) ("allegations that an insurer violated the UIPA and UCSP are irrelevant to a court's consideration of whether the insurer's actions also violated § 8371 because the Pennsylvania Superior Court established a definitive two-prong test for answer that question . . . ."). [60] Therefore, Federated's argument that Endurance's supposed violations of the UIPA and UCSP establish bad faith as a matter of law fail as a matter of law.

In any event, mere delay does not constitute bad faith. *Rowe v. Nationwide Ins. Co.*, 6 F. Supp. 3d 621, 634 (W.D. Pa. 2014), *aff'd*, 234 F.3d 1265 (3d Cir. 2000) ("[A] long period of time between demand and settlement does not, on its own, necessarily constitute bad faith .... [I]f delay is attributable to the need to investigate further or even to simple negligence, no bad faith has occurred.") (quoting *Kosierowski v. Allstate Ins. Co*., 51 F. Supp.2d 583, 588-89 (E.D. Pa. 1999)); *Williams v. Hartford Cas. Ins. Co.*, 83 F. Supp. 2d 567, 572 (E.D. Pa. 2000) (finding no bad faith when an insurer delayed its investigation of insured's claim when an insurer delayed its investigation of insured's claims for **fifteen months**); *Segall v. Liberty Mut. Ins. Co.*, No. 99-6400, 2000 WL 1694026, at *2 (E.D. Pa. Nov. 9, 2000) ("The Third Circuit . . . f[ound] that a period of approximately **thirteen months** between the initiation of a UIM claim and its settlement did not constitute bad faith absent aggravating factors.") (citing *Quaciari v. Allstate Ins. Co*., 998 F. Supp. 578, 583 (E.D. Pa. 1998), aff'd without opinion, 172 F.3d 860 (3d Cir. 1998)).

---

[60] Moreover, "the UIPA attempts to prevent and regulate violations systemic in the insurance industry, as only violations committed 'with a frequency that indicated a general business practice' are sanctionable." *Oehlmann*, 644 F.Supp.2d at 531; *see also Bernstein v. Geico Cas. Co.*, No. 19-1899, 2020 WL 1308226, *4 n.3 (E.D.Pa. March, 19, 2020) ("Because Plaintiffs only identify an isolated instance of Defendant's alleged bad faith conduct in their argument that Defendant violated both statutes, neither is persuasive in showing that Defendant lacked <u>any</u> reasonable basis in delaying Plaintiff's claim.")

More important, there was no unreasonable delay in Endurance's investigation or responses. As summarized in Endurance's motion for summary judgment memorandum of law, the entire course of events—from Federated's first request for "costs of correction" coverage on April 10, 2023 through Endurance's "denial" of coverage on June 12, 2023—spanned a period of just over two months.[61] **Moreover,** only three weeks passed between the time Federated requested reimbursement of the settlement payments on May 23 and the time Endurance issued its June 12 letter stating that there was no coverage for those payments.[62] Throughout the course of the matter in the meantime, Endurance's claims handler, Lisa Jacobson, remained in constant communication with Federated and its coverage counsel, Reed Smith, providing timely acknowledgments and responses to Reed Smith's near-constant barrage of updates, requests, and demands. Even a cursory summary of the relevant timeline confirms this:

- On **April 6,** within four business days of receiving Reed Smith's initial "Notice of Circumstances"—which is not a demand or request for coverage under the policy—Ms. Jacobson responded that she had been assigned to handle the matter and proposed a call to discuss it.[63]

- When Federated pushed for an immediate call, Ms. Jacobson agreed, even though she would be on vacation at the time: "I am happy to take the call from vacation."[64]

- In the meantime, **on April 7**, in response to Reed Smith's separate April 6 request, Ms. Jacobson immediately signed a confidentiality agreement, which Reed Smith said was necessary for Federated to provide certain documents.[65]

- On Monday, **April 10,** Ms. Jacobson participated in a discussion with Reed Smith, the broker, and other Federated representatives, in which Federated provided information regarding the "administrative error," stated that Federated intended to seek "costs of

---

[61] Endurance Br. at 33-34.
[62] *Id.*
[63] Endurance's SUMF ¶ 38.
[64] Endurance Appx. Ex. 16, ENDURANCE004155.
[65] Endurance Supp. Appx. Ex. 6.

correction" coverage, and represented that "[a]ctual costs of correction [were] 150K to date."[66]

- After that call, Ms. Jacobson informed Reed Smith that "[w]e will wait the written notice you are planning to submit under Section I.B. of the PL Coverage part. Following receipt and review of same, we will to issue our coverage position."[67]

- The same day, Reed Smith forwarded a letter requesting "Costs of Correction Under Professional Liability Coverage Part, Insuring Agreement I.B" stating that an "urgent response is required . . . **prior to any Claim being made in connection therewith**" but failing to identify any costs or expenses incurred.[68]

- On Wednesday, **April 19**, Federated's broker emailed Ms. Jacobson to report that "[t]here have been some developments that we would like to run by [Endurance] and the other insurers" and requested a call "tomorrow or Friday."[69] Ms. Jacobson immediately responded that she was available that Friday and the broker, in turn, responded that "we will set up for Friday afternoon."[70]

- In the meantime, on Thursday, **April 20**, Reed Smith forwarded Goodwin Proctor's April 19 letter on behalf of the Tender Fund, asserting that it was a written demand that "triggers the coverage afforded under Insuring Agreement I.A. of the Policy's Professional Liability Coverage Part," apparently rendering the pre-claim request for "costs of correction" coverage moot.[71]

- Five days later, in an **April 25** email to Reed Smith and Federated, Ms. Jacobson requested information "to assist in my review of this matter" and "to best document the file and understand what transpired," "including a copy of the alternative proposal to be discussed with the SEC."[72]

- On Thursday, **April 27**, Reed Smith purported to respond to Ms. Jacobson's requests, providing more than 200 pages of documents.[73]

- The next Tuesday, **May 2**, Ms. Jacobson participated in another call with Reed Smith and Federated.[74] In a letter to Ms. Jacobson the same day, Reed Smith purported to update Endurance regarding "two settlement offers" Federated was contemplating and requesting

---

[66] Endurance's SUMF ¶¶ 39-44.
[67] Endurance Appx. Ex. 16, ENDURANCE004155.
[68] Endurance Appx. Ex. 22.
[69] Endurance Supp. Appx. Ex. 7.
[70] Endurance Appx. Ex. 22.
[71] Endurance Appx. Ex. 29.
[72] Endurance SUMF ¶69; Endurance Appx. Ex. 30.
[73] Endurance SUMF ¶72; Endurance Appx. Ex. 31.
[74] Endurance Appx. Ex. 32, FHI00006752.

that Endurance agree that either would be covered or, barring that, consent that the insureds could take reasonable steps to protect their own interests, among other things.[75]

- In a **May 3** email to Reed Smith, Ms. Jacobson responded: "Courtney, It was nice speaking with you yesterday, and thank you for your letter. As our review and investigation remain ongoing, in order to allow the Insureds to act in their best interest, [Endurance] agrees to waive lack of consent as a coverage defense to the Insured's course of action to remedy its failure to register shares (i.e., whether it proceeds with proposal 1 or proposal 2). We continue to reserve all other rights under the Policy, at law and/or equity." [76]

- The same day, Reed Smith expressed appreciation for Ms. Jacobson's "attention and careful consideration of this claim."[77]

- Six days later, in a **May 9** email to Ms. Jacobson, Reed Smith requested "an estimated time for receipt of Endurance's coverage position, so that we can respond to positions from the excess carriers, such as the correspondence from CNA below [in which CNA stated that it would need to review Endurance's coverage determination before it could offer its own coverage determination]." Ms. Jacobson responded the same day that "[o]ur investigation remains ongoing" and that Endurance "continue[s] to reserve all rights in the interim."[78]

- After Reed Smith immediately followed up, pushing again for an estimate on when Endurance "expect[ed] to issue the coverage opinion," Ms. Jacobson answered: "We received over 200 pages of documents on April 27th, about a week and a half ago, and our review remains ongoing. Further, on May 3rd we agreed to waive lack of consent as a coverage defense in order to allow the Insureds to defend as they see fit. We will issue a coverage position in due course."[79]

- In a **May 10** email, Reed Smith reported that "[t]he SEC staff confirmed yesterday evening that the SEC will not object to Federated Hermes pursing the alternative settlement offer, to compensate shareholders affected by its failure to register Tender Fund shares, in a manner that will not cause the Fund to liquidate and that will not delay the affected shareholder receipt of compensation due to the Fund's liquidity status."[80]

- Ms. Jacobson responded the same day that "[t]his is the first we are hearing reference to a settlement. I believe a call would be helpful so I can better understand the dynamic . . ."[81] Of course, at this time, a settlement with the shareholders would have been surprising since they had not asserted a demand against Federated or the Tender Fund.

---

[75] Federated's SUMF ¶ 150.
[76] Endurance's SUMF ¶75.
[77] *Id*. ¶76.
[78] *See* Federated Ex. 48.
[79] *Id.*
[80] Endurance's SUMF ¶78; Federated Ex. 48.
[81] Federated Ex. 48.

- On **May 12**, Ms. Jacobson clarified that, rather than settlement, "we understood our discussions were around how Insured was deciding to effectuate the statutory remedy for failing to register."[82]

- In what this Court has characterized as "fighting words,"[83] Reed Smith immediately countered that "Endurance's failure to respond or give any guidance has increased damages by over $70,000 per day, impeded the response to the Fund, and put Federated Hermes in a bad situation with the SEC who discovered this error and wants it fixed. At this point, Endurance has now waived and is estopped from taking any defense as to either remedy."[84]

- On **May 12** and **May 15**, the affected Tender Fund shareholders sent the requested "written demands" to Federated Hermes and Federated entered settlement agreements with those shareholders days later.[85]

- On **May 23**, Reed Smith demanded that Endurance and Continental reimburse "losses" incurred in connection with the settlement agreements.[86]

- Three weeks later, in a **June 12** response letter, outside counsel for Endurance, Michael Perlis, stated Endurance's initial coverage determination that the "alternative settlement" payments were not **Loss**,[87] which prompted Federated to file its lawsuit in this Court.

Thus, the record demonstrates that, from the outset, Endurance was engaged, responsive, and diligent in its investigation, participating in multiple telephone discussions with the broker, the insureds, and Reed Smith,[88] requesting information,[89] reviewing voluminous documents provided,[90] and performing independent investigation.[91] Additionally, Endurance retained and

---

[82] *Id.*

[83] *See* Endurance Supp. Appx. Ex. 8, December 20, 2024 Transcript of Discovery Hearing before Honorable Kezia O.L. Taylor at 6.

[84] Federated Ex. 48.

[85] Endurance SUMF ¶¶83-90, 93, 100.

[86] Endurance SUMF ¶104.

[87] Endurance SUMF ¶106.

[88] Endurance SUMF ¶¶38-44,

[89] Endurance SUMF ¶69.

[90] Federated Ex. 48.

[91] *See* Endurance Supp. Appx. Ex. 4,  Tr. of Dep. of L. Jacobson 114:12-17 ("I did use Google in my investigation of the applicable securities laws and to get a better understanding of what they were and the remedies they're under, but I may not have done that day one. That was probably done, you know, throughout the life of investing the claim."); *id*. 121: 6-22 ("I think in the course of handling this file, I did a lot of research and, you now, engaged specific counsel to get a better understanding of this type of violation . . . .")

consulted with securities counsel to better understand the underlying securities issues[92] and then, only after Reed Smith accused it of prejudicing Federated, consulted with coverage counsel.[93]

Nothing about Endurance's responses and investigation prejudiced Federated. Although Reed Smith has repeatedly asserted that Endurance's supposed delay somehow prevented Federated from mitigating loss arising from a potential claim, discovery in this matter establishes that that representation is false for at least three reasons. **First**, to remedy its failure to register, Federated filed its public rescission offer on April 10, 2023, without even seeking Endurance's advance consent or approval.[94] It then proceeded to engage in discussions with the SEC and the shareholders to attempt to resolve the issue, again without seeking Endurance's advance consent or approval.[95]

**Second**, Federated has conceded that any remedy—whether it was rescission or the "alternative settlement" proposal—needed the approval of both the SEC and the shareholders and that statutory interest would continue to accrue in the meantime.[96] The undisputed record establishes that the SEC did not "approve" the "alternative settlement" until May 9, 2023[97] and that the shareholders did not formally accept that settlement offers until several days later.[98] Meanwhile, as soon as Federated requested it, in early May, Endurance agreed to waive the policy's consent provision so that Federated could take any steps that it deemed necessary to

---

[92] *See* Endurance Supp. Appx. Ex. 8, Tr. of Dep. of L. Jacobson at 125:18-126:2 ("[W]e retained securities counsel to help us better understand and be educated on the statute and the remedies thereunder . . . It was Baker Hostetler, it was Doug Green, and there was a fund counsel as well, his name is escaping me, but I know he joined one of our conference calls.").

[93] Endurance SUMF ¶¶ 38-39, 59, 62, 69.

[94] Endurance SUMF ¶ 45.

[95] Endurance Appx. Ex. 16, ENDURANCE004155.

[96] Endurance SUMF ¶ 59.

[97] Endurance SUMF ¶ 78.

[98] Endurance SUMF ¶ 101.

protect its interests without first seeking Endurance's advance consent.[99] Federated entered settlements with the shareholders within days of the SEC's "approval."[100] In the meantime, interest continued to accrue regardless of what Endurance did. Endurance had no obligation to provide advance acknowledgment—before Federated had even incurred any alleged **Loss** resulting from a **Claim**—that coverage might exist under any of the still-hypothetical options under considerations. Even if it were appropriate for an insured to game insurance coverage by choosing a remedy based solely upon whether or not it was covered—and of course that would be tantamount to insurance fraud[101]—Endurance agreed to waive the policy's requirement that Federated seek its advance consent (without waiving any other coverage defenses) so that Federated could defend itself as it deemed appropriate.

**Third**, the policy did not require Endurance to provide pre-claim coverage for so-called "costs of correction" coverage. The insuring agreement that Federated maintains entitled it to "costs of corrections" coverage—Section I(B) of the Professional Liability Coverage Part—provides that "the insurer *may* pay costs and expenses incurred by the **Insured** with the Insurer's written consent to mitigate loss or otherwise compensate any client of the **Insured** *prior to any* ***Claim*** *being made*…."[102] In other words, Endurance is not required to pay costs and expenses, but it *may* do so to mitigate loss before a **Claim** is made.[103] Even if Endurance had been required to

---

[99] Endurance SUMF ¶ 75.

[100] Endurance SUMF ¶ 101.

[101] *See* Endurance  Supp. Appx. Ex. 8, Tr. of Dep. of L. Jacobson at 280:2-8 ("As I mentioned, we were pressured for a long time to choose option A or B, which was odd as it's not our decision how the insured re solves a matter, and we -- it doesn't work that way. You don't choose -- you don't decide, oh, I'm going to  resolve something like this because it's covered. That's insurance fraud.")

[102] Endurance SUMF ¶7 (italics added).

[103] *See A. Scott Enterprises, Inc. v.* City of Allentown, 142 A.3d 779, 788-89 (Pa. 2016) (the General Assembly used the term "may" to connote that recording was a discretionary or option act).

pay "costs and expenses"—and it was not—Federated never identified any such costs and expenses that exceeded its self-insured retention.[104] Moreover, it was not unreasonable for Endurance to conclude that any potential pre-claim coverage issue under Section I(B) was moot ten days after Federated's request, when Federated forwarded the April 19 Goodwin Proctor letter, which Reed Smith characterized as a **Claim** triggering the policy's Professional Liability coverage part.[105] Tellingly, Federated's entire "costs of correction" argument ignores the policy terms and instead relies upon its characterization of the "basic purpose of this coverage," which is based upon the language from other policies with completely different terms.

In any case, contrary to Federated's assertions, Endurance did not "ignore" Federated's request for so-called "costs of correction" coverage. As demonstrated above, Endurance was in near-constant communication with Reed Smith and Federated throughout the course of the fast-moving and fast-changing developments. Indeed, Ms. Jacobson testified that Endurance's response included multiple telephone discussions with Reed Smith and Federated:

> Q.       Did you respond to the request for Cost of Correction coverage?
>
> A.       Yes, we did. We had multiple phone calls and asked for more information. When your words, not policy words, were asked for a cost – when we were asked – excuse me. Let me rephrase. When the insured via your letter asked for, quote, Cost of Correction coverage, which, again, is not a policy term, yep.
>
> Q.       And did you ever respond to Cost of Correction coverage so that the Tender Fund could compensate the shareholders who had been sold unregistered shares?
>
> MR. CARLSON: Objection to form.

---

[104] Endurance SUMF ¶105.

[105] Endurance SUMF ¶68; Endurance Appx. Ex. 29. Federated now asserts that "[t]he Claims materialized because Endurance stayed silent when its written consent was required for the Insureds to 'mitigate loss' prior to any **Claims**." Federated Br. at 29. But, again, Endurance agreed to waive consent as a defense as soon as consent was requested.

A.    Yes. Again, I think we can just agree for purposes of all three answers the reference to the Costs of Correction coverage under the policy is the words used in your correspondence, they're not actually words used in the policy, but we did – we were incredibly responsive, had multiple calls with you, with Damian [the broker], with George [Magara] who was the general counsel of Federated, and exchanged many emails. We had – we did issue a coverage position and prior to that, we did allow the insured to properly defend itself in the way that it sees fit as this is a non-duty to defend policy and we agreed not to raise consent as a coverage defense.[106]

Federated cites Endurance's "Head of Financial Lines," Ray Santiago,  for its contention that "[t]here is no dispute Endurance delayed."[107] Mr. Santiago is a senior executive at Endurance who testified that he had no direct involvement in underwriting the policy or handling the claim. Nor had he ever read the policy.[108] His limited involvement in the matter arose at the "end of May 2023," when Federated's broker contacted him about a "disputed claim."[109] Mr. Santiago attempted to address Federated's concerns and, after Reed Smith threatened litigation, attempted to explore whether a resolution was possible.[110] Contrary to Federated's assertion, Mr. Santiago never conceded that Endurance's investigation involved an improper delay. Instead, he explained that the matter involved a complicated fact pattern and acknowledged only that Federated wanted a faster response:

THE WITNESS:    Again, this was a unique situation. In the normal course, we should be responding. This was again, a complicated, unique situation.

***

Q.    What was complicated about it?

A.    Trying to understand the fact pattern here is my understanding. Obviously, I'm not handling the claim. . . It was moving fast. Right? You had the SEC

---

[106] *See* Endurance Supp. Appx. Ex. 8, Tr. of Dep. of L. Jacobson at 146:11-147:14.
[107] Federated Br. at 31.
[108] *See* Endurance Supp. Appx. 9, Tr. of Dep. of R. Santiago at 33:3-6, 63:7-10, 81:16-18, 99:5-7.
[109] *Id.* 63: 16-18.
[110] *Id*. 130-131.

in there. There were a lot of constituencies, as I understood it, and my understanding was that initially, you know, we were absorbing the information.

Q.    You were absorbing the information or you were absorbing the fact that there was a big loss that you would have to pay out under the policy?

***

A.    We were absorbing the information. We pay claims, cover claims, that's what we do, and we don't hide behind that responsibility. We are trying to understand the situation so we can respond appropriately, and whether that didn't work out in somebody's time frame, that's unfortunate, but again, I think we were endeavoring to try to do what's right. That's how we conduct ourselves.[111]

In short, Mr. Santiago—who, again, had no direct knowledge of or involvement in the claims-handling—simply acknowledged that Federated thought Endurance's response took "much longer than expected."[112] He never acknowledged or conceded that Endurance's took too long under the circumstances. Under these facts, particularly when viewed in the light most favorable to Endurance as the non-moving party, no reasonable jury could find by clear and convincing evidence that Endurance lacked *any* reasonable basis for the timing and scope of its responses.

## IV.    CONCLUSION

For the foregoing reasons, Federated's motion for summary judgment under Federal Rule of Civil Procedure 56 should be denied. Viewing the facts in the light most favorable to Endurance as the non-moving party, those counts fail as a matter of law. The breach of contract and

---

[111] *See* Endurance Supp. Appx. Ex. 9, Tr. of Dep. of R. Santiago at 99:4-25-100:1-2.

[112] Federated also contends that its "expert," Mark S. Goracy, "found 'no coverage analysis documented in Endurance's claim file' and no 'claim notes, except for two calls with Federated and the insurance tower.'" Marc Mayerson, Endurance's rebuttal expert, disagreed, however. As Mr. Mayerson's report explains, Mr. Goracy improperly construes "claim file" to mean solely a "claim-diary system." Under the NAIC model regulations Mr. Goracy cites, "'Claim File' means any retrievable electronic file, paper file or combination or both." Endurance Supp. Appx. 10, Expert Report of Marc S. Mayerson, ¶ 138.

declaratory judgment counts (Counts I and II) fail as a matter of law because there is nothing in the record that establishes a Loss in excess of the applicable self-insured retention. Regarding Counts III and IV, Federated has not met its burden to prove by *clear and convincing evidence* that Endurance (1) lacked a reasonable basis for denying benefits under the policy, and (2) knew or recklessly disregarded its lack of a reasonable basis in denying the claim. The undisputed facts of record confirm that Endurance's conduct was reasonable (and certainly not reckless) as a matter of law.

HANGLEY ARONCHICK SEGAL PUDLIN
& SCHILLER

By:  */s/ Ronald P. Schiller*

Dated:  November 17, 2025

Ronald P. Schiller
Michael R. Carlson (*pro hac vice*)
Lily K. Huffman (*pro hac vice*)
Christopher J. Mauro (*pro hac vice*)
One Logan Square, 27th Floor
Philadelphia, PA 19103
(215) 568-6200
rschiller@hangley.com
mcarlson@hangley.com
lhuffman@hangley.com
cmauro@hangley.com

*Attorneys for Defendant Endurance American Insurance Company*

## CERTIFICATE OF SERVICE

I, hereby certify that on the 17th of November 2025 a true and correct copy of the foregoing Memorandum of Law in Opposition to Plaintiffs' Motion for Summary Judgment has been filed with the Clerk for the United States District Court for the Western District of Pennsylvania and was served upon all parties of record via the Court's ECF system.

*/s/ Ronald P. Schiller*
Ronald P. Schiller