IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

FEDERATED ADMINISTRATIVE :
SERVICES and FEDERATED HERMES, : C.A. No. 2:23-cv-01239-WSS
INC., :
   Plaintiffs, :
  v. :
ENDURANCE AMERICAN INSURANCE :
COMPANY and CONTINENTAL :
CASUALTY COMPANY, :
   Defendants. :
    :
    :

## ENDURANCE AMERICAN INSURANCE COMPANY'S ANSWER TO PLAINTIFFS' STATEMENT OF MATERIAL FACTS

In accordance with Local Rule 56.C.1., Defendant, Endurance American Insurance Company ("Endurance") submits the following in response to Plaintiffs' Concise Statement of Material Facts pursuant to Local Rule of Civil Procedure 56.B.1.

## I. ANSWER TO PLAINTIFFS' STATEMENT OF FACTS

1. Federated Hermes, Inc. is a publicly traded company regulated by the U.S. Securities and Exchange Commission ("SEC"). *See* Federated Hermes, Inc., Annual Report (Form 10-K) (Feb. 28, 2025); **Exhibit 1**, March 28, 2025 Deposition of Lisa Jacobson ("Jacobson Tr."), at 101:3-5.

**ANSWER:** Admitted.

2. The Federated Hermes Project and Trade Finance Tender Fund (the "Tender Fund"), is a closed-end mutual fund within the Federated Hermes complex. *See* **Exhibit 2**, FHI00013719; **Exhibit 3**, April 9, 2025 Deposition of George Magera ("Magera Tr."), at 17:2-18:17.

**ANSWER**: Denied as stated. The Tender Fund is a Federated Hermes, Inc. ("Federated

Hermes") investment company and is a continuously offered, non-diversified, closed-end fund. *See* Endurance's Appendix in Support of Defendants Motion for Summary Judgment and Concise Statement of Undisputed Material Facts ("Endurance Appx."), Ex. 17, ENDURANCE003583-3634.

3.      Federated Administrative Services ("FAS") is a subsidiary of Federated Hermes. Exhibit 2, at FHI00013752; Exhibit 4, at FHI00001281. FAS is the Tender Fund's administrator and provides administrative services to the Tender Fund. See Exhibit 2, at FHI00013752.

**ANSWER**: Admitted.

4.      K&L Gates LLP ("K&L Gates") is outside counsel for Federated Hermes and the Tender Fund. *See* **Exhibit 5**, at ENDURANCE004040; **Exhibit 3**, Magera Tr. at 96:2-3.

**ANSWER**: Admitted.

5.      In 2023, Federated Hermes purchased a primary professional and management liability insurance policy ("Primary Policy") from Endurance American Insurance Company ("Endurance"). *See* **Exhibit 6**, ENDURANCE000022.

**ANSWER**: Admitted in part; denied in part. Admitted that Endurance issued a Manuscript Primary Professional and Management Liability Insurance Policy, No. FIP10007848907, to Federated Hermes, for the October 1, 2022 to October 1, 2023 policy period (the "Endurance Policy"). *See* Endurance Appx. Ex. 1, Endurance Policy, Declarations. The Endurance Policy provides $10 million limits and sits above various retentions, including a $2.5 million retention for each **Claim**[1] under the professional liability coverage part. *Id*. Declarations, Item 3 and 4. It is denied that the policy was purchased in 2023; by its terms, the policy was issued in 2022. The

---

[1] Bold terms are defined in the Endurance Policy.

Endurance Policy is in writing and speaks for itself, and Endurance denies any characterization of the policy contrary to its express terms.

6.    In 2023, Federated Hermes purchased excess insurance policies from several insurers, including Continental Casualty Company ("Continental" and together with Endurance, "Insurers") (the "Excess Policy"). *See* **Exhibit 7**, CCC_01103.

**ANSWER**: Admitted in part; denied in part. Continental issued an Excess Liability Insurance Policy to Federated Hermes, No. 596617901, for the October 1, 2022 to October 1, 2023 policy period (the "Continental Excess Policy"). *See* Exhibit A to the Motion of Defendant Continental Casualty Company for Summary Judgment; Ex. 2, Continental Excess Policy, Declarations. It is denied that the policy was purchased in 2023; by its terms, the policy was issued in 2022. The Continental Excess Policy is in writing and speaks for itself, and Endurance denies any characterization of the policy contrary to its express terms.

7.    The Excess Policy generally follows the terms and conditions of the Primary Policy. *See e.g.*, **Exhibit 7**, at CCC_01106.

**ANSWER**: Admitted in part; denied in part. Admitted that the Continental Excess Policy provides "follow-form" coverage with respect to the Endurance Policy (*i.e.,* in accordance with the terms and conditions of the followed Endurance Policy) but denied to the extent that the Continental Excess Policy specifically provides different coverage as denoted in the policy. *See* Exhibit A to Continental Motion, Continental Excess Policy, §I. The Endurance Policy and Continental Excess Policy are in writing and speak for themselves, and Endurance denies any characterization of the policies contrary to their express terms.

8.     Pursuant to an Agreement for Administrative Services ("Administrative Services Agreement"), FAS agreed to "[p]repare and file with the Securities and Exchange Commission (the "SEC") and the appropriate state securities authorities: (i) the registration statements for the [Tender Fund] and the [Tender Fund's] Shares and all amendments thereto; (ii) annual and semiannual reports to shareholders and other applicable regulatory reports and communications; (iii) proxy materials; (iv) notices pursuant to Rule 24f-2; and (v) such other documents as may be necessary to enable the [Tender Fund] to continuously offer its shares." *See* **Exhibit 8**, at ENDURANCE007646, ENDURANCE007648, ENDURANCE007677, ENDURANCE007705, ENDURANCE007731.

**ANSWER**: Admitted in part; denied in part. It is admitted that FAS and the Tender Fund entered into the Administrative Services Agreement and that the quoted language appears in the Administrative Services Agreement. The Administrative Services Agreement is in writing and speaks for itself, and Endurance denies any characterization of the agreement contrary to its express terms.

9.     Due to an administrative oversight, FAS failed to register over 44 million Tender Fund shares with the SEC. **Exhibit 9**, at FHI00005321; **Exhibit 5**, at ENDURANCE004040-41; *See* **Exhibit 8**, at ENDURANCE007761-7762; **Exhibit 10**, FHI00005707; **Exhibit 3**, Magera Tr., at 32:2-36:9; **Exhibit 1**, Jacobson Tr., at 123:10-16; **Exhibit 41**, April 17, 2025 Deposition of Jonathan Cipriani ("Cipriani Tr."), at 57:6-21.

**ANSWER**: Admitted.

10.     The Tender Fund sold the unregistered shares to Michigan Catastrophic Claims Association, Auto-Owners Life Insurance Company, Auto-Owners Insurance Company, and Energy Insurance Mutual Limited (collectively, "Affected Shareholders") during the period from April 30, 2021 through February 28, 2023. *See* **Exhibit 11**, at FHI00000429; **Exhibit 10,** FHI00005707**; Exhibit 3,** Magera Tr., at 19:20-20:2.

**ANSWER**: Admitted.

11.     The Tender Fund's prospectuses misrepresented that the shares were registered and omitted to disclose that the shares were not registered. **Exhibit 12**, Endurance First RFA Resp. ¶¶ 41-42; *see also* **Exhibit 13**, Federated Project and Trade Finance Tender Fund, Registration Statement and Prospectus (April 26, 2019); **Exhibit 2,** at FHI00013760; **Exhibit 14**, FHI00010369; **Exhibit 3,** Magera Tr., at 67:21-68:7. **Exhibit 62,** September 16, 2025 Deposition of Andrew Donohue ("Donohue Tr."), at 72:5-73:20.

**ANSWER**: Denied. The statements in this paragraph are conclusions of law to which no response is required. To the extent a response is required, the Tender Fund's prospectuses are in writing and speak for themselves, and Endurance denies any characterization of the prospectuses contrary to their express terms. *See* Plaintiffs Ex. 2 at FHI00013760; Ex. 12 at ¶¶ 41-42. In any event, this allegation is immaterial because the Affected Shareholders never asserted that any Tender Fund prospectus contained misrepresentations and there is nothing in the record to suggest that the "alternative settlements" at issue were an effort to resolve supposed claims regarding misrepresentation. *See* Endurance Appx. Ex. 5, Nos. 36-41, 59-61.

12.    On March 9, 2023, a Branch Chief in the SEC's Division of Investment Management notified K&L Gates that the Tender Fund failed to register its shares. *See* **Exhibit 3**, Magera Tr., at 32:7-23.

**ANSWER**: Admitted in part; denied in part. Endurance objects to this statement on the grounds it is based on inadmissible hearsay because it merely recounts an out-of-court statement allegedly made by a Branch Chief in the SEC's Division of Investment Management. It is admitted only that in a March 31, 2023 letter from counsel for Plaintiffs, Plaintiffs reported to Endurance that "[i]t was recently discovered that three investors subscribed and were issued unregistered shares of the Fund from and after April 30, 2021," *See* Endurance Appx. Ex. 15; other than Plaintiffs' hearsay testimony regarding those communications, there is no admissible evidence in the record regarding the SEC's alleged March 9, 2023 communications with K&L Gates. Therefore, Endurance denies that on March 9, 2023, a Branch Chief in the SEC's Division of Investment Management notified K&L Gates that the Tender Fund failed to register its shares

13.    K&L Gates, on behalf of Federated Hermes and the Tender Fund, engaged with the SEC regarding the share registration error. *See* **Exhibit 14**, FHI00010369; **Exhibit 16**, FHI00010356; **Exhibit 17**, FHI00010354; **Exhibit 18**, FHI00010390; **Exhibit 9**, FHI00005319; **Exhibit 19,** FHI00010352; **Exhibit 20**, FHI00010380.

**ANSWER**: Immaterial; admitted.

14.    Following the SEC's notice, Federated Hermes launched an internal investigation to confirm whether the Tender Fund had issued unregistered shares. *See* **Exhibit 3**, Magera Tr., at 32:24-35:2.

**ANSWER**: Admitted that Mr. Magera testified that Federated Hermes launched an internal investigation to confirm whether the Tender Fund had issued unregistered shares.

15.     In connection with its internal investigation, Federated Hermes confirmed that FAS had failed to register the Tender Fund's shares, and that the Tender Fund had issued the unregistered shares to the Affected Shareholders. *Id.*

**ANSWER**: Admitted that Mr. Magera testified that Federated Hermes launched an internal investigation to confirm whether the Tender Fund had issued unregistered shares. It is further admitted that FAS had failed to register the Tender Fund's shares, and that the Tender Fund had issued the unregistered shares to the Affected Shareholders.

16.     Upon learning of the share registration error, Federated Hermes ceased offering to sell the Tender Fund's shares and promptly posted a notice to that effect on the Tender Fund's webpage. *See* **Exhibit 14**, at FHI00010371; **Exhibit 3**, Magera Tr., at 77:11-19; **Exhibit 21**, FHI00002111; **Exhibit 22**, FHI00007158.

**ANSWER**: Admitted in part; denied in part. Admitted only that for a short period of time after learning about the registration error, Federated Hermes placed a temporary freeze on soliciting the fund and no subscriptions were permitted from new or existing shareholders. *See* Plaintiffs Ex. 14 at FHI00010371; Ex. 21 at FHI00002111; Ex. 22 at FHI00007158. The record is silent as to whether the Tender Fund posted a notice to that effect on the Tender Fund's webpage and, therefore, Endurance denies same.

17.     On March 30, 2023, Federated Hermes notified the Affected Shareholders of the registration error. *See* **Exhibit 21**, FHI00002111.

**ANSWER**: Admitted in part; denied in part. Admitted that on March 30, 2023 Federated Hermes notified Cardinal Investment Advisor, Scott Skornia, who handled investments for one of the Affected Shareholders, Michigan Catastrophic Claims Association ("MCCA"), that there had been a registration issue that Federated Hermes was working to resolve with the SEC but did not

provide any specifics and noted that it was purposely being vague. *See* Plaintiffs' Ex. 21, FHI00002111. It is denied that Federated Hermes notified all of the Affected Shareholders of the registration error, however, on March 30, 2023. Further, the March 30, 2023 email sent to Mr. Skornia is in writing and speaks for itself, and Endurance denies any characterization of this email contrary to its express terms.

18.     On March 31, 2023, Federated Hermes notified the Insurers of the share registration error. *See* **Exhibit 5**, ENDURANCE004040; **Exhibit 61**, April 14, 2025 Deposition of Andrew Lipkowitz ("Lipkowitz Tr."), at 68:16-22.

**ANSWER**: Admitted in part; denied in part. It is admitted that Federated Hermes sent a letter to Endurance on March 31, 2023 providing a Notice of Circumstance of the Administrative Error. The letter is in writing and speaks for itself, and Endurance denies any characterization of this letter contrary to its express terms.

19.     On April 10, 2023, the Tender Fund filed with the SEC a Form N-2 Registration Statement for a rescission offer. *See* **Exhibit 11**, FHI00000426.

**ANSWER**: Admitted in part; denied in part. It is admitted that the Tender Fund filed a Form N-2 Registration Statement on April 10, 2023 for a rescission offer. The N-2 Registration Statement is in writing and speaks for itself, and Endurance denies any characterization of this filing contrary to its express terms.

20.    The April 10, 2023 Form N-2 Registration Statement filing states the Tender Fund is "making the Rescission Offer to ensure compliance with the Securities Act and applicable state law, and to limit any contingent liability under the federal securities laws and applicable state law that the Fund may have as a result of the registration status of the" unregistered shares. *See id.* at FHI00000429.

**ANSWER**: Admitted in part; denied in part. It is admitted that the Tender Fund filed a Form N-2 Registration Statement on April 10, 2023 and contains the quoted language. The N-2 Registration Statement is a writing which speaks for itself, and Endurance denies any characterization of this filing contrary to its express terms.

21.    The April 10, 2023 Form N-2 Registration Statement filing states that if an Affected Shareholder accepts the rescission offer, the Tender Fund will repurchase the unregistered shares at a "Rescission Price" equal to the amount the Affected Shareholder paid for the unregistered shares, plus simple interest, less all cash distributions the Affected Shareholder received in respect of those shares. *See id.*

**ANSWER**: Admitted in part; denied in part. It is admitted that the Tender Fund filed a Form N-2 Registration Statement on April 10, 2023 which discusses the rescission offer. The N-2 Registration Statement is a writing which speaks for itself, and Endurance denies any characterization of this filing contrary to its express terms.

22.     The formula for calculating the "Rescission Price" that is set forth in the April 10, 2023 Form N-2 Registration Statement filing is consistent with the formula for calculating statutory damages for rescission under Section 12 of the Securities Act of 1933, as amended ("Securities Act"). *Compare id.* (defining the "Rescission Price" as "the amount you paid for such Covered Shares, plus simple interest (i.e., not compounded), less all cash distributions you have received in respect of those shares, if any.") *with* 15 U.S.C. § 77l(a) ("[T]he person purchasing such security from him, who may sue either at law or in equity in any court of competent jurisdiction, to recover the consideration paid for such security with interest thereon, less the amount of any income received thereon[.]").

**ANSWER**: Admitted in part; denied in part. The statements in this paragraph are conclusions of law to which no response is required. To the extent a response is required, Endurance admits that the Tender Fund filed a Form N-2 Registration Statement on April 10, 2023 that sets forth a recession price that Plaintiffs contend is consistent with the formula for calculating statutory damages for rescission under Section 12 of the Securities Act of 1933, as amended ("Securities Act"). *Compare id.* (defining the "Rescission Price" as "the amount you paid for such Covered Shares, plus simple interest (i.e., not compounded), less all cash distributions you have received in respect of those shares, if any.") *with* 15 U.S.C. § 77l(a) ("[T]he person purchasing such security from him, who may sue either at law or in equity in any court of competent jurisdiction, to recover the consideration paid for such security with interest thereon, less the amount of any income received thereon[.]"). The N-2 Registration Statement is in writing and speaks for itself, and Endurance denies any characterization of the document contrary to its express terms.

23.    On April 10, 2023, Federated Hermes participated in a phone call with Cardinal Investment Advisors ("Cardinal"), a consultant for two of the Affected Shareholders, Michigan Catastrophic Claims Association and Energy Insurance Mutual Limited. *See* **Exhibit 24,** at FHI00007794; **Exhibit 9,** at FHI00005321-22.

**ANSWER**: Admitted.

24.    On the April 10, 2023 call, Cardinal told Federated Hermes that it expected Michigan Catastrophic Claims Association and Energy Insurance Mutual Limited would accept the rescission offer and subsequently reinvest in the Tender Fund. *See* **Exhibit 1,** Jacobson Tr., at 189:17-190:5; **Exhibit 24**, at FHI00007794; **Exhibit 9,** at FHI00005321-22.

**ANSWER**: Denied. Mr. Kane who handled investments for Energy Insurance Mutual, testified that he did not recall the specifics discussed with Federated Hermes during the April 10, 2023 call. *See* Endurance Appx. Ex. 10, Tr. of Dep. of S. Kane at 39:22-23. Mr. Skonria, who handled investments for MCCA, summarized the April 10, 2023 call with Federated Hermes to his client noting that based on this conversation "EIM may or may not want to redeem as it would represent an arbitrage creating instant value for the portfolio." *See* Plaintiffs Ex. 36 at EIM00007. Further, Cardinal specifically informed Federated Hermes that it did not have discretionary authority for its clients and that its client would need to review and approve any specific offers or agreements themselves. *See* Endurance Appx. Ex. 37 at FHI00010187.

25.    On the April 10, 2023 call, Cardinal told Federated Hermes that it expected rational investors would accept the rescission offer because the rescission price exceeded the current market value of their investments. **Exhibit 24**, at FHI00007794; **Exhibit 9**, at FHI00005321-22.

**ANSWER**: Denied. Endurance objects to this statement to the extent it is based on inadmissible hearsay because it merely recounts an out-of-court statement allegedly made by

- 11 -

Cardinal Investment employees. Sean Kane of Cardinal Investments, who handled investments for Energy Insurance Mutual, testified that he did not recall the specifics discussed with Federated Hermes during the April 10, 2023 call. *See* Endurance Appx. Ex. 10, Tr. of Dep. of S. Kane at 39:22-23). Scott Skornia of Cardinal Investments, who handled investments for MCCA, summarized the April 10, 2023 call with Federated Hermes to his client in an email noting that based on this conversation "EIM may or may not want to redeem as it would represent an arbitrage creating instant value for the portfolio." *See* Plaintiffs Ex. 36 at EIM00007. Further, Mr. Kane specifically informed Federated Hermes that Cardinal did not have discretionary authority for its clients and that its clients would need to review and approve any specific offers or agreements themselves. *See* Endurance Appx. Ex. 37 at FHI00010187.

26.     On the April 10, 2023 call, Cardinal asked Federated Hermes how significant the price difference was between the rescission price and the current market value of their clients' investments. *See* **Exhibit 24**, at FHI00007794.

**ANSWER**: Denied. Endurance objects to this statement to the extent it is based on inadmissible hearsay because it merely recounts an out-of-court statement allegedly made by Cardinal Investment employees. Mr. Kane who handled investments for Energy Insurance Mutual, testified that he did not recall the specifics discussed with Federated Hermes during the April 10, 2023 call. *See* Endurance Appx. Ex. 10, Tr. of Dep. of S. Kane at 39:22-23. However, Mr. Skornia did inform MCCA that Federated Hermes was confirming whether the simple interest rate over the period of the investment may exceed the actual market value of the fund as of 3/31 in his email to the client. *See* Plaintiffs Ex. 36 at EIM00007.

27.     On May 12, 2023, Auto-Owners Insurance (on behalf of Auto-Owners Insurance and Auto-Owners Life Insurance) emailed the Tender Fund's Chief Compliance Officer, stating that Auto-Owners "would most likely agree to the previously discussed offer under the rescission offer as the remedy for failure to register the tender fund shares" and requesting confirmation of "how and when to remedy the tender fund shares." **Exhibit 25**, at AO-000140.

**ANSWER**: Admitted in part; denied in part. It is admitted that Matthew Lennox sent an email on behalf of Auto-Owners-Insurance dated May 12, 2023 to Stephen Van Meter at his Federated Hermes email address. The May 12, 2023 email was sent on Mr. Van Meter's instructions, after he had orally offered the settlement amount. *See* Endurance Appx. Ex. 7, Tr. of Dep. of S. Van Meter at 131:17-132:6. The May 12, 2023 email is a writing which speaks for itself and Endurance denies any characterization of the email contrary to its express terms. By way of further response, the Tender Fund's Chief Compliance Officer, Mr. Van Meter, was also Federated Hermes' Chief Compliance Officer. *See* Plaintiffs' Ex. 13, at 59.

28.     On May 15, 2023, Cardinal (on behalf of Michigan Catastrophic Claims Association) emailed the Tender Fund's Chief Compliance Officer, stating, "You'll recall that Cardinal's client, MCCA, would have likely accepted the Federated rescission offer under the condition that the total rescission price exceeded the current NAV of their investment. Can you please confirm how and when the Fund will compensate MCCA?" *See* **Exhibit 26**, at FHI00005717.

**ANSWER**: Admitted in part; denied in part. It is admitted that Scott Skornia (on behalf of MCCA) sent an email dated May 15, 2023 to Stephen Van Meter at his Federated Hermes email address. The May 15, 2023 email, was sent at Mr. Van Meter's instructions, after he had orally offered the settlement amount. *See* Endurance Appx. Ex. 7, Tr. of Dep. of S. Van Meter at 131:17-

132:6. Further, Mr. Kane specifically informed Federated Hermes that it did not have discretionary authority for its clients and that its client would need to review and approve any specific offers or agreements themselves. *See* Endurance Appx. Ex. 37 at FHI00010187. The May 15, 2023 email is a writing which speaks for itself and Endurance denies any characterization of the email contrary to its express terms. By way of further response, the Tender Fund's Chief Compliance Officer, Mr. Van Meter, was also Federated Hermes' Chief Compliance Officer. *See* Plaintiffs' Ex. 13, at 59.

29.    On May 15, 2023, Cardinal (on behalf of Energy Insurance Mutual Limited) emailed the Tender Fund's Chief Compliance Officer, stating, "Ditto for Energy Mutual." *Id.* at FHI00005716.

**ANSWER**: Admitted in part; denied in part. It is admitted that Sean Kane (on behalf of Energy Insurance Mutual Limited) sent an email date May 15, 2023 to Stephen Van Meter at his Federated Hermes email address. The May 15, 2023 email, was sent on Mr. Van Meter's instructions, after he had orally offered the settlement amount. *See* Endurance Appx. Ex. 7, Tr. of Dep. of S. Van Meter at 131:17-132:6. Further, Mr. Kane specifically informed Federated Hermes that it did not have discretionary authority for its clients and that its client would need to review and approve any specific offers or agreements themselves. *See* Endurance Appx. Ex. 37 at FHI00010187. The May 15, 2023 email is a writing which speaks for itself and Endurance denies any characterization of the email contrary to its express terms. By way of further response, the Tender Fund's Chief Compliance Officer, Mr. Van Meter, was also Federated Hermes' Chief Compliance Officer. *See* Plaintiffs' Ex. 13, at 59.

30.    On May 16, 2023, Cardinal (on behalf of Energy Insurance Mutual Limited) emailed the Tender Fund's Chief Compliance Officer, stating Energy Insurance Mutual Limited "would have likely accepted the Federated rescission offer under the condition that the total rescission price exceeded the current NAV of their investment. Can you please confirm how and when the Fund will compensate Energy Insurance Mutual?" **Exhibit 27**, FHI00002167.

**ANSWER**: Admitted in part; denied in part. It is admitted that Sean Kane (on behalf of Energy Insurance Mutual Limited) sent an email dated May 16, 2023 to Stephen Van Meter at his Federated Hermes email address. The May 16, 2023 email was sent on Mr. Van Meter's instructions, after he had orally offered the settlement amount. *See* Endurance Appx. Ex. 7, Tr. of Dep. of S. Van Meter at 131:17-132:6. Further, Mr. Kane specifically informed Federated Hermes that it did not have discretionary authority for its clients and that its client would need to review and approve any specific offers or agreements themselves. *See* Endurance Appx. Ex. 37 at FHI00010187. The May 16, 2023 email is a writing which speaks for itself, and Endurance denies any characterization of the email contrary to its express terms. By way of further response, the Tender Fund's Chief Compliance Officer, Mr. Van Meter, was also Federated Hermes' Chief Compliance Officer. *See* Plaintiffs' Ex. 13, at 59.

31.    K&L Gates, on behalf of Federated Hermes and the Tender Fund, engaged with the SEC regarding the proposed rescission offer. *See* **Exhibit 18**, at FHI00010390; **Exhibit 9,** at FHI00005319-23; **Exhibit 28**, at FHI00010363.

**ANSWER**: Admitted.

32.     The SEC requested that the Tender Fund file a delaying amendment to prevent the Form N-2 Registration Statement from becoming effective automatically. *See* **Exhibit 3,** Magera Tr., at 58:12-23, 59:13-17; **Exhibit 29**, April 11, 2025 Deposition of Stephen Van Meter ("Van Meter Tr."). at 63:23-64-22.

**ANSWER**: Denied. The exhibits to which Plaintiffs cite do not reflect that the SEC requested that the Tender Fund file a delaying amendment. Federated Hermes filed a delaying amendment on April 12, 2023 almost immediately after speaking to the Affected Shareholders. *See* Endurance Appx. Ex. 26.

33.     On April 12, 2023, the Tender Fund filed a delaying amendment. **Exhibit 30**, FHI00000552.

**ANSWER**: Admitted.

34.     The April 12, 2023 delaying amendment prevented the Form N-2 Registration Statement from becoming effective until the SEC declared it effective. *See* **Exhibit 3**, Magera Tr., at 58:2-59:17; **Exhibit 29**, Van Meter Tr., at 63:8-65:19.

**ANSWER**: Admitted in part; denied in part. The statements in this paragraph are conclusions of law to which no response is required. To the extent a response is required, Endurance admits that the purpose of the delaying amendment is to delay the Form N-2 Registration Statement from becoming effective. The April 12, 2023 delaying amendment is a writing which speaks for itself, and Endurance denies any characterization of the filing contrary to its express terms.

35. Federated Hermes estimated that a full rescission would have required the Tender Fund to pay approximately $480 million to the Affected Shareholders in exchange for tender of the unregistered shares. *See* **Exhibit 10**, at FHI00005707; **Exhibit 8**, at ENDURANCE007522, ENDURANCE007764; **Exhibit 31**, Heavner Report, at 20-21, 24, Exhibit 1.A.

**ANSWER**: Admitted in part; denied in part. It is admitted that Federated Hermes estimated the rescission price as of March 31, 2023 to total $477,233,615.58. It is disputed that $480 million reflected the rescission price required to be paid under Section 12 of the Securities Act of 1933 as that sum included rescission of all shares of the Tender Fund that had not been properly registered between April 30, 2021 and February 28, 2023; under the statute, the Affected Shareholders only had the right to rescind shares that fell within the one-year statute of limitations: "the statute of limitations for enforcement of federal statutory rescission rights by a statutory holder is one year commencing on the date of the sale of the security sold in violation of the federal registration requirements..." *See* Endurance Appx. Ex., 31 at ENDURANCE003568, ENDURANCE003578. Therefore, at most, the rescission price for tender of the unregistered shares that fell within the statute of limitations was $31,721,616. *See* Endurance's Supplemental Appendix ("Endurance Supp. Appx.") Ex. 1, Expert Rebuttal Report of J. Duross O'Bryan, Opinion 2, ¶¶44-47.

36. Federated Hermes estimated that the statutory interest component of a full rescission was increasing at a rate of approximately $72,000 per day. *See* **Exhibit 10,** at FHI00005707; **Exhibit 32**, at ENDURANCE007829; **Exhibit 3**, Magera Tr., at 84:25-85:5, 87:2-88:3; **Exhibit 1**, Jacobson Tr., at 187:7-13, 188:2-10, 288:13-21.

**ANSWER**: Denied. On April 20, 2023, Federated Hermes advised Endurance that the estimated liability costs were rising at a rate of $72,000 per day. *See* Endurance Appx. Ex. 29, ENDURANCE000003. The April 20, 2023 letter is a writing which speaks for itself, and

Endurance denies any characterization of the letter contrary to its express terms. Moreover, under the statute, the Affected Shareholders only had the right to rescind shares that fell within the one-year statute of limitations: "the statute of limitations for enforcement of federal statutory rescission rights by a statutory holder is one year commencing on the date of the sale of the security sold in violation of the federal registration requirements..." *See* Endurance Appx. Ex. 31 at ENDURANCE003568, ENDURANCE003578. Therefore, the daily interest amount is incorrect because it is based on amounts that were not subject to rescission.

37.    Conducting a rescission offer would have required: (1) preparing and filing a Form N-2 registration statement for the rescission offer; (2) review and comment by the SEC's Division of Investment Management; (3) addressing the SEC staff's comments, filing a final registration statement, and delivering it to the Affected Shareholders; and (4) keeping the rescission offer open for the Affected Shareholders for a specified period of time (as described in the Form N-2 Registration Statement that was filed on April 10, 2023). *See* **Exhibit 3**, Magera Tr., at 58:12-23; **Exhibit 11**, at FHI00000430.

**ANSWER**: Denied. The statements in this paragraph are conclusions of law to which no response is required. To the extent a response is required, a rational investor would not have pursued rescission under the circumstances. *See* Endurance Supp. Appx. Ex. 2, Expert Report of Professor Andrew K. Jennings, Opinion at 15-22. Indeed, a rational investor would have avoided taking any action that risked needlessly disrupting the fund. If, as Plaintiffs contend, the rescission remedy might have resulted in the Fund's liquidation at a loss, the shareholders obviously would have suffered as well—either because it would have adversely affected other shares they owned that were not subject to the rescission remedy or because they would have foreclosed the possibility of any future economic benefits associated with the Fund. Here, Auto-Owners and Michigan

Catastrophic Claims Association also owned registered shares that were not subject to any rescission offer. *See* Endurance Appx. Ex. 31 at ENDURANCE003808.

38. The estimated rescission price of approximately $480 million represented over 80% of the Tender Fund's net asset value ("NAV") as of March 31, 2023. *See* **Exhibit 15**, at FHI00014105; **Exhibit 31**, Heavner Report, at 27.

**ANSWER**: Admitted in part; denied in part. It is admitted that Federated Hermes estimated the rescission price as of March 31, 2023 to total $477,233,615.58, but it is denied that it properly calculated the rescission price under Section 12 of the Securities Act of 1933 as that sum included rescission of all shares of the Tender Fund that had not been properly registered between April 30, 2021 and February 28, 2023. Under the statute, the Affected Shareholders only had the right to rescind shares that fell within the one-year statute of limitations: "the statute of limitations for enforcement of federal statutory rescission rights by a statutory holder is one year commencing on the date of the sale of the security sold in violation of the federal registration requirements..." *See* Endurance Appx. Ex. 31 at ENDURANCE003568, ENDURANCE003578. Therefore, at most, the rescission price for tender of the unregistered shares that fell within the statute of limitations was $31,721,616, which is approximately 6% of the Tender Fund's net asset value as of March 31, 2023. *See* Endurance Appx. 1, Expert Rebuttal Report of J. Duross O'Bryan, Opinion 2, at ¶¶44-47; *See* Plaintiffs' Exhibit 15 at FHI00014105.

39. As of March 31, 2023, more than 80% of the Tender Fund's portfolio consisted of trade-finance instruments classified as illiquid "Level 3" assets. *See* **Exhibit 15**, at FHI00014103; **Exhibit 31**, Heavner Report, at 27; **Exhibit 65**, Donohue Report, at 5.

**ANSWER**: Immaterial; admitted. If, as Plaintiffs contend, the rescission remedy might have resulted in the Fund's liquidation at a loss, the shareholders obviously would have suffered

as well—either because it would have adversely affected other shares they owned that were not subject to the rescission remedy or because they would have foreclosed the possibility of any future economic benefits associated with the Fund. Here, Auto-Owners and Michigan Catastrophic Claims Association also owned registered shares that were not subject to any rescission offer. *See* Endurance Appx. Ex. 31 at ENDURANCE003808.

40.    To fund any rescission payments, the Tender Fund's predominantly illiquid portfolio of Level 3 assets would have had to have been liquidated. *See* **Exhibit 3,** Magera Tr., at 60:15-61:2, 75:15-76:2; **Exhibit 1,** Jacobson Tr., at 129:9-130:6, 145:4-13, 145:17:25, 223:6-21, 286:24-287:9; **Exhibit 31,** Heavner Report at 27; **Exhibit 33,** at CCC_01824.

**ANSWER**: Immaterial; denied. Admitted that Federated Hermes estimated the rescission price as of March 31, 2023 to total $477,233,615.58, but it is denied that it properly calculated the rescission price under Section 12 of the Securities Act of 1933 as that sum included rescission of all shares of the Tender Fund that had not been properly registered between April 30, 2021 and February 28, 2023. Under the statute, the Affected Shareholders only had the right to rescind shares that fell within the one-year statute of limitations: "the statute of limitations for enforcement of federal statutory rescission rights by a statutory holder is one year commencing on the date of the sale of the security sold in violation of the federal registration requirements..." *See* Endurance Appx. Ex. 31 at ENDURANCE003568, ENDURANCE003578. Therefore, at most, the rescission price for tender of the unregistered shares that fell within the statute of limitations was $31,721,616, which is approximately 6% of the Tender Fund's net asset value as of March 31, 2023. *See* Endurance Supp. Appx. Ex. 1, Expert Rebuttal Report of J. Duross O'Bryan, Opinion 2, ¶¶44-47; *See* Plaintiffs' Exhibit 15 at FHI00014105.

41.    Liquidation of the Tender Fund's portfolio would have resulted in price haircuts and additional transaction costs. *See* **Exhibit 31,** Heavner Report, at 26-29; **Exhibit 9**, FHI00005322; **Exhibit 63**, September 10, 2025 Deposition of Lee Heavner ("Heavner Tr."), at 62:24-68:21, 71:12-24; **Exhibit 65**, Donohue Report, at 14; **Exhibit 62**, September 16, 2025 Deposition of Andrew Donohue ("Donohue Tr."), at 47:17-49:6.

**ANSWER**: Immaterial; denied. It is denied that liquidation of the Tender Fund's portfolio was necessary if Plaintiffs had properly calculated the rescission offer. Federated Hermes estimated the rescission price as of March 31, 2023 to total $477,233,615.58, that sum included rescission of all shares of the Tender Fund that had not been properly registered between April 30, 2021 and February 28, 2023; however, the Affected Shareholders only had the right to rescind shares that fell within the one-year statute of limitations: "the statute of limitations for enforcement of federal statutory rescission rights by a statutory holder is one year commencing on the date of the sale of the security sold in violation of the federal registration requirements...." *See* Endurance Appx. Ex. 31 at ENDURANCE003568, ENDURANCE003578. Therefore, at most, the rescission price for tender of the unregistered shares that fell within the statute of limitations was $31,721,616, which is approximately 6% of the Tender Fund's net asset value as of March 31, 2023. *See* Endurance Supp. Appx. Ex. 1, Expert Rebuttal Report of J. Duross O'Bryan, Opinion 2, ¶¶44-47; *See* Plaintiffs' Exhibit 15 at FHI00014105. Moreover, a rational investor would not have pursued rescission under the circumstances. *See* Endurance Supp. Appx. Ex. 2, Expert Report of Professor Andrew K. Jennings, Opinion at ¶¶15-22. Indeed, a rational investor would have avoided taking any action that risked needlessly disrupting the Fund. If, as Plaintiffs contend, the rescission remedy might have resulted in the Fund's liquidation at a loss, the shareholders obviously would have suffered as well—either because it would have adversely affected other

shares they owned that were not subject to the rescission remedy or because they would have foreclosed the possibility of any future economic benefits associated with the Fund. Here, Auto-Owners and Michigan Catastrophic Claims Association also owned registered shares that were not subject to any rescission offer. *See* Endurance Appx. Ex. 31 at ENDURANCE003808.

42.    The rescission offer process would have taken considerable time, increased costs, and resulted in further harm to the Tender Fund and its remaining shareholders, including shareholders that held properly registered shares. *See* **Exhibit 63**, Heavner Tr., at 62:24-68:21, 85:8-14; **Exhibit 62**, Donohue Tr., at 47:17-50:7; *see also* **Exhibit 3**, Magera Tr., at 60:15-61:2, 75:15-76:2; **Exhibit 1**, Jacobson Tr., at 129:9-130:6, 145:4-13, 145:17:25, 223:6-21, 286:24-287:9; **Exhibit 31**, Heavner Report at 26-29; **Exhibit 33**, at CCC_01824.

**ANSWER**: Denied. This statement is speculation based upon a hypothetical series of events that never occurred and would not have occurred. It is disputed that a rational investor would have pursued rescission under the circumstances. *See* Endurance Supp. Appx. 2, Expert Report of Professor Andrew K. Jennings, Opinion at 15-22. Indeed, a rational investor would have avoided taking any action that risked needlessly disrupting the Fund. If, as Plaintiffs contend, the rescission remedy might have resulted in the Fund's liquidation at a loss, the shareholders obviously would have suffered as well—either because it would have adversely affected other shares they owned that were not subject to the rescission remedy or because they would have foreclosed the possibility of any future economic benefits associated with the Fund. Here, Auto-Owners and Michigan Catastrophic Claims Association also owned registered shares that were not subject to any rescission offer. *See* Endurance Appx. Ex. 31 at ENDURANCE003808.

43.    Goodwin Procter LLP was independent counsel to the independent trustees of the Tender Fund. **Exhibit 32**, at ENDURANCE007841-42.

**ANSWER**: Admitted.

44.    On April 19, 2023, Goodwin Procter LLP sent a written letter, on behalf of the Tender Fund, to Federated Hermes demanding reimbursement and indemnification for all losses related to the share registration error. *Id.*

**ANSWER**: Admitted in part; denied in part. It is admitted that Goodwin Procter LLP sent a letter on April 19, 2023. The April 19, 2023 letter is a writing that speaks for itself, and Endurance denies any characterization of the letter contrary to its express terms.

45.    The Hon. Maureen Lally-Green is one of the Tender Fund's independent trustees. *See* **Exhibit 38**, at FHI00000642, FHI00000651, FHI00000684, FHI00000686.

**ANSWER**: Immaterial; admitted.

46.    KPMG LLP ("KPMG") is the independent registered public accounting firm for the Tender Fund. *See* **Exhibit 2**, at FHI00013760.

**ANSWER**: Admitted.

47.    During KPMG's review of the contemplated rescission offer, a KPMG colleague relayed prior SEC experience resolving a similar unregistered-shares issue through settlement, and suggested Federated Hermes explore that avenue with someone previously in a leadership role in the SEC Division of Investment Management. **Exhibit 3**, Magera Tr., at 63:5-15; **Exhibit 29**, Van Meter Tr., at 68:7-70:22.

**ANSWER**: Denied. Endurance objects to this statement on the grounds it is based on inadmissible hearsay because it merely recounts an out-of-court statement allegedly made by a KPMG colleague. Endurance served interrogatories and document requests requesting information

regarding the alternative offer and relevant communications with KPMG. Instead of producing the requested information, Plaintiffs produced a 994-page privilege log identifying 4,500 documents that it had withheld, including relevant communications with KPMG stating that such communications were protected by the accountant-client privilege. *See* Endurance Appx. Ex. 4 at No. 5; Ex. 5 at No. 4; Endurance Supp. Appx. Ex. 3, Excerpts from Plaintiffs' Privilege Log. Now Plaintiffs are attempting to rely upon information they refused to provide in discovery and improperly characterize them as "undisputed facts." Other than hearsay characterizations of the statements, the record is silent regarding the KPMG's prior SEC experience resolving a similar unregistered-shares issue. To the extent it purports to rely on KPMG communications, Plaintiffs have waived the accountant-client privilege and should be required to produce the requested information.

48.    Acting on KPMG's suggestion, Federated Hermes' and the Tender Fund's Chief Compliance Officer contacted Mr. David Grim (then at Stradley Ronon Stevens and Young LLP ("Stradley Ronon")). **Exhibit 3**, Magera Tr., at 63:5-15; **Exhibit 29**, Van Meter Tr. 70:23-71:24.

**ANSWER**: Denied. Defendants served interrogatories and document requests requesting information as to the genesis of the alternative offer and relevant communications with KPMG. Instead of producing the requested information, Plaintiffs produced a 994-page privilege log identifying 4,500 documents that it had withheld, including relevant communications with KPMG stating that such communications were protected by the accountant-client privilege. *See* Endurance Appx. Ex. 4 at No. 5; Endurance Supp. Appx. Ex. 3, Excerpts from Plaintiffs' Privilege Log. Now Plaintiffs are attempting to rely upon information they refused to provide in discovery and improperly characterize them as "undisputed facts." Other than hearsay characterizations of the statements, the record is silent regarding the KPMG's prior SEC experience resolving a similar

unregistered-shares issue. To the extent it purports to rely on KPMG communications, Plaintiffs have waived the accountant-client privilege and should be required to produce the requested information.

49.    K&L Gates and Stradley Ronon, on behalf of Federated Hermes and the Tender Fund, engaged with the SEC regarding an alternative settlement approach. *See* **Exhibit 14**, FHI00010369; **Exhibit 16**, FHI00010356; **Exhibit 17**, FHI00010354; **Exhibit 18**, FHI00010390; **Exhibit 9**, FHI00005319; **Exhibit 19,** FHI00010352; **Exhibit 20**, FHI00010380.

**ANSWER**: Admitted.

50.    On May 1, 2023, K&L Gates and Stradley Ronon sent the Branch Chief in the SEC's Division of Investment Management a memorandum describing the alternative settlement approach in response to a telephonic request from the SEC. *See* **Exhibit 9**, at FHI00005320-23.

**ANSWER**: Admitted in part; denied in part. It is admitted that K&L Gates and Stradley Ronon sent a memorandum dated May 1, 2023 to the SEC. The May 1, 2023 memorandum is a writing which speaks for itself, and Endurance denies any characterization of the memorandum contrary to its express terms.

51.    On May 9, 2023, the SEC informed K&L Gates and Stradley Ronon that it was working through its review of the memorandum. **Exhibit 20**, at FHI00010383.

**ANSWER**: Admitted in part; denied in part. The May 9, 2023 communication is in writing and speaks for itself, and Endurance denies any characterization of this communication contrary to its express terms.

52.    On May 9, 2023, the SEC asked K&L Gates and Stradley Ronon "who the Federated entity entering into the shareholder agreements will be." *See id.* at FHI00010382.

**ANSWER**: Admitted in part; denied in part. It is admitted that the quoted language appears

in the May 9, 2023 communication. The May 9, 2023 communication is a writing which speaks for itself, and Endurance denies any characterization of this communication contrary to its express terms.

53.     On May 9, 2023, the SEC orally advised K&L Gates that it would not object to the alternative settlement approach. **Exhibit 3**, Magera Tr., at 119:20-24; **Exhibit 60**, at ENDURANCE003857.

**ANSWER**: Admitted in part; denied in part. Endurance objects to this statement on the grounds it is based on inadmissible hearsay because it merely recounts an out-of-court statement allegedly made by the SEC. Endurance admits only that counsel for Plaintiffs informed it on May 10, 2023 that "the SEC staff confirmed yesterday evening that the SEC will not object to Federated Hermes pursuing the alternative settlement offer…" Other than inadmissible hearsay testimony, there is nothing in the record regarding the SEC's communication stating that it did not object to Federated Hermes pursuing the "alternative settlement offer" and, therefore, Endurance denies the remainder of this paragraph. *See* Plaintiffs' Ex. 60 at ENDURANCE003857.

54.     On May 15, 2023, FAS sent proposed the alternative settlement agreements to the Affected Shareholders. **Exhibit 25**, AO-000139; **Exhibit 26**, FHI00005716.

**ANSWER**: Admitted.

55.     On May 19, 2023, FAS entered into alternative settlement agreements with the Affected Shareholders (the "Shareholder Settlements"). *See* **Exhibit 34**, at ENDURANCE009754-9788.

**ANSWER**: Admitted.

56.     The Shareholder Settlements state that their purpose is "to establish an amicable arrangement to: (i) offer a settlement that would put you in a substantially similar financial position to that [the Affected Shareholder] would have been in had the Fund conducted a rescission offer with respect to the Covered Shares, while also permitting you to stay invested in the Fund; and (ii) eliminate any contingent liability under the federal securities laws and other applicable federal and state law that certain Settlement Parties (as defined herein) may have as a result of the registration status of the Covered Shares." *Id.* at ENDURANCE009755, ENDURANCE009761, ENDURANCE009767, ENDURANCE009774.

**ANSWER**: Admitted in part; denied in part. It is admitted that the quoted language appears in the Shareholder Settlements. The Shareholder Settlements in writing and speak for themselves, and Endurance denies any characterization of the Shareholder Settlements that is contrary to their express terms.

57.     Under the Shareholder Settlements, FAS agreed to pay a defined "Settlement Amount" to each Affected Shareholder. *See id.*

**ANSWER**: Admitted in part; denied in part. The Shareholder Settlements in writing and speak for themselves, and Endurance denies any characterization of the Shareholder Settlements that is contrary to their express terms.

58.     Each Shareholder Settlement states that the "Settlement Amount" was calculated as the aggregate original price the Affected Shareholder paid for the unregistered shares, plus simple statutory interest through May 15, 2023, less the value of the unregistered shares (as of May 12, 2023), any cash distributions received on the unregistered shares, and any shares acquired through the Tender Fund's dividend reinvestment program ("DRIP Shares"). *Id.*

**ANSWER**: Admitted in part; denied in part. It is admitted only that the Shareholder

Settlements set forth how the Settlement Amount was calculated. The Shareholder Settlements in writing and speak for themselves, and Endurance denies any characterization of the Shareholder Settlements that is contrary to their express terms.

59.    Under the Shareholder Settlements, FAS agreed to pay the following "Settlement Amounts" to the Affected Shareholders (i) $5,984,470.64 to Auto-Owners Insurance Company; (ii) $1,724,004.89 to Auto-Owners Life Insurance Company; (iii) $597,585.53 to Energy Insurance Mutual Limited; and (iv) $9,592,868.61 to Michigan Catastrophic Claims Association. *Id.*

**ANSWER**: Admitted in part; denied in part. It is admitted only that the sums set forth in this paragraph to the Affected Shareholders are those set forth in the Shareholder Settlements. The Shareholder Settlements are in writing and speak for themselves, and Endurance denies any characterization of the Shareholder Settlements that is contrary to their express terms.

60.    Federated Hermes' workpapers prepared in connection with the Shareholder Settlement computations reflect the following aggregate figures: (1) Aggregate rescission price: $480,554,790.61; (2) Aggregate value of shares that would have been tendered and canceled at NAV as of the settlement offer date: $462,655,860.93; and (3) Net economic benefit the Affected Shareholders would have received by exercising rescission: $17,898,929.68. *See* **Exhibit 10**, FHI00005707; **Exhibit 31**, Heavner Report, at 18-22; **Exhibit 63**, Heavner Tr., at 53:6-55:3.

**ANSWER**: Admitted in part; denied in part. It is admitted that Federated Hermes estimated the rescission price to be $480,554,790.61, value of shares that would have been tendered and canceled at NAV as of the settlement offer date to be $462,655,860.93, and net economic benefit the Affected Shareholders would have received by exercising rescission to be $17,898,929.68 but denied that these sums were properly calculated by Federated under Section 12 of the Securities

Act of 1933. Indeed, Federated Hermes incorrectly calculated these sums because they include rescission of all shares of the Tender Fund that had not been properly registered between April 30, 2021 and February 28, 2023. But the Affected Shareholders only had the right to rescind shares that fell within the one-year statute of limitations under the federal securities laws: "the statute of limitations for enforcement of federal statutory rescission rights by a statutory holder is one year commencing on the date of the sale of the security sold in violation of the federal registration requirements...." *See* Endurance Appx. Ex. 31 at ENDURANCE003568; ENDURANCE003578. Therefore, at most, the rescission price for tender of the unregistered shares that fell within the statute of limitations was $31,721,616. Endurance Supp. Appx. Ex. 1, Expert Rebuttal Report of J. Duross O'Bryan, Opinion 2, at ¶¶44-47; *See* Plaintiffs' Exhibit 15 at FHI00014105. Further, Federated's internal workpapers are in writing and speak for themselves, and Endurance denies any characterization of these workpapers contrary to their express terms.

61.     Under the Shareholder Settlements, each Affected Shareholder "absolutely and unconditionally" released all claims by the Affected Shareholders against the Tender Fund, FAS, and their directors/trustees, officers, and other affiliates (as well as their insurers) "relating to, arising from or involving" the unregistered shares, and agreed "not to pursue additional remedies." *See* **Exhibit 34**, ENDURANCE009756-57, ENDURANCE009762-63, ENDURANCE009768-69, ENDURANCE009775-76.

**ANSWER**: Admitted in part; denied in part. It is admitted that the quoted language in this paragraph appears in the Shareholder Settlements. The Shareholder Settlements are in writing and speak for themselves, and Endurance denies any characterization of the Shareholder Settlements that is contrary to their express terms.

62.    The Shareholder Settlements were executed by FAS and each Affected Shareholder and stated that the parties intended to be legally bound. *See id.* at ENDURANCE009751.

**ANSWER**: Admitted in part; denied in part. It is admitted that the Shareholder Settlements were executed by FAS and the Affected Shareholders. It is also admitted that the words "legally bound" appear in the Shareholder Settlements. The Shareholder Settlements are in writing and speak for themselves, and Endurance denies any characterization of the Shareholder Settlements that is contrary to their express terms.

63.    As a result of FAS entering into the Shareholder Settlements directly with Affected Shareholders, the Tender Fund avoided liquidation. **Exhibit 3**, Magera Tr., at 60:14-61:17, 75:15-76:1.

**ANSWER**: Denied. This statement is speculation based upon a hypothetical series of events that never occurred and would not have occurred. It is disputed that a rational investor would have pursued rescission under the circumstances. *See* Endurance Supp. Appx. Ex. 2, Expert Report of Professor Andrew K. Jennings, Opinion at 15-22. Indeed, a rational investor would have avoided taking any action that risked needlessly disrupting the Fund. If, as Plaintiffs contend, the rescission remedy might have resulted in the Fund's liquidation at a loss, the shareholders obviously would have suffered as well—either because it would have adversely affected other shares they owned that were not subject to the rescission remedy or because they would have foreclosed the possibility of any future economic benefits associated with the Fund. Here, Auto-Owners and Michigan Catastrophic Claims Association also owned registered shares that were not subject to any rescission offer.  *See* Endurance Appx. Ex. 31 at ENDURANCE003808.

64.     On May 22, 2023, FAS paid the settlement amounts to the Affected Shareholders pursuant to the Shareholder Settlements. *See* **Exhibit 35**, FHI00002146; **Exhibit 36**, EIM000070; **Exhibit 37**, AO-000037.

**ANSWER**: Admitted.

65.     On May 19, 2023, the Tender Fund filed a new Form N-2 Registration Statement to register the previously unregistered shares. *See* **Exhibit 38**, FHI00000556.

**ANSWER**: Admitted.

66.     On May 22, 2023, the Form N-2 Registration Statement went effective. *Id.*; *see also* **Exhibit 39**, at FHI00000730.

**ANSWER**: Admitted in part; denied in part. The statements in this paragraph are conclusions of law to which no response is required. To the extent a response is required, it is admitted only that the Annual Shareholder Report Plaintiffs cite indicates that "the unregistered shares of the Fund were appropriately registered with the SEC on May 22, 2023." The Annual Shareholder Report Plaintiff is in writing and speaks for itself, and Endurance denies any characterization of the report contrary to its express terms.

67.     The SEC did not permit registration of the Tender Fund's unregistered shares until after the SEC evaluated the alternative settlement approach and confirmed it had no objections. *See* **Exhibit 30**, FHI00000552; **Exhibit 3**, Magera Tr., at 96:14-25; **Exhibit 18**, at FHI00010390; **Exhibit 1**, Jacobson Tr., at 144:7-9; **Exhibit 29,** Van Meter Tr., at 80:22-81:25; **Exhibit 62,** Donohue Tr., at 56:13-25.

**ANSWER**: Admitted in part; denied in part. Endurance objects to this statement on the grounds it is based on inadmissible hearsay because it merely recounts an out-of-court statement allegedly made by the SEC. Endurance admits, however, that Plaintiffs represented to it that the

SEC would not permit registration of the Tender Fund's shares until after the SEC evaluated the alternative settlement approach and confirmed that it had no objections.

68.     On May 30, 2023, the Tender Fund filed its audited Annual Shareholder Report. *See* **Exhibit 39**, FHI00000695.

**ANSWER**: Admitted in part; denied in part. It is admitted that the Annual Shareholder Report was filed but the referenced document is not dated. The record is silent as to the date the Annual Shareholder Report was filed and therefore the assertion regarding the date is denied.

69.     To date, the SEC has not brought an enforcement action against the Tender Fund, FAS, or Federated Hermes arising out of the share registration error. *See* **Exhibit 3**, Magera Tr., at 124:10-125:22.

**ANSWER**: Admitted.

70.     Andrew Donohue, the former Director of the SEC's Division of Investment Management and former SEC Chief of Staff, submitted an Expert Report in this litigation on June 20, 2025. *See* **Exhibit 65**, June 20, 2025 Expert Report of Andrew J. Donohue.

**ANSWER**: Admitted.

71.     Based on his "regulatory experience and understanding of how the SEC typically addresses such matters," Mr. Donohue opined that the alternative settlement approach adopted by the Insureds was "necessary, appropriate, reasonable, investor-protective, and consistent with how the SEC views a registrant's legal and fiduciary duties, as well as regulatory expectations." *See id.* at 3; *see generally* **Exhibit 65**, Donohue Report; *see also* **Exhibit 62**, Donohue Tr., at 35:17-36:25, 49:11-50:7, 59:1-63:3.

**ANSWER**: Admitted in part; denied in part. It is admitted that the quoted language appears in Mr. Donohue's report. It is denied that the alternative settlement approach was "necessary,

appropriate, reasonable, investor-protective, and consistent with how the SEC views a registrant's legal and fiduciary duties, as well as regulatory expectations." According to Endurance's securities law expert, the alternative settlement approach adopted by Plaintiffs was not required under Section 12(a)(1) and the circumstances and is not standard industry practice. *See* Endurance Supp. Appx. Ex. 2, Expert Report of Andrew K. Jennings, at 18. Further, Mr. Donohue's report is in writing and speaks for itself, and Endurance denies any characterization of Mr. Donohue's report that is contrary to its express terms. Endurance reserves its right to move *in limine* to strike or exclude some or all of Mr. Donahue's report.

72.      Mr. Donohue further explained that, based on his experience at the SEC, the staff would have viewed a settlement for less than the full rescission amount as insufficient and would have escalated the matter for further SEC action. *See generally* **Exhibit 65**, Donohue Report.

**ANSWER**: Admitted in part; denied in part. It is admitted only that Mr. Donahue submitted a report on Plaintiffs' behalf. The report is in writing and speaks for itself and Endurance denies any characterization of Mr. Donahue's report that is contrary to its express terms. Endurance reserves its right to move *in limine* to strike or exclude some or all of Mr. Donahue's report. Furthermore, as Endurance's securities law expert, Andrew Jennings, opined in his report, "the historical public record reflects that making full or partial rescission or other payments to purchasers who bought unregistered, non-exempt shares is neither necessary nor sufficient for avoiding SEC enforcement regarding a registration failure." *See* Endurance Supp. Appx. Ex. 2, Expert Report of Andrew K. Jennings, at 21-22.

73.    Endurance issued the Primary Policy to Federated Hermes with a **Policy Period** of October 1, 2022 to October 1, 2023, and bearing the Policy Number FIP10007848907. *See* **Exhibit 6**, at ENDURANCE000022; **Exhibit 12**, at ¶ 1.

**ANSWER**: Admitted in part; denied in part. It is admitted that the Endurance Policy provided issued a Manuscript Primary Professional and Management Liability Insurance Policy, No. FIP10007848907, to Federated Hermes, for the October 1, 2022 to October 1, 2023 policy period (the "Endurance Policy"). *See* Endurance Appx. Ex. 1, Endurance Policy, Declarations. The Endurance Policy is in writing and speaks for itself; Endurance denies any characterization of the policy contrary to its express terms.

74.    The Primary Policy has a $10 million limit of liability. *See* **Exhibit 6**, at ENDURANCE000022.

**ANSWER**: Admitted in part; denied in part. This paragraph is admitted with the qualification that the Endurance Policy sits above various retentions, including a $2.5 million retention under the Professional Liability Coverage Part and $2 million retention under the Management Liability Coverage Part's Fund Coverage insuring agreement. The Endurance Policy is in writing and speaks for itself; Endurance denies any characterization of the policy contrary to its express terms.

75.    The Primary Policy has a $2.5 million retention for each **Claim** under the Professional Liability Coverage Part, and a $2 million retention for each **Claim** under Insuring Agreement I.F. of the Management Liability Coverage Part. *Id.* at ENDURANCE000022.

**ANSWER**: Admitted in part; denied in part. It is admitted that the Endurance Policy sits above various retentions, including a $2.5 million retention under the Professional Liability Coverage Part and $2 million retention under Insuring Agreement I.F. the Management Liability

Coverage Part. The Endurance Policy is in writing and speaks for itself; Endurance denies any characterization of the policy contrary to its express terms.

76.    Continental issued an Excess Insurance Policy to Federated Hermes with a **Policy Period** of October 1, 2022 to October 1, 2023, and bearing the Policy Number 596617901 ("Continental Excess Policy"). *See* **Exhibit 7**, CCC_01103; **Exhibit 40**, CNA First RFA Resp., at ¶ 1.

**ANSWER**: Admitted in part; denied in part. It is admitted that Continental issued an excess policy with a policy period of October 1, 2022 to October 1, 2023 bearing the Policy Number 596617901. The Continental Excess Policy is in writing and speaks for itself; Endurance denies any characterization of the policy contrary to its express terms.

77.    The Continental Excess Policy has a $10 million limit of liability. **Exhibit 7**, at CCC_01104.

**ANSWER**: Admitted in part; denied in part. It is admitted that the Continental Excess Policy has a limit of liability of $10 million excess of $10 million. *See* Exhibit A to Continental Motion, Continental Excess Policy, §I. The Continental Excess Policy is in writing and speaks for itself; Endurance denies any characterization of the policy contrary to its express terms.

78.    As a following-form policy, the Excess Policy provides "coverage in accordance with all of the terms, conditions and limitations … of the" Primary Policy. *Id.* at CCC_01106.

**ANSWER**: Admitted in part; denied in part. It is admitted only that the Continental Excess Policy is specifically excess over the Endurance Policy, and it provides "follow-form" coverage with respect to the Endurance Policy (*i.e.,* in accordance with the terms and conditions of the followed Endurance Policy), except as otherwise provided in the Continental Excess Policy, with a limit of liability of $10 million excess of $10 million. *See* Exhibit A to Continental Motion,

Continental Excess Policy, §I. The Continental Excess Policy is in writing and speaks for itself; Endurance denies any characterization of the policy contrary to its express terms.

79.     The Primary Policy includes both a Management Liability Coverage Part and a Professional Liability Coverage Part. *See* **Exhibit 6**, at ENDURANCE000022, ENDURANCE000038-58.

**ANSWER**: Admitted in part; denied in part. This paragraph is admitted with the qualification that the Endurance Policy also provides other coverages. By way of further response, the Endurance Policy is in writing and speaks for itself; Endurance denies any characterization of the policy contrary to its express terms.

80.     Insuring Agreement I.A. of the Professional Liability Coverage Part provides: "[i]f during the **Policy Period** … any **Claim** is made against the **Insured** for **Wrongful Acts** committed or alleged to have been committed by the **Insured** … the Insurer agrees to pay on its behalf **Loss** resulting from such **Claim**." *Id.* at ENDURANCE000052.

**ANSWER**: Admitted in part; denied in part. It is admitted that Plaintiffs have cited to portions of Insuring Agreement I.A. but it is denied that this paragraph sets forth the entire insuring agreement. Insuring Agreement I.A. Professional Liability Coverage Part of the Endurance Policy provides that

> A.     If during the **Policy Period** or the Extended Reported Period, if exercised, any **Claim** is made against the **Insured** for **Wrongful Acts** committed or alleged to have been committed by the **Insured** or by persons for whose **Wrongful Acts** the **Insured** is or is alleged to be legally responsible (including **Employees** acting within the scope of their employment) the Insurer agrees to pay on its behalf **Loss** resulting from such **Claim**.

*See* Endurance Appx. Ex., 1, Professional Liability Coverage Part, §I(A). By way of further response, the Endurance Policy is in writing and speaks for itself; Endurance denies any characterization of the policy contrary to its express terms.

81.     Insuring Agreement I.B. of the Professional Liability Coverage Part provides: "[s]olely with respect to any **Wrongful Act** reported in accordance with Subsection V.B. NOTICE OF POTENTIAL CLAIM of the General Terms and Conditions which may subsequently give rise to a **Claim** for which coverage may be provided under this Coverage Part, the Insurer may pay costs and expenses incurred by the **Insured** with the Insurer's written consent to mitigate loss or otherwise compensate any client of the **Insured** prior to any **Claim** being made in connection therewith." *Id.*

**ANSWER**: Admitted in part; denied in part. It is admitted only that Insuring Agreement I.B. of the Professional Liability Coverage Part in the Endurance Policy contains the quoted language. The Endurance Policy is in writing and speaks for itself; Endurance denies any characterization of the policy contrary to its express terms.

82.     The Professional Liability Coverage Part defines the term **Insured** to include "the **Company**, and the **Funds**." *Id.* at ENDURANCE000053.

**ANSWER**: Admitted in part; denied in part. It is admitted only that the definition of Insured includes the quoted language. The Endurance Policy is in writing and speaks for itself; Endurance denies any characterization of the policy contrary to its express terms.

83.     The General Terms and Conditions of the Primary Policy define the term Company to include "the **Named Insured** … and any **Subsidiary** of the foregoing[.]" *See id.* at ENDURANCE000026.

**ANSWER**: Admitted in part; denied in part. It is admitted only that the term Company is defined to include the quoted language. The Endurance Policy is in writing and speaks for itself; Endurance denies any characterization of the policy contrary to its express terms.

84. Federated Hermes is the **Named Insured** under the Primary Policy. *Id.* at ENDURANCE000022; **Exhibit 4**, at FHI00001277, FHI00001279-1280; **Exhibit 40**, at ¶ 6.

**ANSWER**: Admitted.

85. FAS is an **Insured** under the Professional Liability Coverage Part. *See* **Exhibit 4,** at FHI00001280; **Exhibit 40**, at ¶ 7.

**ANSWER**: Admitted.

86. The General Terms and Conditions of the Primary Policy define the term **Fund** to include "any **Investment Company** for which a **Company** acts as the principal investment advisor[.]" **Exhibit 6**, at ENDURANCE000027.

**ANSWER**: Admitted in part; denied in part. It is admitted that the term Fund includes the quoted language. The Endurance Policy is in writing and speaks for itself; Endurance denies any characterization of the policy contrary to its express terms.

87. The General Terms and Conditions of the Primary Policy define the term **Investment Company** to include "an investment company registered under the Investment Company Act of 1940, as amended … for which the **Named Insured** or any of its **Subsidiaries** acts as the principal investment advisor." *Id.* at ENDURANCE000028.

**ANSWER**: Admitted in part; denied in part. It is admitted that the term Investment Company includes the quoted language. The Endurance Policy is in writing and speaks for itself; Endurance denies any characterization of the policy contrary to its express terms.

88. The Tender Fund is a **Fund** under the Professional Liability Coverage Part. *See* **Exhibit 4**, FHI00001276, at FHI00001281; **Exhibit 40**, at ¶ 9; *see also* **Exhibit 1**, Jacobson Tr., 127:23-128:1.

**ANSWER**: Admitted.

89.    The Tender Fund is an **Insured** under the Professional Liability Coverage Part. **Exhibit 4,** at FHI00001281; **Exhibit 40**, at ¶ 8; **Exhibit 1**, Jacobson Tr., at 127:23-128:1.

**ANSWER**: Immaterial; admitted. However, the Tender Fund is not a party to this litigation.

90.    The Professional Liability Coverage Part defines the term **Claim** to include "a written demand by or on behalf of a claimant for monetary or non-monetary damages, injunctive relief, or other relief, once such demand is received by an **Insured**[.]" **Exhibit 6**, at ENDURANCE000052.

**ANSWER**: Admitted in part; denied in part. It is admitted that the term **Claim** includes the quoted language. The Endurance Policy is in writing and speaks for itself; Endurance denies any characterization of the policy contrary to its express terms.

91.    The April 19, 2023 demand from Goodwin Procter LLP, on behalf of Tender Fund, to Insureds is a **Claim** made during the **Policy Period**. **Exhibit 1**, Jacobson Tr. 249:24-252:10, 259:9-22; **Exhibit 4**, FHI00001276, at FHI00001282-83; **Exhibit 69**, CNA RFA Second RFA Resp. ¶ 1; **Exhibit 41**, Cipriani Tr. at 64:4-12.

**ANSWER**: Denied. The statements in this paragraph contain conclusions of law to which no response is required. To the extent a response is required, the April 19, 2023 letter is in writing and speaks for itself;, Endurance denies any characterization of the letter contrary to their express terms.

92.    The Professional Liability Coverage Part defines the term **Wrongful Act** to include "any actual or alleged act, error, omission, misstatement, misleading statement, neglect, or breach of duty actually or allegedly committed or attempted by any **Insured** … in the provision of or failure to perform **Professional Services**[.]" *See* **Exhibit 6**, at ENDURANCE000055.

**ANSWER**: Admitted in part; denied in part. It is admitted that the term Wrongful Act includes the quoted language. The Endurance Policy is in writing and speaks for itself; Endurance denies any characterization of the policy contrary to its express terms.

93.    The Professional Liability Coverage Part defines the term **Professional Services** to include "any advisory, consulting, management, marketing, monitoring, investment, financial, administrative, due diligence, lending services, or extensions of credit performed by an Insured, directly or indirectly, to or on behalf of a **Fund** or for the benefit of a **Fund**[.]" *Id.* at ENDURANCE000054-55.

**ANSWER**: Admitted in part; denied in part. It is admitted that the term **Professional Services** includes the quoted language. The Endurance Policy is in writing and speaks for itself; Endurance denies any characterization of the policy contrary to its express terms.

94.    FAS's provision of administrative services to the Tender Fund, including registration of the Tender Fund's shares, constitutes **Professional Services** under the Professional Liability Coverage Part. *See* **Exhibit 4**, at FHI00001282; **Exhibit 40**, CNA RFA Resp. ¶ 20-21.

**ANSWER**: Denied. The statements in this paragraph contain conclusions of law to which no response is required. To the extent a response is required, the Endurance Policy is in writing and speaks for itself; Endurance denies any characterization of the policy contrary to its express terms.

95.    FAS's failure to register the Tender Fund's shares constitutes a **Wrongful Act** under the Professional Liability Coverage Part. *See* **Exhibit 4**, at FHI00001282; **Exhibit 40**, at ¶¶ 22-23.

**ANSWER**: Denied. The statements in this paragraph contain conclusions of law to which no response is required. To the extent a response is required, the Endurance Policy is in writing and speaks for itself; Endurance denies any characterization of the policy contrary to its express terms.

96.    The Professional Liability Coverage Part defines the term **Loss** to mean "the total amount which the **Insureds** become legally obligated to pay on account of each and every **Claim** in each **Policy Period** … made against them for **Wrongful Acts** for which coverage applies, including, but not limited to … settlements, and **Defense Costs**[.]" *See* **Exhibit 6**, at ENDURANCE000053.

**ANSWER**: Admitted in part; denied in part. It is admitted only that the Professional Liability Coverage Part defines **Loss** to include the quoted language. It is denied, however, that Plaintiffs have set forth all relevant portions of the **Loss** definition. The Professional Liability Coverage Part defines the term **Loss** to mean "the total amount which an **Insured** becomes legally obligated to pay on account of each and every **Claim**, ... made against them for **Wrongful Acts** for which coverage applies, including, but not limited to, damages, punitive damages, exemplary damages, the multiple portion of any multiplied damage award, judgments, any award of pre-judgment and post judgment interest, settlements, and **Defense Costs**, **Loss** shall also include any plaintiff's attorneys and experts fees and any other plaintiff's costs or expenses awarded against or otherwise payable by the **Insured**, or payable from funds that the **Insured** has paid into escrow, pursuant to a judgment or settlement. . ." but "does not include. . . matters uninsurable under the

law pursuant to which this Policy is construed." *See* Endurance Appx. Ex., 1, Professional Liability Coverage Part, § II(D) and (N). The Endurance Policy is in writing and speaks for itself; Endurance denies any characterization of the policy contrary to its express terms.

97.    The General Terms and Conditions of the Primary Policy define the term **Defense Costs** to mean "that part of **Loss** consisting of reasonable costs, charges, fees (including, but not limited to, attorney and expert fees), and expenses … incurred, including costs of electronic discovery vendors and costs directly related to compliance with any litigation holds, in investigating, defending, or appealing **Claims** and the premium for appeal, attachment, or similar bonds[.]" *Id.* at ENDURANCE000026.

**ANSWER**: Admitted in part; denied in part. It is admitted only that the term **Defense Cost** includes the quoted language. The Endurance Policy is in writing and speaks for itself; Endurance denies any characterization of the policy contrary to its express terms.

98.    FAS's **Defense Costs** are **Loss** under the Professional Liability Coverage Part. *See* **Exhibit 4**, at FHI00001277, FHI00001284; **Exhibit 1**, Jacobson Tr., at 199:7-13.

**ANSWER**: Immaterial; admitted in part; denied in part. The statements in this paragraph contain conclusions of law to which no response is required. To the extent a response is required, the Endurance Policy is in writing and speaks for itself; Endurance denies any characterization of the policy contrary to its express terms. The Endurance Policy sits above various retentions, including a $2.5 million retention for each **Claim** under the Professional Liability Coverage Part. *See* Endurance Appx. Ex., 1, Declarations, Item 3 and 4. There is nothing in the record regarding FAS's **Defense Costs**, let alone **Defense Costs** that exceed any applicable retention.

99.    The Primary Policy does not define the term "settlements." *See generally* **Exhibit 6**.

**ANSWER**: Admitted in part; denied in part. It is admitted that the term "settlements" is not a defined term in the Endurance Policy. The Endurance Policy is in writing and speaks for itself; Endurance denies any characterization of the policy contrary to its express terms.

100.    The Shareholder Settlements are "settlements" under the ordinary meaning of the term. *See* **Exhibit 34,** at ENDURANCE009754-9788.; *See Settlement*, BLACK'S LAW DICTIONARY (12th ed. 2024); **Exhibit 41**, Cipriani Tr., at 100:11-16.

**ANSWER**: Admitted in part; denied in part. The statements in this paragraph contain conclusions of law to which no response is required. To the extent a response is required, the Shareholder Settlements are in writing and speak for themselves; Endurance denies any characterization of the Shareholder Settlement's contrary to their express terms.

101.    Under the Management Liability Coverage Part, the Insurers agreed to pay "on behalf of a **Fund** all **Loss** which it becomes legally obligated to pay on account of any **Claim** first made against it during the **Policy Period** … for a **Wrongful Act** of such **Fund** … taking place before or during the **Policy Period**." *See* **Exhibit 6**, at ENDURANCE000039.

**ANSWER**: Immaterial; admitted. It is admitted only that the language quoted above appears in a subpart of the Management Liability Coverage Part. It is denied that this provision is relevant because the "alternative settlement" payments were paid by FAS, not the Tender Fund, and FAS is seeking reimbursement from the insurers in this coverage litigation for the amounts it paid to the Affected Shareholders. *See* Plaintiffs' SUMF ¶64. By way of further response, the Endurance Policy is in writing and speaks for itself; Endurance denies any characterization of the policy contrary to its express terms.

102.    The Tender Fund is a **Fund** under the Management Liability Coverage Part. **Exhibit 4**, at FHI00001280-1281; **Exhibit 40**, at ¶ 9; *see also* **Exhibit 1,** Jacobson Tr., at 17:17-21, 127:23-128:1.

**ANSWER**: Immaterial; admitted in part; denied in part. The statements in this paragraph contain conclusions of law to which no response is required. To the extent a response is required, the Endurance Policy is in writing and speaks for itself; Endurance denies any characterization of the policy contrary to its express terms. It is admitted that the Tender Fund is a **Fund** under the Management Liability Coverage Part. It is denied that this provision is material here because the "alternative settlement" payments were paid by FAS, not the Tender Fund, and FAS is seeking reimbursement from the insurers in this coverage litigation for the amounts it paid to the Affected Shareholders. *See* Plaintiffs' SUMF ¶64.

103.    The Tender Fund is an **Insured** under the Management Liability Coverage Part. **Exhibit 4**, at FHI00001281; **Exhibit 40**, at ¶ 8.; **Exhibit 1**, Jacobson Tr. 127:23-128:1; **Exhibit 41**, Cipriani Tr., at 65:17-20.

**ANSWER**: Immaterial; admitted in part; denied in part. The statements in this paragraph contain conclusions of law to which no response is required. To the extent a response is required, the Endurance Policy is in writing and speaks for itself; Endurance denies any characterization of the policy contrary to its express terms. It is admitted that the Tender Fund is a **Fund** under the Management Liability Coverage Part. It is denied that this provision is material here because the "alternative settlement" payments were paid by FAS, not the Tender Fund, and FAS is seeking reimbursement from the insurers in this coverage litigation for the amounts it paid to the Affected Shareholders. *See* Plaintiffs' SUMF ¶64.

104.    The Management Liability Coverage Part defines the term **Claim** to include a "written demand by or on behalf of a claimant for monetary or non-monetary damages, injunctive relief, or other relief." *See* **Exhibit 6**, at ENDURANCE000040.

**ANSWER**: Admitted in part; denied in part. It is admitted only that the quoted language appears in the definition of Claim. The Endurance Policy is in writing and speaks for itself; Endurance denies any characterization of the policy contrary to its express terms.

105.    The May 2023 Affected Shareholders demands to the Tender Fund are **Claims** made during the **Policy Period** under the Management Liability Coverage Part. *See* **Exhibit 4**, at FHI00001280; **Exhibit 1**, Jacobson Tr. at 240:22-241:9, 259:9-22.

**ANSWER**: Denied. The statements in this paragraph contain conclusions of law to which no response is required. To the extent a response is required, the May 2023 demands and the policy are in writing and speak for themselves; Endurance denies any characterization of those documents contrary to their express terms. Further, the demands were directed to Stephen Van Meter at his Federated Hermes email address and were sent upon his instructions, after he had already orally offered the "alternative settlement" amounts. *See* Endurance Appx. Ex. 7, Tr. of Dep. of S. Van Meter at 131:17-132:6.

106.    The Management Liability Coverage Part defines the term **Wrongful Act** to include "any error, misstatement, misleading statement, act, omission, neglect, or breach of duty actually or allegedly committed or attempted by a **Fund**[.]" *See* **Exhibit 6**, at ENDURANCE000047.

**ANSWER**: Admitted in part; denied in part. It is admitted only that the quoted language appears in the definition of Wrongful Act. The Endurance Policy is in writing and speaks for itself; Endurance denies any characterization of the policy contrary to its express terms.

107.    The Tender Fund's sales of unregistered shares to Affected Shareholders constitute Wrongful Acts under the Management Liability Coverage Part. *See* **Exhibit 4**, at FHI00001280; **Exhibit 12**, at ¶¶ 40-41; **Exhibit 40**, at ¶¶ 22-23.

**ANSWER**: Admitted in part; denied in part. The statements in this paragraph contain conclusions of law to which no response is required. To the extent a response is required, the Endurance Policy is in writing and speaks for itself; Endurance denies any characterization of the policy contrary to its express terms.

108.    The Tender Fund's misstatements in prospectuses representing that shares were registered and omissions not disclosing that the shares were unregistered constitute Wrongful Acts under the Management Liability Coverage Part. *Id.*; *see also* **Exhibit 40**, at ¶ 24.

**ANSWER**: Denied. The statements in this paragraph are conclusions of law to which no response is required. To the extent a response is required, the policy and the Tender Fund's prospectuses are in writing and speak for themselves; Endurance denies any characterization of the prospectuses contrary to their express terms. *See* Plaintiffs Ex. 2 at FHI00013760; Ex. 12 at ¶¶ 41-42. In any event, this allegation is immaterial because the Affected Shareholders never asserted that any Tender Fund prospectus contained misrepresentations and there is nothing in the record to suggest that the "alternative settlements" at issue were an effort to resolve supposed claims regarding misrepresentation. *See* Endurance Appx. Ex. 5 at Nos. 36-41, 59-61.

109.    The Management Liability Coverage Part defines **Loss** to mean "the total amount which an **Insured** becomes legally obligated to pay on account of each and every **Claim** … in each **Policy Period** … made against them for **Wrongful Acts** for which coverage applies, including, but not limited to … settlements, and **Defense Costs**[.]" *See* **Exhibit 6**, at ENDURANCE000042.

**ANSWER**: Admitted in part; denied in part. It is admitted only that the Management Liability Coverage Part defines **Loss** to include the quoted language. It is denied, however, that Plaintiffs have set forth all relevant portions of the **Loss** definition. The Endurance Policy is in writing and speaks for itself; Endurance denies any characterization of the policy contrary to its express terms.

110.    The Tender Fund's **Defense Costs** are covered **Loss** under the Management Liability Coverage Part. *See* **Exhibit 4**, at FHI00001284; **Exhibit 1**, Jacobson Tr., at 199:7-13.

**ANSWER**: Immaterial; denied. The statements in this paragraph contain conclusions of law to which no response is required. To the extent a response is required, the Endurance Policy is in writing and speaks for itself; Endurance denies any characterization of the policy contrary to its express terms. The Endurance Policy sits above various retentions. *See* Endurance Appx. Ex. 1, Declarations, Item 3 and 4. There is nothing in the record regarding the Tender Fund's **Defense Costs**, let alone **Defense Costs** that exceed any applicable retention.

111.    The Management Liability Coverage Part further states that **Loss**, "other than **Defense Costs**, does not include: … matters uninsurable under the law pursuant to which this Policy is construed or fines or penalties other than civil fines and penalties imposed on an **Insured** for non-knowing or non-willful conduct; provided that: (a) the Insurer will not assert that the portion of any **Defense Costs**, settlement, or judgment in a **Claim** arising from an initial or subsequent public offering of an **Insured Entity's** securities constitutes uninsurable **Loss** due to the alleged violations of Section 11 and/or 12 of the Securities Act of 1933 as amended[.]" **Exhibit 6**, at ENDURANCE000043.

**ANSWER**: Immaterial; admitted in part; denied in part. It is admitted only that the quoted language appears in the Management Liability Coverage Part's definition of **Loss**. The policy is in writing and speaks for itself; Endurance denies any characterization of the policy that is contrary to its express terms. Moreover, it is denied that this provision is material here because the "alternative settlement" payments were paid by FAS, not the Tender Fund, and FAS is seeking reimbursement from the insurers for the amounts *it* paid to the Affected Shareholders. *See* Plaintiffs' SUMF ¶64.

112.    Endurance's Head of Financial Lines testified that it is common in the insurance market for policies to include provisions stating that the insurer will not assert that Section 11 and Section 12 claims are uninsurable. *See* **Exhibit 42**, April 23, 2025 Deposition of Ray Santiago ("Santiago Tr.") at 132:23-133:16.

**ANSWER**: Denied. Contrary to Plaintiffs' assertion, Mr. Santiago did not testify that this provision is "common in the market." In response to counsel's leading question regarding whether the provision was "common in the market," Mr. Santiago testified that he is familiar with carve-outs in policies that provide that an insurer will not claim that violations of Section 11 or Section

12 constitute uninsurable loss and that it is a request "that's asked for in the market." *See* Plaintiffs' Ex. 42, Deposition of Ray Santiago ("Santiago Tr.") at 132:23-133:16.

113.     The Insurers do not contend that any exclusion in the Primary Policy bars coverage. *See generally* ECF No. 26 (Continental's Affirmative Defenses); ECF No. 33 (Endurance's Affirmative Defenses); **Exhibit 1**, Jacobson Tr 244:16-245:6, 253:15-254:18.

**ANSWER**: Admitted in part; denied in part. It is admitted only that Endurance did not address any specific exclusions in its June 12, 2023 correspondence. However, it reserved all rights under the Policy, at law and equity, several times, including but not limited to during the April 21, 2023 call and in Endurance's April 25, 2023, May 3, 2023 and May 9, 2023 emails and in its June 12, 2023 letter. *See* Plaintiffs' Ex. 48; Endurance Appx. Exs. 28-29, 32. Moreover, Plaintiffs' summary judgment motion asserts, for the first time, that the Tender Fund is entitled to Fund Coverage under policy's Management Liability coverage part; in its responsive brief, Endurance has raised exclusions that would bar coverage under the Fund Coverage insuring agreement.

114.     The Insurers' sole coverage defense is that the Shareholder Settlements constitute "uninsurable **Loss**." **Exhibit 1**, Jacobson Tr. at 253:15-254:18; ECF No. 26 (Continental's Affirmative Defenses) at ¶¶ 11-12; ECF No. 33 (Endurance's Affirmative Defenses) at ¶¶ 13-15.

**ANSWER**: Denied. Endurance's Memorandum of Law in Support of its Motion for Summary Judgment, sets forth its coverage positions. *See* Endurance's Memorandum of Law in Support of its Motion for Summary Judgment, pgs. 18-31. Moreover, Plaintiffs' summary judgment motion asserts, for the first time, that the Tender Fund is entitled to Fund Coverage under policy's Management Liability Coverage Part; in its responsive brief, Endurance has raised exclusions that would bar coverage under the Fund Coverage insuring agreement.

115.    Endurance's Head of Financial Lines testified that he was surprised that Endurance was asserting that the Shareholder Settlements were "uninsurable **Loss**" given the Primary Policy's carve-back for Section 11 and 12 claims, and stated that "the words say what they say" and "are clear." *See* **Exhibit 42**, Santiago Tr., at 134:13-135:12.

**ANSWER**: Denied. This is a misleading characterization of Mr. Santiago's testimony. Mr. Santiago's testimony was in response to counsel's question regarding the **Loss** definition in the Management Liability coverage part (not the **Loss** definition in the Professional Liability coverage part): "Given that language in the policy, would it surprise you to understand that Endurance is claiming that Section 11 and Section 12 violations are not covered under the policy." Mr. Santiago responded: "I mean, as the policy is written, I would say yes. Without context of the complaint in general, I struggle to say definitively, but, yeah, as this is written, the words say what they say." *See* Plaintiffs' Ex. 42, Santiago Tr. at 134:13-135:12.

116.    The Primary Policy states that the **Insured** "shall not make any payment, incur any **Defense Costs**, admit any liability, settle any **Claim**, assume any obligations, or incur any expenses without the consent of the Insurer, which consent shall not be unreasonably delayed or withheld." *See* **Exhibit 6**, at ENDURANCE000025.

**ANSWER**: Admitted in part; denied in part. It is admitted only that the quoted language appears in the Endurance Policy. The Endurance Policy is in writing and speaks for itself; Endurance denies any characterization of the policy contrary to its express terms.

117.    The Primary Policy states that the Insurer "shall have the right and shall be given the opportunity to effectively associate with the **Insureds** in the investigation, defense, and settlement, including, but not limited to, the negotiation of a settlement, of any **Claim** that appears reasonably likely to be covered in whole or in part by this Policy." *See id.*

**ANSWER**: Admitted in part; denied in part. It is admitted only that the quoted language appears in the Endurance Policy. The Endurance Policy is in writing and speaks for itself; Endurance denies any characterization of the policy contrary to its express terms.

118.    On March 31, 2023, the Insureds provided the Insurers with a Notice of Circumstance pursuant to Section V(B) of the Primary Policy. *See* **Exhibit 5**, ENDURANCE004037; **Exhibit 41**, Cipriani Tr. at 55:11-24.

**ANSWER**: Admitted in part; denied in part. It is admitted that Plaintiffs sent a letter, dated March 31, 2023, to Endurance stating it that was a Notice of Circumstance. The March 31, 2023 letter is in writing and speaks for itself; Endurance denies any characterization of the letter contrary to its express terms.

119.    The March 31, 2023 notice advised the Insurers that FAS was responsible for registering the Tender Fund's shares with the SEC, that Tender Fund shareholders were issued unregistered shares from and after April 30, 2021, and that the Tender Fund was considering rescission offers for those shares. **Exhibit 5**, at ENDURANCE004040.

**ANSWER**: Admitted in part; denied in part. The March 31, 2023 letter is in writing and speaks for itself; Endurance denies any characterization of the letter contrary to its express terms.

120.    The March 31, 2023 notice advised the Insurers of potential demands from the Tender Fund's Board of Trustees for "(1) any costs associated with making the rescission offers (including the difference between the original purchase price and the NAV of the Fund on the date the rescission offer is accepted); (2) the amount of interest required to be paid to any investors who accept the rescission offers; and (3) any SEC civil penalties required to be paid by the Fund if the SEC initiates an enforcement action against the Fund." *Id.* at ENDURANCE004041.

**ANSWER**: Admitted in part; denied in part. It is admitted only that the quoted language appears in the March 31, 2023 letter. The March 31, 2023 letter is in writing and speaks for itself; Endurance denies any characterization of the letter contrary to its express terms.

121.    The March 31, 2023 notice advised the Insurers that "there is a possibility that the SEC could bring an enforcement action against one or more of the Federated Hermes Insureds for offering or selling unregistered securities in violation of Section 5 of the Securities Act of 1933." *Id.*

**ANSWER**: Admitted in part; denied in part. It is admitted only that the quoted language appears in the March 31, 2023 letter. The March 31, 2023 letter is in writing and speaks for itself; Endurance denies any characterization of the letter contrary to its express terms.

122.    Endurance admitted that "SEC investigations are expensive to defend." *See* **Exhibit 1**, Jacobson Tr., at 96:10-17, 121:14-16.

**ANSWER**: Immaterial; denied. It is denied that Endurance made any such admission as this subject was not a corporate designee topic. Endurance's claims handling, Lisa Jacobson testified, as a fact witness, that SEC investigations are "expensive to defend" but explained that "all of this is dependent on the facts and circumstances of each case. As you know, the SEC investigations vary. It depends on what they're investigating and for how long and how

- 52 -

voluminous the document protection is. But it could range anywhere from a few hundred grand to a few million." Further, Ms. Jacobson testified that while such investigations are expensive to defend, such costs are not normally considered covered Loss: "more likely than not, and again, dependent on the facts and the policy wording, the SEC can fine, penalize and disgorge, and that is typically not a covered loss under most policies…" *See* Plaintiff's Ex. 1, Jacobson Tr. at 96:10-17, 121:14-16.

123.    Endurance admitted that "there were definitely a very large amount of SEC investigations during the Biden administration" and acknowledged that the SEC was regarded as "activist" during the time it identified the registration issue involving the Tender Fund. *See* **Exhibit 1**, Jacobson Tr., at 100:7-17.

**ANSWER**: Immaterial; denied. It is denied that Endurance made any such admission as this subject was not a corporate designee topic. Admitted only that Ms. Jacobson provided the quoted testimony as a fact witness.

124.    Endurance admitted that the SEC investigates share registration violations. *See* **Exhibit 1**, Jacobson Tr., at 106:17-108:1.

**ANSWER**: Immaterial; denied. It is denied that Endurance made any such admission as this subject was not a corporate designee topic. Further, Plaintiffs cite a portion of Ms. Jacobson's transcript that does not support their assertion. Ms. Jacobson specifically testified, as a fact witness, that she is "not the SEC, and I don't know why they do what they do" and that she is "not by any stretch of the imagination a securities law expert" and that her "knowledge of how [the SEC] operates is based on my handling of claims that involves these things." *See* Plaintiffs' Ex. 1, Jacobson Tr. at 106:17-108:1.

125.    Endurance admitted that the SEC may impose various penalties on a company in an enforcement action, including monetary penalties that can reach into the millions of dollars. *See* **Exhibit 1**, Jacobson Tr., at 98:2-13.

**ANSWER**: Immaterial; denied. It is denied that Endurance made any such admission as this subject was not a corporate designee topic. Ms. Jacobson testified, as a fact witness, that with respect to an SEC <u>enforcement action</u>, that "the results of an SEC enforcement action is typically a fine, a penalty, or a disgorgement that's specific to the case" and that "depending on the circumstances" the results could be in the millions of dollars. *See* Plaintiffs' Ex. 1, Jacobson Tr. at 98:2-13. However, she specifically testified that she is "not the SEC, and I don't know why they do what they do" and that she is "not by any stretch of the imagination a securities law expert" and that her "knowledge of how [the SEC] operates is based on my handling of claims that involves these things." *Id*. at 106:17-108:1. Further, the SEC never brought an enforcement action here. *See* Plaintiffs' SUMF ¶ 69.

126.    Endurance was aware of the "potential claims that could occur" based on Insureds' March 31, 2023 notice. *See* **Exhibit 1**, Jacobson Tr., at 118:9-119:21, 174:20-175:9, 176:2-12, 259:9-22; **Exhibit 43**, ENDURANCE008814.

**ANSWER**: Immaterial; admitted in part; denied in part. It is admitted only that the quoted language appears in the March 31, 2023 letter. The March 31, 2023 letter is in writing and speaks for itself; Endurance denies any characterization of the letter contrary to its express terms.

127.    Endurance admitted that FAS's professional services error "could be very expensive to Federated Hermes." *See* **Exhibit 1**, Jacobson Tr., at 119:9-21.

**ANSWER**: Immaterial; admitted in part; denied in part. It is denied that Endurance made any such admission as this subject was not a corporate designee topic. It is admitted only that in

response to a question from Federated's counsel that "We are talking about a very expensive professional services error, aren't we?" Ms. Jacobson testified, as a fact witness: "I think, you know, potentially, based on what was noticed to Sompo, yes, it could be very expensive to Federated Hermes." *See* Plaintiffs' Ex. 1, Tr. of Dep. of L. Jacobson at 119:15-21. Whether any professional services error "could be very expensive" is not necessarily material to whether coverage exists. By way of further response, the Endurance Policy sits above various retentions, including a $2.5 million retention for each **Claim** under the Professional Liability Coverage Part and a $2 million retention under the Management Liability Coverage Part. Endurance Appx. Ex. 1, Declarations, Item 3 and 4. There is nothing in the record regarding any **Defense Costs** FAS, or any other Federated Hermes entity, incurred.

128.    Endurance testified that the March 31, 2023 notice did not set off "any particular alarm bells" for Endurance. *See* **Exhibit 1**, Jacobson Tr., at 121:1-122:3.

**ANSWER**: Immaterial; admitted in part; denied in part. It is denied that Endurance made any such admission as this subject was not a corporate designee topic. In response to a question from Federated's counsel that "it's a major type of error, isn't it, when you fail to register securities with the SEC," Ms. Jacobson testified, as a fact witness that, based on her "research and, you know, engag[ing] specific counsel to get a better understanding of this type of violation…" that "it didn't setoff [sic] any particular alarm bells." *See* Plaintiffs' Ex. 1, Tr. of Dep. of L. Jacobson at 121:1-122:3. Ms. Jacobson did not testify that the March 31, 2023 notice did not set off any particular alarm bells and that characterization of her testimony is denied.

129.    Endurance acknowledged that the failure to register the Tender Fund's shares was a "strict liability" violation. *See* **Exhibit 1**, Jacobson Tr., at 122:4-123:5, 131:1-7, 143:7-17; **Exhibit 4**, at FHI00001281.

**ANSWER**: Admitted in part; denied in part. To the extent the statements in this paragraph are conclusions of law to which no response is required, they are denied. To the extent a response is required, Ms. Jacobson testified that for this case, if the shareholders had opted for the rescission remedy, "that the insured was responsible for the remedy under the statute, that's it." *See* Plaintiffs' Ex. 1, Jacobson Tr. at 122:4-16.

130.    Endurance admitted that FAS's administrative error created liability for the Tender Fund. *See* **Exhibit 1**, Jacobson Tr., at 128:2-9.

**ANSWER**: Immaterial; admitted in part; denied in part. To the extent the statements in this paragraph are conclusions of law to which no response is required, they are denied. To the extent a response is required, it is admitted that in response to a question from Federated's counsel that "Obviously Endurance does not dispute that the Tender Fund had liability as the result of the administrative error that was made by Federated Administrative Services, correct?" Ms. Jacobson testified "I believe based on the information provided to us." Whether any administrative error "created liability for the Tender Fund" is not necessarily material to whether coverage exists. Moreover, the Tender Fund did not pay the "alternative settlement" amounts and is not a party to this litigation. *See* Plaintiffs' Ex. 1, Tr. of Dep. of L. Jacobson at 128:2-9.

131.    Endurance testified that it did not think the share registration error "was a huge deal, although" it "could see how people at Federated were probably concerned." *See* **Exhibit 1**, Jacobson Tr., at 142:12-143:6.

**ANSWER**: Immaterial; denied. This paragraph mischaracterizes Lisa Jacobson's deposition testimony. In responding to counsel's leading deposition question that "it's not a good thing when the disclosure branch chief tells you that you have made an error, correct?" Ms. Jacobson testified that "Again I think it really depends on the circumstance. I think here was – based on the information I had, this appeared to be a real, honest, you know, clerical mistake, and Federated complied with the SEC in addressing that… so "it was really no harm/no foul whatsoever, and it was addressed by – and Federated complied with the SEC and cooperated. So no, I don't think it was a huge deal, although I could see how people at Federated were probably concerned. *See* Plaintiffs' Ex. 1, Tr. of Dep. of L. Jacobson at 142:12-143:6.

132.    As of April 10, 2023, Endurance understood that this was a time-sensitive and urgent insurance claim. *See* **Exhibit 1**, Jacobson Tr. at 135:10-14.

**ANSWER**: Admitted in part; denied in part. It is admitted that the April 10, 2023 letter from counsel for Plaintiffs characterized the request for so-called "costs of correction" coverage under I.B. of the Professional Liability Coverage Part as "urgent" *See* Endurance Appx. Ex. 1., Declarations and Professional Liability Coverage Part, §I(B). It is also admitted that in response to a question from Federated "Did you understand as of April 10 based upon these communications both from Michelle McArdle, the insurance risk manager, and Damian Brew, that there was some urgency to this matter" Ms. Jacobson testified "Yes." *See* Plaintiffs' Ex. 1, at 135:10-14. *See* Plaintiffs' Ex. 1, Jacobson Tr. at 135:10-14 (emphasis added). However, the April 10 letter did not identify any costs or expenses that exceeded any applicable retention.

133.    On April 10, 2023, the Insureds sent an "URGENT" request to the Insurers seeking costs-of-correction coverage pursuant to Insuring Agreement B of the Professional Liability Coverage Part. *See* **Exhibit 23**, ENDURANCE004045; *see* **Exhibit 1**, Jacobson Tr., at 160:8-17, 171:24-172:7; **Exhibit 61,** Lipkowitz Tr. 77:22-78:6.

**ANSWER**: Admitted in part; denied in part. It is admitted that Plaintiffs sent a letter on April 10, 2023 marked "URGENT" and seeking what counsel characterized as "costs of correction" coverage. The April 10, 2023 letter sought coverage under insuring Agreement I.B. of the Policy's Professional Liability Coverage Part which provides that

> B.    Solely with respect to any **Wrongful Act** reported in accordance with Subsection V.B. NOTICE OF POTENTIAL CLAIM of the General Terms and Conditions which may subsequently give rise to a **Claim** for which coverage may be provided under this Coverage Part, the Insurer may pay costs and expenses incurred by the **Insured** with the Insurer's written consent to mitigate loss or otherwise compensate any client of the **Insured** prior to any **Claim** being made in connection therewith.

*See* Endurance Appx. Ex. 1., Professional Liability Coverage Part, §I(B). By its terms, this insuring agreement is permissive: Endurance is not required to pay costs and expenses, but it *may* do so to mitigate loss before a **Claim** is made. *Id.* Further, should Endurance determine that it will pay such costs and expenses, it is only required to pay the costs and expenses that exceed the $2.5 million retention for each **Claim** under the Professional Liability Coverage Part. *Id*. Declarations, Item 3 and 4. By way of further response, the April 10, 2023 letter is a writing which speaks for itself and, Endurance denies any characterization of the letter contrary to its express terms.

134.    Endurance's Head of Financial lines testified that that costs-of-correction coverage is time-sensitive insurance coverage. *See* **Exhibit 42**, Santiago Tr., at 89:10-23.

**ANSWER**: Denied. Mr. Santiago testified that the scope of coverage under "Cost of Corrections" is going to vary but that it's a time sensitive coverage with respect to a response. *See*

Plaintiffs' Ex. 42, Santiago Tr. at 89:10-23. By way of further response, Mr. Santiago was not asked about the specific policy language at issue here.

135.    Endurance never completed a coverage analysis with respect to the Insureds' April 10, 2023 request for costs-of-correction coverage. *See* **Exhibit 1**, Jacobson Tr., at 181:22-182:8, 178:5-14; *see also id.* at 178:5-14.

**ANSWER**: Denied. Endurance was in near-constant communication with Reed Smith and Plaintiffs throughout the course of the fast-moving and fast-changing developments. Indeed, Ms. Jacobson testified that Endurance's response included multiple telephone discussions with Reed Smith and Federated:

> Q.    Did you respond to the request for Cost of Correction coverage?
>
> A.    Yes, we did. We had multiple phone calls and asked for more information. When your words, not policy words, were asked for a cost – when we were asked – excuse me. Let me rephrase. When the insured via your letter asked for, quote, Cost of Correction coverage, which, again, is not a policy term, yep.
>
> Q.    And did you ever respond to Cost of Correction coverage so that the Tender Fund could compensate the shareholders who had been sold unregistered shares?
>
> MR. CARLSON: Objection to form.
>
> A.    Yes. Again, I think we can just agree for purposes of all three answers the reference to the Costs of Correction coverage under the policy is the words used in your correspondence, they're not actually words used in the policy, but we did – we were incredibly responsive, had multiple calls with you, with Damian [the broker], with George [Magara] who was the general counsel of Federated, and exchanged many emails. We had – we did issue a coverage position and prior to that, we did allow the insured to properly defend itself in the way that it sees fit as this is a non-duty to defend policy and we agreed not to raise consent as a coverage defense.

*See* Endurance Supp. Appx. Ex. 4, Tr. of Dep. of L. Jacobson at 146:11-147:14.

By way of further response, coverage under I.B. of the Professional Liability Coverage

Part in the Endurance Policy provides permissive, rather than mandatory coverage, for "costs of corrections" that exceed the $2.5 million retention, which the costs had not even remotely reached. *See* Endurance Appx. Ex. 1., Declarations and Professional Liability Coverage Part, §I(B). In fact, Plaintiffs estimated that costs incurred, as of April 10, 2023, were approximately $150,000—well within any applicable self-insured retention. *See* Endurance Appx. Ex. 19. Further, Plaintiffs' asserted a formal Claim, just 10-days later, on April 20, 2023. *See* Endurance Appx. Ex. 29 at ENDURANCE000002. Endurance's June 12, 2023 letter offered to reimburse **Defense Costs** in excess of the applicable retention. Endurance's SUMF ¶ 108.

136.    Endurance testified it "never needed to fully complete" a coverage analysis with respect to the Insureds' April 10, 2023 request for costs-of-correction coverage "in light of the claim coming in shortly thereafter." *See* **Exhibit 1**, Jacobson Tr. at 181:22-182:9; *see also* **Exhibit 44**, September 11, 2025 Deposition of Marc Mayerson ("Mayerson Tr."), at 93:24-94:7, 103:16-23.

**ANSWER**: Admitted in part; Denied in part. It is admitted only that Ms. Jacobson testified: "So we never needed to fully complete that analysis in light of the claim coming in shortly thereafter, and like I said, the coverage position speaks for itself." *See* Plaintiffs' Ex. 1, Jacobson Tr. at 181:22-182:9. Moreover, Endurance was in near-constant communication with Reed Smith and Plaintiffs throughout the course of the fast-moving and fast-changing developments. Indeed, Ms. Jacobson testified that Endurance's response included multiple telephone discussions with Reed Smith and Federated:

Q.    Did you respond to the request for Cost of Correction coverage?

A.    Yes, we did. We had multiple phone calls and asked for more information. When your words, not policy words, were asked for a cost – when we were asked – excuse me. Let me rephrase. When the insured via your letter asked

for, quote, Cost of Correction coverage, which, again, is not a policy term, yep.

Q.    And did you ever respond to Cost of Correction coverage so that the Tender Fund could compensate the shareholders who had been sold unregistered shares?

MR. CARLSON: Objection to form.

A.    Yes. Again, I think we can just agree for purposes of all three answers the reference to the Costs of Correction coverage under the policy is the words used in your correspondence, they're not actually words used in the policy, but we did – we were incredibly responsive, had multiple calls with you, with Damian [the broker], with George [Magara] who was the general counsel of Federated, and exchanged many emails. We had – we did issue a coverage position and prior to that, we did allow the insured to properly defend itself in the way that it sees fit as this is a non-duty to defend policy and we agreed not to raise consent as a coverage defense.

*See* Endurance Supp. Appx. Ex. 4 Tr. of Dep. of L. Jacobson at 146:11-147:14.

By way of further response, coverage under I.B. of the Professional Liability Coverage Part in the Endurance Policy provides permissive, rather than mandatory coverage, for "costs of corrections" that exceed the $2.5 million retention, which the costs had not even remotely reached. *See* Endurance Appx. Ex. 1., Declarations and Professional Liability Coverage Part, §I(B). In fact, Plaintiffs estimated that costs incurred, as of April 10, 2023, were approximately $150,000—well within any applicable self-insured retention. *See* Endurance Appx. Ex. 19. Further, Plaintiffs' asserted a formal Claim, just 10-days later, on April 20, 2023. *See* Endurance Appx. Ex. 29 at ENDURANCE000002. Endurance's June 12, 2023 letter offered to reimburse **Defense Costs** in excess of the applicable retention. Endurance's SUMF ¶ 108.

137.    Endurance admitted that claim handlers have an obligation to give a written coverage position in response to an insured's request for coverage. **Exhibit 1**, Jacobson Tr. at 323:15-324:10.

**ANSWER**: Admitted in part; denied in part. Admitted that Ms. Jacobson testified that "So, as I stated, as part of our job as claims handlers, we do issue coverage positions to our insureds in connection with matters noticed to us." *See* Plaintiffs' Ex. 1, Jacobson Tr. at 323:15-324:10. To the extent Plaintiffs allege that Endurance failed to provide a written coverage position, Endurance denies same.

138.    Endurance never issued a written response to the Insureds' April 10, 2023 request for costs-of-correction coverage. *See id*; *see also* **Exhibit 44**, Mayerson Tr., at 93:24-94:7, 103:16-23.

**ANSWER**: Denied. Endurance was in near-constant communication with Reed Smith and Plaintiffs throughout the course of the fast-moving and fast-changing developments. Indeed, Ms. Jacobson testified that Endurance's response included multiple telephone discussions with Reed Smith and Federated:

Q.    Did you respond to the request for Cost of Correction coverage?

A.    Yes, we did. We had multiple phone calls and asked for more information. When your words, not policy words, were asked for a cost – when we were asked – excuse me. Let me rephrase. When the insured via your letter asked for, quote, Cost of Correction coverage, which, again, is not a policy term, yep.

Q.    And did you ever respond to Cost of Correction coverage so that the Tender Fund could compensate the shareholders who had been sold unregistered shares?

MR. CARLSON: Objection to form.

A.    Yes. Again, I think we can just agree for purposes of all three answers the reference to the Costs of Correction coverage under the policy is the words used

in your correspondence, they're not actually words used in the policy, but we did – we were incredibly responsive, had multiple calls with you, with Damian [the broker], with George [Magara] who was the general counsel of Federated, and exchanged many emails. We had – we did issue a coverage position and prior to that, we did allow the insured to properly defend itself in the way that it sees fit as this is a non-duty to defend policy and we agreed not to raise consent as a coverage defense.

*See* Endurance Supp. Appx. Ex. 4 Tr. of Dep. of L. Jacobson at 146:11-147:14.

By way of further response, coverage under I.B. of the Professional Liability Coverage Part in the Endurance Policy provides permissive, rather than mandatory coverage, for "costs of corrections" that exceed the $2.5 million retention, which the costs had not even remotely reached. *See* Endurance Appx. Ex. 1., Declarations and Professional Liability Coverage Part, §I(B). In fact, Plaintiffs estimated that costs incurred, as of April 10, 2023, were approximately $150,000—well within any applicable self-insured retention. *See* Endurance Appx. Ex. 19. Further, Plaintiffs asserted a formal Claim, just 10-days later, on April 20, 2023. *See* Endurance Appx. Ex. 29 at ENDURANCE000002. Endurance issued its initial coverage conclusions on June 12, 2023. *See* Endurance Appx. Ex. 51.

139.    ICI Mutual describes costs of correction as follows: "'Costs of correction' coverage, pioneered by ICI Mutual, provides for reimbursement to an insured company for its costs of correcting situations that, if not corrected, would result in actual legal liability on the part of the insured company. Significantly, a lawsuit or other 'claim' is not necessary to trigger the potential availability of this coverage. Indeed, a basic purpose of this coverage is to permit prompt correction by insured companies of operations-based errors in order to avoid later, more expensive problems or litigation." **Exhibit 1**, Jacobson Tr., at Depo. Ex. 16.

**ANSWER**: Immaterial; denied. The statements in this paragraph contain conclusions of law to which no response is required. To the extent a response is required, the referenced document

is in writing and speaks for itself. Endurance denies any characterization of that document contrary to its express terms. Moreover, the ICI Mutual description of such coverage is immaterial because ICI Mutual did not issue the relevant policy here and the document at issue addresses wholly different policy language. Insuring Agreement I.B. of the Professional Liability Coverage Part in the Endurance Policy specifically states what coverage is afforded and clearly denotes that the coverage is permissive so that Endurance is not required to pay costs and expenses, but it *may* do so to mitigate loss before a **Claim** is made, once the applicable retention is paid. *See* Endurance Appx. Ex. 1., Professional Liability Coverage Part, §I(B).

140.    HUB International describes costs of correction coverage as follows: "Think of Cost of Corrections (COC) coverage as preemptive liability protection that allows an investment company or trading firm to trigger its own payout after an error. Avoiding a lawsuit, but still making the customer whole, without the need to contribute beyond the deductible COC coverage is a reputation saver for many businesses." **Exhibit 1**, Jacobson Tr., at Depo. Ex. 15.

**ANSWER**: Immaterial; denied. The statements in this paragraph contain conclusions of law to which no response is required. To the extent a response is required, the referenced document is in writing and speaks for itself. Endurance denies any characterization of that document contrary to its express terms. Moreover, the HUB International description of such coverage is immaterial because HUB International did not issue the relevant policy here and the document at issue addresses wholly different policy language.

141.    Insuring Agreement I.B. of the Professional Liability Coverage Part in the Endurance Policy specifically states what coverage is afforded and clearly denotes that the coverage is permissive so that Endurance is not required to pay costs and expenses, but it *may* do so to mitigate loss before a **Claim** is made, once the applicable retention is paid. *See* Endurance Appx. Ex. 1., Professional Liability Coverage Part, §I(B). Endurance's expert referred to costs-of-correction coverage as a "pay-now-or-pay- more-later coverage." **Exhibit 45**, July 18, 2025 Expert Report of Marc Mayerson ("Mayerson Report") at 17 ¶ 59.

**ANSWER**: Denied. Mr. Mayerson does not specifically refer to Insuring Agreement I.B. of the Endurance Policy as "pay-now-or-pay-more-later coverage"; instead, his report focuses on the fact that pre-claim coverage "in any particular circumstance depends on both the wording and facts" and that the wording in the Endurance Policy "plainly contemplates that Endurance has reasonably wide discretion in terms of its performance. Looking specifically at the cost-of-corrections coverage further, Endurance's performance is described as permissive, not mandatory." *See* Plaintiffs' Ex. 45 at ¶¶ 55-61. Mr. Mayerson's report is a writing which speaks for itself, and Endurance denies any characterization of the report contrary to its express terms.

142.    On April 20, 2023, Insureds provided the Insurers with a "Supplemental Notice and Notice of Claim." *See* **Exhibit 32**, ENDURANCE007827; **Exhibit** 41, Cipriani Tr. 63:20-23; **Exhibit 61**, Lipkowitz Tr., at 85:22-86:16.

**ANSWER**: Admitted in part; denied in part. It is admitted that Plaintiffs sent a follow-up correspondence to Endurance dated April 20, 2023 and the quoted language appears in the letter. The April 20, 2023 letter is in writing and speaks for itself; Endurance denies any characterization of the letter contrary to its express terms

143.    The April 20, 2023 notice tendered the April 19, 2023 written demand from the Tender Fund and requested coverage under Insuring Agreement I.A. of the Primary Policy's Professional Liability Coverage Part for "all Loss resulting from this Claim." **Exhibit 32**, at ENDURANCE007827-007842.

**ANSWER**: Admitted in part; denied in part. It is admitted only that the April 20, 2023 letter attached the April 19, 2023 letter from Goodwin Proctor. To the extent the statement in this paragraph contains legal conclusions, no response is required. To the extent a response is required, both documents are in writing and speak for themselves. Endurance denies any characterization of those documents contrary to its express terms.

144.    The April 20, 2023 letter further requested an immediate call with the Insurers and stated that "estimated liability costs are rising at a rate of at least $72,000 per day, and the Insureds would like to respond to the Written Demand and reach a resolution in a timely manner to mitigate the financial, legal, and potential regulatory risks." *Id.* at ENDURANCE007829.

**ANSWER**: Admitted in part; denied in part. It is admitted only that the quoted language appears in the April 20, 2023 letter. The April 20, 2023 letter is in writing and speaks for itself; Endurance denies any characterization of the letter contrary to its express terms.

145.    Endurance understood that statutory interest was increasing at a rate of $72,000 per day. **Exhibit 1**, Jacobson Tr., at 187:7-13, 188:2-10, 288:13-21.

**ANSWER**: Admitted in part; denied in part. It is admitted only that Plaintiffs represented that statutory interest was increasing at a rate of $72,000 per day. The characterization in this paragraph regarding the rate of interest per day contains legal conclusions to which no response is required. To the extent a response is required, the interest calculation ignores the one-year statute of limitations. At most, the rescission price for tender of the unregistered shares that fell within the

statute of limitations was $31,721,616. *See* Endurance Supp. Appx. Ex. 1, Expert Rebuttal Report of J. Duross O'Bryan, Opinion 2, ¶¶44-47. In any event, the record establishes that the SEC did not "approve" the "alternative settlement" until May 9, 2023, and that the shareholders did not formally accept those settlement offers until several days later. Endurance's SUMF ¶¶ 78, 100. Meanwhile, as soon as Plaintiffs requested it, in early May, Endurance agreed to waive the policy's consent provision so that Plaintiffs could take any steps that they deemed necessary to protect its interests without first seeking Endurance's advance consent. Endurance's SUMF ¶¶ 74-75. Plaintiffs entered settlements with the shareholders within days of the SEC's "approval. Endurance's SUMF ¶¶ 78, 100. In the meantime, interest continued to accrue regardless of what Endurance did.

146.    On an April 21, 2023 call, the Insureds presented two resolution options to the Insurers: (1) a formal rescission offer projected at approximately $480 million, and (2) an approximately $17.9 million alternative settlement approach. *See* **Exhibit 46**, ENDURANCE008807-8808; **Exhibit 33**, CCC_01824-25; **Exhibit 1,** Jacobson Tr. at 190:6-14; **Exhibit 3**, Magera Tr., at 92:9-93:17; *see also* **Exhibit 8**, ENDURANCE007518-20, ENDURANCE007763-66.

**ANSWER**: Denied. The Insureds did not "present" two resolution options on the April 21, 2023 call. Instead, on an April 21, 2023 telephone call, Federated informed its insurers that, in light of feedback from Affected Shareholders, it was considering offering an alternative to rescission, which Federated confirmed would need to be approved by the SEC. *See* Endurance Appx. Ex. 28, April 21, 2023 notes, ENDURANCE008815. Further, although Federated Hermes estimated the rescission price as of March 31, 2023 to total approximately $480 million, that sum included rescission of all shares of the Tender Fund that had not been properly registered between

April 30, 2021 and February 28, 2023; however, the Affected Shareholders only had the right to rescind shares that fell within the one-year statute of limitations: "the statute of limitations for enforcement of federal statutory rescission rights by a statutory holder is one year commencing on the date of the sale of the security sold in violation of the federal registration requirements...". *See* Endurance Appx.Ex., 31 at ENDURANCE003568; ENDURANCE003578. Therefore, at most, the rescission price for tender of the unregistered shares that fell within the statute of limitations was $31,721,616. *See* Endurance Supp. Appx. Ex. 1, Expert Rebuttal Report of J. Duross O'Bryan, Opinion 2, ¶¶44-47.

147.    On April 25, 2023, Endurance's claim handler sent the Insureds a "few follow-up questions/requests" regarding the share registration error and the alternative settlement option. *See* **Exhibit 64**, ENDURANCE004327.

**ANSWER**: Admitted in part; denied in part. It is admitted that Ms. Jacobson sent an email dated April 25, 2023 to Plaintiffs with eight follow-up questions and requests. The April 25, 2023 email is in writing and speaks for itself; Endurance denies any characterization of the email contrary to its express terms.

148.    Less than 48 hours later, on April 27, 2023, the Insureds responded to Endurance's follow-up questions and requests by providing Endurance with a 7-page letter (exclusive of exhibits) that attached as exhibits documents and information requested by Endurance. *See* **Exhibit 8**, ENDURANCE007518; **Exhibit 61**, Lipkowitz Tr., at 96:22-97:23.

**ANSWER**: Admitted in part; denied in part. It is admitted only that counsel for Plaintiffs responded on April 27, 2023 to Ms. Jacobson's April 25, 2023 email and the letter was 7-pages long (exclusive of exhibits). By way of further response, the April 27, 2023 correspondence included over 200 pages of exhibits. The April 27, 2023 letter and exhibits are in writing which

speak for themselves; Endurance denies any characterization of the documents contrary to their express terms.

149.    In the April 27, 2023 letter, the Insureds provided the Insurers with an analysis of the proposed alternative settlement approach to be discussed with the SEC, a written timeline of events, a copy of the April 10, 2023 Form N-2 Registration Statement filing, copies of each version of the applicable Administrative Services Agreements between FAS and the Tender Fund that were in effect, a spreadsheet showing the unregistered shares purchases, and spreadsheets comparing the rescission offer calculation with the alternative settlement approach calculations. *See generally* **Exhibit 8**, ENDURANCE007518-ENDURANCE007766.

**ANSWER**: Admitted in part; denied in part. It is admitted only that Plaintiffs provided the Insurers with an April 27, 2023 letter. The April 27, 2023 letter is in writing and speaks for itself; Endurance denies any characterization of the letter contrary to its express terms.

150.    On May 2, and May 3, 2023, the Insureds sent letters to Endurance and Continental, respectively, seeking their consent to present the alternative settlement approach to Affected Shareholders and requesting confirmation that pursuing the alternative settlement approach instead of the rescission offer would not be coverage determinative. *See* **Exhibit 47**, ENDURANCE003841; **Exhibit 48**, at ENDURANCE004382; **Exhibit 61**, Lipkowitz Tr., at 104:13-106:7.

**ANSWER**: Admitted in part; denied in part. It is admitted that Plaintiffs sent a letter on May 2, 2023 to Endurance. The letter is in writing and speaks for itself; Endurance denies any characterization of the letter contrary to its expressly terms. Moreover, it is denied that Plaintiffs' statements in this paragraph correctly characterize the May 2, 2023 letter. Instead, the May 2, 2023 letter stated that Plaintiffs were contemplating two settlement offers: the recission offer and the

alternative proposal. Plaintiffs then requested that Endurance provide Plaintiffs with input as to how to resolve the administrative error in order to ensure it was deemed a covered **Loss** and, additionally, waive various rights and defenses Endurance had under the Endurance Policy and law. Endurance provided consent to allow Plaintiffs to take reasonable action to protect their own interest and agreed to waive lack of consent as a defense – specific requests made by Plaintiffs in their May 2, 2023 letter – but reserved all rights under the Policy, at law and/or in equity. *See* Plaintiffs' Ex. 1 at 280:1-8; Ex. 47 at ENDURANCE003841-43; Endurance Appx. Ex. 32.

151.    Federated Hermes' General Counsel testified that the choice between the rescission offer and alternative settlement approach would have been influenced by the Insurers' stated position. *See* **Exhibit 3,** Magera Tr., at 98:25-101:19.

**ANSWER**: Denied. Plaintiffs' statements in this paragraph are not supported by the exhibit. Indeed, Mr. Magera provided no such testimony and instead testified he ultimately could not speak to exactly how Plaintiffs would have proceeded had it known whether one option over the other was covered. *See* Plaintiffs' Ex. 3, Magera Tr., at 98:25-101:19.

152.    On May 3, 2023, Endurance stated that "in order to allow the Insureds to act in their best interest," Endurance "agree[d] to waive lack of consent as a coverage defense to the Insureds' course of action to remedy its failure to register shares" (whether proceeding with the rescission offer or the alternative settlement approach). *See* **Exhibit 49**, ENDURANCE004339-40.

**ANSWER**: Admitted in part; denied in part. It is admitted that Endurance agreed to waive lack of consent as a coverage defense on May 3, 2023. The May 3, 2023 email communication is in writing and speaks for itself; Endurance denies any characterization of the email communication contrary to its express terms.

153.    The Insureds responded to Endurance's May 3, 2023 email, requesting that Endurance confirm it would not assert any coverage defense based on the Insureds' choosing the alternative settlement approach over the rescission offer. Endurance did not respond to the Insureds' request. *See id.* at ENDURANCE004339.

**ANSWER**: Admitted in part; denied in part. It is admitted that Plaintiffs responded to Endurance's May 3, 2023 email. Plaintiffs' response is in writing and speaks for itself; Endurance denies any characterization of the writing contrary to its express terms. Among other things, the response from Plaintiffs' counsel stated: "Thank you very much, Lisa – Federated Hermes, and I personally appreciate your attention and careful consideration of this Claim." *See* Plaintiffs' Ex. 49. It is denied that Endurance did not respond to Plaintiffs' requests. Endurance responded to Plaintiffs' request in its May 3, 2023 email stating:

> As our review and investigation remain ongoing, in order to allow the Insureds to act in their best interest, [Endurance] agrees to waive lack of consent as a coverage defense to the Insureds' course of action to remedy its failure to register shares (i.e., whether it proceeds with proposal 1 or proposal 2). We continue to reserve all other rights under the Policy, at law and/or in equity.

*See* Endurance Appx. Ex. 32 at FHI00006752. Further, as Ms. Jacobson explained during her deposition, such a request "was odd as it's not [Endurance's] decision how the insured resolves a matter, and [Endurance] – it doesn't work that way. You don't choose – you don't decide, oh, I'm going to resolve something like this because it's covered. That's insurance fraud" and because it was not Endurance's "obligation to opine on how [Federated] defense itself, how it resolves its matter…" Endurance did what it felt "was appropriate and agreed not to raise consent as a coverage defense s in order to allow the insured to do what it needed to do." *See* Plaintiffs' Ex. 1 at 275: 24-276: 1-5; 280:1-8.

154.    On May 4, 2023, Continental stated that Endurance had not yet taken a coverage position and that Continental was not able to provide its coverage position until it had an opportunity to review Endurance's position. *See* **Exhibit 48**, at ENDURANCE004381.

**ANSWER**: Admitted in part; denied in part. It is admitted that Continental sent Plaintiffs a communication on May 4, 2023. The May 4, 2023 email communication is in writing and speaks for itself; Endurance denies any characterization of the communication contrary to its express terms.

155.    On May 5, 2023, Continental stated it could not take a position with respect to whether the Insureds' choice of settlement approach would be coverage determinative until it received and reviewed the primary coverage position. *Id.* at ENDURANCE004380.

**ANSWER**: Admitted in part; denied in part. It is admitted that Continental sent Plaintiffs a communication on May 5, 2023. The May 5, 2023 email communication is in writing and speaks for itself; Endurance denies any characterization of the communication contrary to its express terms.

156.    On May 8, 2023, the Insureds again asked Endurance to confirm it would not assert any coverage defense based on the Insureds' choosing the alternative settlement approach over the rescission offer. Endurance did not answer the Insureds' question, and instead referred the Insureds to its May 3 email waiving lack of consent. Endurance further asked to be informed of the outcome with the SEC. *See* **Exhibit 49**, at ENDURANCE004339.

**ANSWER**: Admitted in part; denied in part. It is admitted only that counsel for Plaintiffs wrote to Endurance on May 8, 2023. The May 8, 2023 email communication is in writing and speaks for itself; Endurance denies any characterization of the communication contrary to its express terms. By way of further response, Endurance responded to Plaintiffs' inquiry regarding

coverage defenses based on the Insureds' choosing the alternative settlement approach over the rescission offer in its May 3, 2023 email. *See* Endurance Appx. Ex. 32 at FHI00006752. Further, as Ms. Jacobson explained during her deposition, such a request "was odd as it's not [Endurance's] decision how the insured resolves a matter, and [Endurance] – it doesn't work that way. You don't choose – you don't decide, oh, I'm going to resolve something like this because it's covered. That's insurance fraud" and because it was not Endurance's "obligation to opine on how [Federated] defense itself, how it resolves its matter…" Endurance did what it felt "was appropriate and agreed not to raise consent as a coverage defense s in order to allow the insured to do what it needed to do." *See* Plaintiffs' Ex. 1 at 275: 24-276: 1-5; 280:1-8.

157.    On May 9, 2023, the Insureds asked Endurance for an estimated time of receipt for its coverage position. *See* **Exhibit 50**, ENDURANCE007771.

**ANSWER**: Admitted in part; denied in part. It is admitted that Plaintiffs sent an email on May 9, 2023 in which they asked for a coverage position from Endurance for the first time. The May 9, 2023 email communication is in writing and speaks for itself; Endurance denies any characterization of the communication contrary to its express terms.

158.    Endurance's claim handler drafted (but did not send) an email on May 9, 2023 stating that it was "premature to analyze coverage, as we must wait to see what the Loss" is. *See id*. With respect to the internal draft, Endurance's claim handler testified that "once a settlement was reached because we agreed not to raise consent as a coverage defense, that was our obligation under the policy at the time." *See* **Exhibit 1**, Jacobson Tr., at 280:9-14.

**ANSWER**: Immaterial; admitted in part; denied in part. It is admitted that Ms. Jacobson drafted an email that was not sent. The draft email is in writing and speaks for itself; Endurance denies any characterization of the draft contrary to its express terms. By way of further response,

Ms. Jacobson stated in the draft email: "We are continuing to review all of the information provided to date. Further, at this time, it would appear premature to analyze coverage." *See* Endurance Supp. Appx. Ex. 5. Ms. Jacobson testified that what she meant in this email was that it was premature for Endurance to analyze coverage until there was a payment: "So what I refer to in this email is that we would analyze coverage as the facts develop. In this case, [that was] once a settlement was reached because we agreed not to raise consent as a coverage defense, that was our obligation under the policy at the time." *See* Endurance Supp. Appx. Ex. 4, Tr. of Dep. of L. Jacobson at 278:23-280:14.

159.    Endurance did not inform the Insureds that it thought it was "premature to analyze coverage." *Compare* **Exhibit 48**, at ENDURANCE004379-4380 *with* **Exhibit 50**, at ENDURANCE007771.

**ANSWER**: Admitted in part; denied in part. The referenced documents are in writing and speak for themselves. Endurance denies any characterization of those documents contrary to their express terms. Moreover, on May 3, 2023 Endurance advised Plaintiffs that its review and investigation was ongoing and repeated that to Plaintiffs on May 9, 2023. *See* Endurance Appx. Ex. 32 at FHI00006752; Plaintiffs' Ex. 48 at ENDURANCE004380.

160.    Endurance responded to the Insureds on May 9, 2023 stating that its "coverage investigation remains ongoing." **Exhibit 48**, at ENDURANCE004380.

**ANSWER**: Admitted in part; denied in part. It is admitted that on May 9, 2023, Endurance advised Plaintiffs that its coverage investigation remains ongoing." The May 9, 2023 email is in writing and speaks for itself. Endurance denies any characterization of that email contrary to its express terms. Moreover, as Endurance further stated in that email: "We received over 200 pages of documents on April 27th, about a week and a half ago, and our review remains ongoing. Further,

on May 3rd, we agreed to waive lack of consent as a coverage defense in order to allow the Insureds to defend as they see fit. We will issue a coverage position in due course." *See* Plaintiffs' Ex. 48 at ENDURANCE004380.

161.    Later on May 9, 2023, the Insureds again asked when Endurance expected to issue its coverage opinion, noting Endurance's prior questions had been answered weeks earlier. Endurance responded that it was reviewing the April 27, 2023 letter, had waived lack of consent to "allow the Insureds to defend as they see fit," and would issue a position in "due course." *See id.* at ENDURANCE004379-4380.

**ANSWER**: Admitted in part; denied in part. It is admitted that Plaintiffs and Endurance engaged in email communications on May 9, 2023. Those emails are in writing and speak for themselves. Endurance denies any characterization of those emails contrary to their express terms. Moreover, in addition to the quoted language, Lisa Jacobson advised counsel for Plaintiffs that "[w]e received over 200 pages of documents on April 27th, about a week and a half ago, and our review remains ongoing. Further, on May 3rd, we agreed to waive lack of consent as a coverage defense in order to allow the Insureds to defend as they see fit. We will issue a coverage position in due course." *See* Plaintiffs' Ex. 48 at ENDURANCE004380.

162.    On May 10, 2023, the Insureds advised Endurance that the SEC would not object to the alternative settlement approach and again asked whether choosing it would prejudice coverage. *Id.* at ENDURANCE004379.

**ANSWER**: Admitted in part; denied in part. It is admitted that on May 10, 2023, counsel for Plaintiffs sent an email to Lisa Jacobson stating that "SEC staff confirmed yesterday evening that the SEC [would] not object to Federated Hermes pursing the alternative settlement offer ...." The May 10, 2023 email is in writing and speaks for itself; Endurance denies any characterization

of the email contrary to its express terms.

163.    On May 11, 2023, Endurance responded to the Insureds, stating, "This is the first we are hearing of a reference to a settlement." The Insureds explained that the alternative settlement approach had been discussed at length with its insurers, including Endurance, for weeks, and was outlined in detail in the April 27, 2023 letter in response to Endurance's questions. *See id*. at ENDURANCE004378-79.

**ANSWER**: Admitted in part; denied in part. It is admitted only that the quoted language appears in Endurance's email. The May 11, 2023 email is in writing and speaks for itself; Endurance denies any characterization of the email contrary to its express terms. The May 11, 2023 also included the following: "This is the first we are hearing of a reference to settlement. I believe a call would be helpful so I can better understand the dynamic. Are you available tomorrow morning? We continue to reserve all rights accordingly." *See* Plaintiffs' Ex. 48, ENDURANCE004377. In an email the next day, Ms. Jacobson stated "we understood our discussions were around how Insured was deciding to effectuate the statutory remedy for failing to register." Endurance's SUMF ¶ 81.

164.    On May 12, 2023, Endurance replied to the Insureds, stating that "[t]he word settlement had not been used, but instead we understood our discussions were around how Insured was deciding to effectuate the statutory remedy for failing to register." The Insureds responded, noting that the word "settlement" appeared 33 times in the April 27, 2023 response letter to Endurance's questions regarding this Claim, and 10 times in the May 2 letter to Endurance. *See id.* at ENDURANCE004378.

**ANSWER**: Admitted in part; denied in part. It is admitted only that the quoted language appears in the May 12, 2023 emails. The May 12, 2023 emails are in writing and speak for

themselves; Endurance denies any characterization of the emails contrary to their express terms.

165.    On May 12, 2023, the Insureds tendered Auto Owners' May 12, 2023 written demand to the Insurers for coverage for "all Loss resulting from this Claim." *See* **Exhibit 51**, ENDURANCE007819.

**ANSWER**: Admitted in part; denied in part. Plaintiffs' characterizations of Auto Owners' May 12, 2023 email is a conclusion of law to which no response is required. To the extent a response is required, it is admitted only that the May 12 communications are written documents that speak for themselves; Endurance denies any characterization of the documents contrary to their express terms.. By way of further response, while Auto-Owners sent the May 12, 2023 email, it did so on Plaintiffs' instruction and only after Plaintiffs had already orally made the alternative settlement offer to Auto-Owners. *See* Endurance Appx. Ex. 7, Tr. of Dep. of S. Van Meter at 131:17-132:6; Endurance's SUMF ¶ 81.

166.    On May 15, 2023, the Insureds tendered the May 15, 2023 written demands from Michigan Catastrophic Claims Association and Energy Insurance Mutual Limited to the Insurers for coverage for "all Loss resulting from this Claim." The May 15, 2023 notice further advised that the Insureds gave the Insurers "ample opportunity to comment on or raise any objections to the alternative settlement proposal," and that the Insureds would be moving forward with the alternative settlement approach by FAS entering into the Shareholder Settlements with the Affected Shareholders. *See* **Exhibit 52**, ENDURANCE009739.

**ANSWER**: Admitted in part; denied in part. Plaintiffs' characterizations of the May 15, 2023 emails from Michigan Catastrophic Claims Association and Energy Insurance Mutual Limited is a conclusion of law to which no response is required. To the extent a response is required, it is admitted only that the May 15 communications are written documents that speak for

themselves; Endurance denies any characterization of the documents contrary to their express terms. By way of further response, while Michigan Catastrophic Claims Association and Energy Insurance Mutual Limited sent the May 15, 2023 emails, it did so on Plaintiffs' instruction and only after Plaintiffs had already orally made the alternative settlement. *See* Endurance Appx. Ex. 7, Tr. of Dep. of S. Van Meter at 131:17-132:6; Endurance's SUMF ¶ 81.

167.    Endurance did not raise any concerns or objections to the Shareholder Settlements prior to their execution. *See* **Exhibit 1**, Jacobson Tr. 274:18-278:22.

**ANSWER**: Denied. Endurance reserved its rights under the Policy, at law and equity, several times, including but not limited to during the April 21, 2023 call and in Endurance's April 25, 2023, May 3, 2023 and May 9, 2023 emails. *See* Plaintiffs' Ex. 48; Endurance Appx.Exs. 28-29, 32. Nor is there anything in the record to support the suggestion that Endurance was provided copies of the Shareholder Settlements prior to their execution.

168.    Endurance testified that it "did not need to" raise any concerns or objections to the Shareholder Settlements prior to their execution. *See id.* at 278:5-22.

**ANSWER**: Denied. Ms. Jacobson testified that it was not Endurance's "obligation to opine on how the insured defends itself, how it resolves its matters, this is not a duty to defend policy, and we did what we felt was appropriate and agreed not to raise consent as a coverage defense in order to allow the insured to do what it needed to do." *See* Plaintiffs' Ex. 1, pp. 275:24-276:1-5. Further, as noted above, Endurance reserved its rights under the Policy, at law and equity, several times, including but not limited to its April 6, 2023 communication, during the April 21, 2023 call and in Endurance's April 25, 2023, May 3, 2023 and May 9, 2023 emails. *See* Plaintiffs' Ex. 48; Endurance Appx. Exs. 16, 28-29, 32.

169.    Endurance never communicated to the Insureds that it would not be raising any concerns or objections to the Shareholder Settlements prior to their execution. *See generally* **Exhibit 3**, Magera Tr., at 98:25-99:25; **Exhibit 48**, at ENDURANCE004379-4380; **Exhibit 49**, ENDURANCE004339; **Exhibit 1,** Jacobson Tr. 274:18-278:22.

**ANSWER**: Admitted in part; denied in part. Endurance reserved its rights under the Policy, at law and equity, several times, including but not limited to its April 6, 2023 communication, during the April 21, 2023 call and in Endurance's April 25, 2023, May 3, 2023 and May 9, 2023 emails. *See* Plaintiffs' Ex. 48; Endurance Appx. Exs. 16, 28-29, 32. Nor is there anything in the record to support the suggestion that Endurance was provided copies of the Shareholder Settlements prior to their execution. However, Ms. Jacobson informed Plaintiffs that Endurance would not raise consent as a defense to coverage so that Plaintiffs could defend their interests as they saw appropriate. *See* Endurance's SUMF ¶¶ 74-75.

170.    Continental did not raise any concerns or objections to the Shareholder Settlements prior to their execution. *See* **Exhibit 40**, at ¶¶ 73–76; **Exhibit 61**, Lipkowitz Tr., at 118:6-13; **Exhibit 41**, Cipriani Tr. 54:15-17.

**ANSWER**: Denied. Continental reserved its rights under the Primary Policy, Excess Policy and applicable law on several occasions, including in its May 4, 2023 email. *See* Plaintiffs' Ex. 48.

171.    Endurance did not issue a reservation of rights letter to the Insureds prior to the execution of the Shareholder Settlements. *See generally* **Exhibit 3,** Magera Tr. 98:25-99:25; **Exhibit 48**, at ENDURANCE004379-4380; **Exhibit 49**, ENDURANCE004339; **Exhibit 1**, Jacobson Tr., at 274:18-278:22.

**ANSWER**: Denied. In addition to Endurance's initial acknowledgment letter, in which it

reserved rights, Endurance reserved its rights under the Endurance Policy, at law and equity, several times, orally and in writing, including but not limited to its April 6, 2023 communication, during the April 21, 2023 call and in Endurance's April 25, 2023, May 3, 2023 and May 9, 2023 emails. *See* Plaintiffs' Ex. 48; Endurance Appx. Exs. 16, 28-29, 32.

172.    Continental did not issue a reservation of rights letter to the Insureds prior to the execution of the Shareholder Settlements. **Exhibit 48**, at ENDURANCE004379-4380; *see generally* **Exhibit 40**, at ¶¶ 73–76; **Exhibit 61**, Lipkowitz Tr., at 118:6-13; **Exhibit 41**, Cipriani Tr. 54:15-17.

**ANSWER**: Denied. Continental reserved its rights on several occasions, including in its Continental reserved its rights under the Primary Policy, Excess Policy and applicable law on several occasions, including in its May 4, 2023 email. *See* Plaintiffs' Ex. 4.

173.    Endurance did not advise the Insureds of its coverage position prior to the execution of the Shareholder Settlements. *See generally* **Exhibit 4.**

**ANSWER**: Admitted in part; denied in part. It is admitted only that Endurance did not issue its coverage position letter until June 12, 2023, after Plaintiffs and the Affected Shareholders had entered into the Shareholder Settlements and Plaintiffs had requested reimbursement for the purported **Loss**. It is denied, however, that Endurance did not advise the Plaintiffs of its coverage position prior to that time. In addition to Endurance's initial acknowledgment letter, in which it reserved rights, Endurance reserved its rights under the Endurance Policy, at law and equity, several times, orally and in writing, including but not limited to its April 6, 2023 communication, during the April 21, 2023 call and in Endurance's April 25, 2023, May 3, 2023 and May 9, 2023 emails. *See* Plaintiffs' Ex. 48; Endurance Appx. Exs. 16, 28-29, 32.

174.    Continental did not advise the Insureds of its coverage position prior to the execution of the Shareholder Settlements. *See* **Exhibit 40**, at ¶¶ 73–76; **Exhibit 61**, Lipkowitz Tr., at 118:6-13; **Exhibit 41**, Cipriani Tr., at 54:15-17.

**ANSWER**: Admitted in part; denied in part. It is admitted that Continental did not issue its coverage position letter until June 12, 2023, after Plaintiffs and the Affected Shareholders entered into the Shareholder Settlements but denied to the extent that Plaintiffs imply that Continental did not reserve its rights on several occasions, including in its May 4, 2023 email. *See* Plaintiffs' Ex. 4.

175.    On May 12, 2023, Endurance retained outside litigation counsel, Michael Perlis of the law firm Kaufman Borgeest & Ryan LLP. *See* **Exhibit 1,** Jacobson Tr., at 322:15-19, 231:24-232:14; **Exhibit 53**, ENDURANCE009827.

**ANSWER**: Admitted.

176.    As of May 12, 2023, Endurance's claim handler had not completed a coverage analysis. *See* **Exhibit 1**, Jacobson Tr., at 270:6-10; **Exhibit 42**, Santiago Tr. at 69:25-70:7; **Exhibit 50**, ENDURANCE007771; **Exhibit 1**, Jacobson Tr., at 280:9-14; **Exhibit 44**, Mayerson Tr., at 112:22-113:6.

**ANSWER**: Denied. Throughout the course of the matter, Endurance's claims handler, Lisa Jacobson, remained in constant communication with Plaintiffs and their coverage counsel, Reed Smith, providing timely acknowledgments and responses to Reed Smith's near-constant barrage of updates, requests, and demands, including analysis on a rolling basis. Even a cursory summary of the relevant timeline confirms this:

- On **April 6,** within four business days of receiving Reed Smith's initial "Notice of Circumstances"—which is not a demand or request for coverage under the policy[2]—Ms. Jacobson responded that she had been assigned to handle the matter and proposed a call to discuss it.[3]

- When Federated pushed for an immediate call, Ms. Jacobson agreed, even though she would be on vacation at the time: "I am happy to take the call from vacation."[4]

- In the meantime, **on April 7**, in response to Reed Smith's separate April 6 request, Ms. Jacobson immediately signed a confidentiality agreement, which Reed Smith said was necessary for Federated to provide certain documents.[5]

- On Monday, **April 10,** Ms. Jacobson participated in a discussion with Reed Smith, the broker, and other Federated representatives, in which Federated provided information regarding the "administrative error," stated that Federated intended to seek "costs of correction" coverage, and represented that "[a]ctual costs of correction [were] 150K to date."[6]

- After that call, Ms. Jacobson informed Reed Smith that "[w]e will wait the written notice you are planning to submit under Section I.B. of the PL Coverage part. Following receipt and review of same, we will advise if anything further is necessary in order to issue our coverage position."[7]

- The same day, Reed Smith forwarded a letter requesting "Costs of Correction Under Professional Liability Coverage Part, Insuring Agreement I.B" stating that an "urgent response is required . . . **prior to any Claim being made in connection therewith**" but failing to identify any costs or expenses incurred.[8]

---

[2] *See* Endurance Appx. Ex. 1, V(B); Endurance Supp. Appx. Ex. 4, Lisa Jacobson Dep Tr. 113:4-14 ("[I]n general, the purpose of a Notice of Circumstance is to provide notice to the insurer of an alleged potential or alleged wrongful act against an insured that may arise to the level of a claim, and really, what it does is it tags the policy period because these are claims made policies so – and it is a voluntary, typically.

[3] *See* Endurance's SUMF ¶ 38.

[4] *See* Endurance Appx. Ex. 16, ENDURANCE004155.

[5] *See* Endurance Supp. Appx. Ex. 6.

[6] *See* Endurance's SUMF ¶¶ 39-44.

[7] *See* Endurance Appx. Ex. 16, ENDURANCE004155.

[8] *See* Endurance Appx. Ex. 22.

- On Wednesday, **April 19**, Federated's broker emailed Ms. Jacobson to report that "[t]here have been some developments that we would like to run by [Endurance] and the other insurers" and requesting a call "tomorrow or Friday."[9] Ms. Jacobson immediately responded that she was available that Friday and the broker, in turn, responded that "we will set up for Friday afternoon."[10]

- In the meantime, on Thursday, **April 20**, Reed Smith forwarded Goodwin Proctor's April 19 letter on behalf of the Tender Fund, asserting that it was a written demand that "triggers the coverage afforded under Insuring Agreement I.A. of the Policy's Professional Liability Coverage Part," apparently rendering the pre-claim request for "costs of correction" coverage moot.[11]

- Five days later, in an **April 25** email to Reed Smith and Federated, Ms. Jacobson requested information "to assist in my review of this matter" and "to best document the file and understand what transpired," "including a copy of the alternative proposal to be discussed with the SEC."[12]

- On Thursday, **April 27**, Reed Smith purported to respond to Ms. Jacobson's requests, providing more than 200 pages of documents.[13]

- The next Tuesday, **May 2**, Ms. Jacobson participated in another call with Reed Smith and Federated.[14] In a letter to Ms. Jacobson the same day, Reed Smith purported to update Endurance regarding "two settlement offers" Federated was contemplating and requesting that Endurance agree that either would be covered or, barring that, consent that the insureds could take reasonable steps to protect their own interests, among other things.[15]

- In a **May 3** email to Reed Smith, Ms. Jacobson responded: "Courtney, It was nice speaking with you yesterday, and thank you for your letter. As our review and investigation remain ongoing, in order to allow the Insureds to act in their best interest, [Endurance] agrees to waive lack of consent as a coverage defense to the Insured's course of action to remedy its failure to register shares (i.e., whether it proceeds with proposal 1 or proposal 2). We continue to reserve all other rights under the Policy, at law and/or equity." [16]

---

[9] *See* Endurance Supp. Appx. Ex. 7.
[10] *See* Endurance Appx. Ex. 22
[11] *See* Endurance Appx. Ex. 29.
[12] *See* Endurance SUMF ¶69; Endurance Appx. Ex. 30.
[13] *See* Endurance SUMF ¶72; Endurance Appx. Ex. 31.
[14] *See* Endurance Appx. Ex. 32, FHI00006752.
[15] Federated's SUMF ¶ 150.
[16] Endurance's SUMF ¶75.

- The same day, Reed Smith expressed appreciation for Ms. Jacobson's "attention and careful consideration of this claim."[17]

- Six days later, in a **May 9** email to Ms. Jacobson, Reed Smith requested "an estimated time for receipt of Endurance's coverage position, so that we can respond to positions from the excess carriers, such as the correspondence from CNA below [in which CNA stated that it would need to review Endurance's coverage determination before it could offer its own coverage determination]." Ms. Jacobson responded the same day that "[o]ur investigation remains ongoing" and that Endurance "continue[s] to reserve all rights in the interim."[18]

- After Reed Smith immediately followed up, pushing again for an estimate on when Endurance "expect[ed] to issue the coverage opinion," Ms. Jacobson answered: "We received over 200 pages of documents on April 27th, about a week and a half ago, and our review remains ongoing. Further, on May 3rd we agreed to waive lack of consent as a coverage defense in order to allow the Insureds to defend as they see fit. We will issue a coverage position in due course."[19]

- In a **May 10** email, Reed Smith reported that "[t]he SEC staff confirmed yesterday evening that the SEC will not object to Federated Hermes pursing the alternative settlement offer, to compensate shareholders affected by its failure to register Tender Fund shares, in a manner that will not cause the Fund to liquidate and that will not delay the affected shareholder receipt of compensation due to the Fund's liquidity status."[20]

- Ms. Jacobson responded the same day that "[t]his is the first we are hearing reference to a settlement. I believe a call would be helpful so I can better understand the dynamic . . ."[21]

- On **May 12**, Ms. Jacobson clarified that, rather than settlement, "we understood our discussions were around how Insured was deciding to effectuate the statutory remedy for failing to register."[22]

- In what this Court has characterized as "fighting words,"[23] Reed Smith immediately countered that "Endurance's failure to respond or give any guidance has increased damages by $72,000 per day, impeded the response to the Fund, and put Federated Hermes in a bad

---

[17] Endurance's SUMF ¶76.

[18] *See* Federated Ex. 48.

[19] *See* Federated Ex. 48.

[20] Endurance's SUMF ¶78; Federated Ex. 48.

[21] *See* Federated Ex. 48.

[22] *See* Federated Ex. 48.

[23] *See* Endurance Supp. Appx. Ex. 8, December 20, 2024 Transcript of Discovery Hearing before Honorable Kezia O.L. Taylor at 6.

situation with the SEC who discovered this error and wants it fixed. At this point, Endurance has now waived and is estopped from taking any defense as to either remedy."[24]

- On **May 12** and **May 15**, the affected Tender Fund shareholders sent the requested "written demands" to Federated Hermes and Federated entered settlement agreements with those shareholders days later.[25]

- On **May 23**, Reed Smith demanded that Endurance and Continental reimburse "losses" incurred in connection with the settlement agreements.[26]

- Three weeks later, in a **June 12** response letter, outside counsel for Endurance, Michael Perlis, stated Endurance's initial coverage determination that the "alternative settlement" payments were not **Loss**,[27] which prompted Federated to file its lawsuit in this Court.

Thus, the record demonstrates that, from the outset, Endurance was engaged, responsive, and diligent in its investigation, participating in multiple telephone discussions with the broker, the insureds, and Reed Smith,[28] requesting information,[29] reviewing voluminous documents provided,[30] and performing independent investigation.[31] Additionally, Endurance retained and consulted with securities counsel to better understand the underlying securities issues[32] and then, only after Reed Smith accused it of prejudicing Federated, consulted with coverage counsel.[33]

---

[24] *See* Federated Ex. 48.

[25] Endurance SUMF ¶¶83-90, 93, 100

[26] Endurance's SUMF ¶104.

[27] Endurance's SUMF ¶106.

[28] Endurance SUMF ¶¶38-44,

[29] Endurance SUMF ¶69.

[30] *See* Federated Ex. 48.

[31] *See* Endurance Supp. Appx. Ex. 4 Tr. of Dep. of L. Jacobson at 113:4-14 ("[I]n general, the purpose of a Notice of Circumstance is to provide notice to the insurer of an alleged potential or alleged wrongful act against an insured that may arise to the level of a claim, and really, what it does is it tags the policy period because these are claims made policies so – and it is a voluntary, typically.

[32] *See* Endurance Supp. Appx. Ex. 4, Tr. of Dep. of L. Jacobson at 125:18-126:2 ("[W]e retained securities counsel to help us better understand and be educated on the statute and the remedies thereunder . . .It was Baker Hostetler, it was Doug Green, and there was a fund counsel as well, his name is escaping me, but I know he joined one of our conference calls.").

[33] SUMF ¶¶ 38-39, 59, 62, 69.

177.    Endurance retained outside litigation counsel to represent Endurance's interests in anticipation of litigation. *See* **Exhibit 1**, Jacobson Tr. 322:15-19, 231:24-232:14; **Exhibit 44**, Mayerson Tr., at 27:21-28:2.

**ANSWER**: Admitted.

178.    Endurance and its outside litigation counsel represented that counsel's work did not consist of "claims handling or adjustment," and that counsel "was not retained as an 'outside adjuster' to handle, adjust, and/or investigate the Insureds' Request for Coverage." *See* **Exhibit 66**, at ¶ 8; **Exhibit 67**, at ¶¶ 7-8.

**ANSWER**: Admitted in part; denied in part. It is admitted that the quoted language appears in the affidavits of Mr. Perlis and Ms. Jacobson that are attached as Exhibits 66 and 67. The affidavits are in writing and speak for themselves; Endurance denies any characterizations of the affidavits contrary to their express terms.

179.    Endurance's outside litigation [sic] prepared for litigation by contacting J. Duross O'Bryan, one of Endurance's experts in this litigation, in May 2023. *See* **Exhibit 54**, September 15, 2023 Deposition of J. Duross O'Bryan ("O'Bryan Tr.") 8:19-9:9.

**ANSWER**: Immaterial; admitted in part; denied in part. To the extent Plaintiffs' mean to assert that outside litigation counsel prepared for litigation by contacting J. Duross O'Bryan, it is admitted only that Mr. O'Bryan testified he learned of "this matter" when he was contacted by Mr. Perlis in 2023. It is denied that he testified that Mr. Perlis "prepared for litigation" by contacting Mr. O'Bryan or that Mr. O'Bryan was even retained by Mr. Perlis at that time. *See* Plaintiffs' Ex. 54. Therefore, the statement that outside litigation [counsel] prepared for litigation by contacting J. Duross O'Bryan in 2023 is denied.

180.    After May 12, 2023, all actions performed by Endurance and its outside litigation counsel were carried out in anticipation of coverage litigation to protect Endurance's interests. *See* **Exhibit 1,** Jacobson Tr., at 231:24-232:14, 322:8-19; **Exhibit 54**, O'Bryan Tr., 8:19-9:9; **Exhibit 66,** at ¶ 8; **Exhibit 67**, at ¶¶ 7-8.

**ANSWER**: Admitted in part; denied in part. The statement in this paragraph contain conclusions of law to which no response is required. To the extent a response is required, it is admitted only that Endurance invoked its rights under Federal Rule of Civil Procedure 26(b)(3)(A) and Pennsylvania law and that under this Court's December 20, 2024 Order, pursuant to Federal Rule of Civil Procedure 26(b)(3)(A), Endurance was "not required to produce any internal claims communications or documents created on or after May 12, 2023 because litigation was reasonably anticipated as of that date [and Endurance] is not required to produce communications with, or other documents received from, its outside counsel, Michael Perlis, Esq." *See* ECF No. 57 (December 20, 2024 Order). The affidavits of Mr. Perlis and Ms. Jacobson are in writing and speak for themselves; Endurance denies any characterizations of the affidavits contrary to their express terms.

181.    On May 15, 2023, Endurance advised the Insureds that it had retained Michael Perlis as "coverage counsel," but did not disclose that Mr. Perlis was engaged to prepare for litigation rather than to assist with claims handling. *See* **Exhibit 53**, ENDURANCE009827.

**ANSWER**: Admitted in part; denied in part. It is admitted only that on May 15, 2023, Endurance informed Plaintiffs that it had "retained Michael Perlis." The suggestion that Plaintiffs—who were themselves represented by litigation counsel—were not aware of Mr. Perlis's role is unsupported by the record and is denied. *See* Plaintiffs' Ex. 66.

182.    Endurance also retained securities counsel in May 2023, but did not place any work product from its securities counsel in its claim handling file. *See* **Exhibit 1**, Jacobson Tr. 123:6-126:20; **Exhibit 44**, Mayerson Tr. 73:17-77:17.

**ANSWER**: Admitted in part; denied in part. It is admitted only that Endurance retained Doug Green, Esquire, of Baker Hostetler, as securities law counsel. Communications between Mr. Green and Endurance are protected by the attorney-client and/or attorney-work product privileges. *See* Endurance Appx. Ex. 8, Tr. of Dep. of L. Jacobson at 125:18-25. As Ms. Jacobson testified at her deposition Endurance "retained securities counsel to help [Endurance] better understand and be educated on the statue and the remedies thereunder and no written communication was exchanged. Communication was purely via phone." *See* Endurance Appx. Ex. 8, 125:18-25.

183.    Endurance did not inform the Insureds that the securities counsel experts' work would not be used in claims handling. *See* **Exhibit 1**, Jacobson Tr. 123:6-126:20.

**ANSWER**: Admitted in part; denied in part. It is admitted only that Endurance retained Doug Green, Esquire, of Baker Hostetler, as securities law counsel. Plaintiffs suggestion that Endurance had any obligation to inform Plaintiffs regarding the purpose of Mr. Green's advice is denied. *See* Endurance Appx. Ex. 8, Tr. of Dep. of L. Jacobson at 125:18-25. Further, as Ms. Jacobson testified at her deposition, Endurance "retained securities counsel to help [Endurance] better understand and be educated on the statue and the remedies thereunder and no written communication was exchanged. Communication was purely via phone." *See* Endurance Appx. Ex. 8 at 125:18-25.

184.    Endurance retained the securities counsel experts to assist in preparing its litigation position rather than to assist with claims handling. *See* **Exhibit 1**, Jacobson Tr. 123:6-126:20; **Exhibit 44**, Mayerson Tr. 73:17-77:17.

**ANSWER**: Denied. As Ms. Jacobson testified, Endurance "retained securities counsel to help [Endurance] better understand and be educated on the statute and the remedies thereunder and no written communication was exchanged." *See* Endurance Appx. Ex. 8 at 125:18-25.

185.    On May 23, 2023, Insureds demanded reimbursement from the Insurers for the Shareholder Settlements. *See* **Exhibit 34**, ENDURANCE009751; **Exhibit 41**, Cipriani Tr. 83:12-84:18.

**ANSWER**: Admitted in part; denied in part. It is admitted that Plaintiffs sent a letter on May 23, 2023 requesting reimbursement for the Shareholder Settlements. The May 23, 2023 letter is in writing and speaks for itself; Endurance denies any characterization of the letter contrary to its express terms.

186.    On June 12, 2023, Endurance's outside litigation counsel, on behalf of Endurance, sent a letter to the Insureds denying coverage for the Shareholder Settlements. *See* **Exhibit 4**, FHI00001276.

**ANSWER**: Admitted in part; denied in part. It is admitted that Endurance sent a letter on June 12, 2023. The June 12, 2023 letter is in writing and speaks for itself; Endurance denies any characterization of the letter contrary to its express terms. Among other things, Endurance informed Plaintiffs that the $17.9 million paid to the Affected Shareholders did not constitute covered **Loss** but instead constituted a "business accommodation." This paragraph is denied to the extent Plaintiffs' imply that Endurance denied all coverage as Endurance advised that it was "prepared to pay the reasonable costs incurred" to correct FAS's administrative error, as well as

"reasonable **Defense Costs**" above the applicable retention. *See* Endurance Appx. Ex. 47. The June 12, 2023 letter is a writing which speaks for itself, and Endurance denies any characterization of the letter contrary to its express terms.

187.    Endurance did not produce a copy of the June 12, 2023 letter in this litigation. *See generally id.* at FHI00001276.

**ANSWER**: Immaterial; admitted.

188.    The June 12, 2023 letter stated that Endurance was "uncertain whether that settlement payment constitutes **Loss** pursuant to the Policy; or a payment that reflects, in whole or in part, a business accommodation." *Id.* at FHI00001284.

**ANSWER**: Admitted in part; denied in part. It is admitted only that the quoted language appears in the June 12, 2023 letter. The June 12, 2023 letter is in writing and speaks for itself; Endurance denies any characterization of the letter contrary to its express terms.

189.    The June 12, 2023 letter did not cite the Primary Policy's definition of **Loss** or explain why the Shareholder Settlements did not satisfy the definition of **Loss**. *See generally id.*

**ANSWER**: Admitted in part; denied in part. The June 12, 2023 letter is in writing and speaks for itself; Endurance denies any characterization of the letter contrary to its express terms. By way of further response, it is admitted only that the definition of **Loss** was not specifically quoted in the June 12, 2023 letter but it is denied that it was not explained why the Shareholder Settlements did not constitute **Loss** under the Endurance Policy. Indeed, the June 12, 2023 letter sets forth the chronology of events, policy provisions at issue and Endurance's coverage analysis, with focus on addressing whether the settlements amounts constituted covered **Loss** as defined under the Policy. *See* Endurance Appx. Ex. 47.

190.    The June 12, 2023 letter stated that the Shareholder Settlements "left the Shareholder Claimants in possession of their shares, their past benefits of owning such shares (i.e., dividends or re-investments for new shares), and all future benefits that might flow from them" and set forth Endurance's belief that "the consideration paid to the Shareholder Claimants may have made them more than whole, which runs counter to the purpose of the Policy." *Id.* at FHI00001284.

**ANSWER**: Admitted in part; denied in part. It is admitted only that the quoted language appears in the June 12, 2023 letter. The June 12, 2023 letter is in writing and speaks for itself; Endurance denies any characterization of the letter contrary to its express terms.

191.    The June 12, 2023 letter quoted the Primary Policy's consent provision and stated that Endurance "reserve[d] all rights accordingly." *Id.* at FHI00001282-83.

**ANSWER**: Admitted in part; denied in part. It is admitted only that the quoted language appears in the June 12, 2023 letter and that the June 12, 2023 letter set forth various provisions from the Endurance Policy. The June 12, 2023 letter is in writing and speaks for itself; Endurance denies any characterization of the letter contrary to its express terms.

192.    The June 12, 2023 letter invited the Insureds "to meet for a real-time discussion about this Claim and whether a potential resolution may be feasible." *Id.* at FHI00001284.

**ANSWER**: Admitted in part; denied in part. It is admitted only that the quoted language appears in the June 12, 2023 letter. The June 12, 2023 letter is in writing and speaks for itself; Endurance denies any characterization of the letter contrary to its express terms. Endurance objects to this paragraph because references to offers or statements made during compromise negotiations are inadmissible under Rule 408 of the Federal Rules of Evidence.

193.    Endurance's Head of Financial lines testified that Endurance was attempting to "reach a compromise" by paying less than the full $10 million limits of its Primary Policy. *See* **Exhibit 42**, Santiago Tr. 129:11-131:15.

**ANSWER**: Admitted in part; denied in part. It is admitted that Ray Santiago explored a compromise of the dispute with Plaintiffs. As Mr. Santiago testified, Endurance's intention "was to try to reach a compromise in some way, shape or form, and unfortunately, it takes two parties to make that happen, and unfortunately, it didn't happen." Mr. Santiago further testified that "[t]hese things take on different forms. Sometimes it's about the claims. Sometimes it's about broader trading relationship, but you got to be willing to have a conversation, and we never got that far. So it's tough for me to speculate what that would have looked like." *See* Plaintiffs' Ex. 42, Tr. of Dep of. R. Santiago at 129:11-131:15. Endurance objects to this paragraph because references to offers or statements made during compromise negotiations are inadmissible under Rule 408 of the Federal Rules of Evidence.

194.    Continental did not issue a pre-suit coverage position. *See* **Exhibit 41**, Cipriani Tr. 54:15-25.

**ANSWER**: Admitted.

195.    Endurance's Head of Financial Lines admitted that "[i]n this particular case, obviously, it took much longer than what was expected, and I certainly acknowledge that." *See* **Exhibit 42,** Santiago Tr. 100:9-11.

**ANSWER**: Admitted in part; denied in part. It is admitted only that Ray Santiago's deposition transcript includes the quoted language. Contrary to Plaintiffs' assertion, Mr. Santiago never conceded that Endurance's investigation involved an improper delay. Instead, he explained that the matter involved a complicated fact pattern and acknowledged only that Plaintiffs wanted

a faster response:

> THE WITNESS:      Again, this was a unique situation. In the normal course, we
> should be responding. This was again, a complicated, unique situation.

> ***

> Q.      What was complicated about it?

> A.      Trying to understand the fact pattern here is my understanding. Obviously,
> I'm not handling the claim. . . It was moving fast. Right? You had the SEC
> in there. There were a lot of constituencies, as I understood it, and my
> understanding was that initially, you know, we were absorbing the
> information.

> Q.       You were absorbing the information or you were absorbing the fact that
> there was a big loss that you would have to pay out under the policy?

> ***

> A.      We were absorbing the information. We pay claims, cover claims, that's
> what we do, and we don't hide behind that responsibility. We are trying to
> understand the situation so we can respond appropriately, and whether that
> didn't work out in somebody's time frame, that's unfortunate, but again, I
> think we were endeavoring to try to do what's right. That's how we conduct
> ourselves.[34]

Mr. Santiago added, "[w]e are not trying to skirt our responsibilities. We are trying to

understand and come up with appropriate determination. In this particular case, obviously, it took

much longer than what was expected, and I certainly acknowledge that." *See* Plaintiffs' Ex. 42, Tr.

of Dep. of R. Santiago at 99:20-100:9-11.

196.    Endurance's Head of Financial Lines admitted that there were complication and

issues with Endurance's claim handling process in this matter. *See* **Exhibit 42**, Tr. of Dep. of R.

Santiago at 117:3- 18.

**ANSWER**: Denied. Mr. Santiago did not testify that there were any issues or complications

with Endurance's claim handling. Instead, Mr. Santiago testified that Plaintiffs had expectations

---

[34] *See* Endurance Supp. Appx. 9, Tr. of Dep. of  R. Santiago at 99:4-25-100:1-2.

and that Endurance endeavored to meet those expectations but that there appeared to be "complications or issues" in doing so. *See* Plaintiffs' Ex. 42, Tr. of Dep. of R. Santiago at 117:3-18.

197.    The custom and practice in the insurance industry is to place all claim-handling materials in the claim file. **Exhibit 56**, September 8, 2025 Deposition of Mark Goracy ("Goracy Tr.") at 192:7-22.

**ANSWER**: Denied. As Mr. Mayerson explained, "a claim-diary system, which is how I would characterize Endurance's Claim Center portal (and which would be so understood by a reasonable claims professional in this context) is not the exclusive foundation for decision-making, and materials outside the diary are accessible to the claims professional in performing their function of claims investigation and determination." *See* Endurance Supp. Appx. 10, Expert Report of Marc S. Mayerson, ¶ 136.

198.    Endurance testified that "all claims handling information in [its] claims file was produced" in this litigation. *See* **Exhibit 1**, Jacobson Tr. 226:18-21.

**ANSWER**: Admitted in part; denied in part. It is admitted only that Ms. Jacobson's deposition testimony includes that quote. It is denied that Endurance produced documents protected under the work product doctrine or attorney-client privilege, or that it had any obligation to do so. Endurance invoked its rights under Federal Rule of Civil Procedure 26(b)(3)(A) and Pennsylvania law and that under this Court's December 20, 2024 Order, pursuant to Federal Rule of Civil Procedure 26(b)(3)(A), Endurance was "not required to produce any internal claims communications or documents created on or after May 12, 2023 because litigation was reasonably anticipated as of that date [and Endurance] is not required to produce communications with, or other documents received from, its outside counsel, Michael Perlis, Esq." *See* ECF No. 57

(December 20, 2024 Order).

199.    Mark S. Goracy, a former VP of Claims at ACE and CIGNA with four decades of experience managing and auditing claim departments, submitted an Expert Report in this litigation on June 20, 2025. *See* **Exhibit 55**, June 20, 2025 Expert Report of Mark S. Goracy.

**ANSWER**: Admitted. Mr. Goracy's report is in writing and speaks for itself; Endurance denies any characterization of the report contrary to its express terms.

200.    Mr. Goracy reviewed Endurance's entire production of documents and found "no coverage analysis documented in Endurance's claim file" and that "Endurance's claim professionals failed to document claim notes, except for two calls with Federated and the insurance tower." *See* **Exhibit 55**, at 28, ¶¶ 70-71; *see also* **Exhibit 56**, Goracy Tr., at 220:5-11, 222:19-25.

**ANSWER**: Admitted in part; denied in part. Mr. Goracy's report is in writing and speaks for itself; Endurance denies any characterization of the report contrary to its express terms. It is admitted only that the quoted language appears in Mr. Goracy's report. It is denied to the extent that Plaintiffs suggest that Endurance did not properly analyze coverage or investigate the matter. In addition, the deposition portions Plaintiffs reference in Mr. Goracy's report only demonstrate that Mr. Goracy testified that he did not recall or remember seeing certain things in his review – in Endurance's file or otherwise. Whether Mr. Goracy actually reviewed Endurance's entire document production involves a material issue of disputed fact to the extent it turns on his credibility as witness.

Further, the quoted language above appears in paragraphs in which Mr. Goracy reviews and discusses Continental's guidelines and Continental's corporate representative's testimony – not Endurance's. In addition, and importantly, Mr. Goracy admitted during his deposition that claims handling policy and procedure manuals are "internal, aspirational and intended to serve as

an ideal for claims practitioners to strive for in handling claims; no duty to an insured is created by the internal use of such manuals and no insured has a reasonable expectation that the lack of compliance with an internal claim handling guidelines creates some type of obligation to an insured." *See* Endurance Supp. Appx. Ex. 11, Tr. of Dep. of M. Goracy at 70:14-25. Mr. Goracy has also previously opined that "claim handling procedure manuals and guidelines represent an idealized vision of how claims should be handled, not how they must be handled." *See id.* at 71:16-72:1-4.

201.    Endurance's claim notes produced in this litigation reflect two unredacted claim note entries. *See* **Exhibit 57**, ENDURANCE009673-75; **Exhibit 1**, Jacobson Tr., at 203:19-204:2.

**ANSWER**: Immaterial; admitted in part; denied in part. It is admitted that certain notes that appear on ENDURANCE009673-75 were redacted. However, it is denied that ENDURANCE009673-75 reflects all of the notes that were taken by Endurance during its investigation of the claim. Also, Endurance invoked its rights under Federal Rule of Civil Procedure 26(b)(3)(A) and Pennsylvania law and that under this Court's December 20, 2024 Order, pursuant to Federal Rule of Civil Procedure 26(b)(3)(A), Endurance was "not required to produce any internal claims communications or documents created on or after May 12, 2023 because litigation was reasonably anticipated as of that date [and Endurance] is not required to produce communications with, or other documents received from, its outside counsel, Michael Perlis, Esq." *See* ECF No. 57 (December 20, 2024 Order).

202.    Continental's claim notes produced in this litigation reflect nine unredacted claim note entries. *See* **Exhibit 33**, CCC_01821-27.

**ANSWER**:  Immaterial; admitted.

203.    National Union's claim notes produced in this litigation reflect eleven claim note entries from April 5, 2023 through May 16, 2023. *See* **Exhibit 58**, National_Union000934-37.

**ANSWER**:  Immaterial; admitted.

204.    Endurance testified that it was unaware of any Pennsylvania insurance statutes or regulations governing its claim handling conduct with respect to the Insureds' requests for coverage. *See* **Exhibit 1**, Jacobson Tr. 42:16-44:4, 46:2-48:23, 50:21-51:11, 85:6-10, 141:12-17, 165:16-166:7, 215:9-15.

**ANSWER**: Denied. Ms. Jacobson specifically testified that she was aware "that there are claim handling requirements by statute in various states. What I'm stating is for this tight line of business, FI claims, non-duty to defend, I don't believe that there are any applicable responsiveness requirements other than our best efforts to respond and be communicative as much as possible and deliver our utmost customer services, which is how we handle our claims." *See* Plaintiffs Ex., 1, Tr. of Dep. of L. Jacobson at 48:14-:23

205.    Endurance's Head of Financial Lines testified that maintaining written claim handling policies and procedures is "good governance practice in any mature organization." *See* **Exhibit 42**, Santiago Tr., at 35:14-21.

**ANSWER**: Denied. This paragraph mischaracterizes Mr. Santiago's testimony. Mr. Santiago testified that it would be good governance practice in any mature organization to have policies and procedures for claims handling. He did not testify that such policies and procedures had to be written. *See* Plaintiffs' Ex. 42, Tr. of Dep. of. R. Santiago at 35:14-21.

206.    Endurance admitted that it had no written claim handling manuals, guidelines, or procedures. *See* **Exhibit 1**, Jacobson Tr., at 25:12-17, 29:2-7, 40:15-41:6, 41:15-42:13.

**ANSWER**: Admitted in part; denied in part. It is admitted only that Endurance has no

written claim handling manuals, guidelines or procedures relevant to this line of coverage. Ms. Jacobson testified, however, that Endurance "prides itself on hiring experienced individuals, we pride ourselves on our in-house training. We don't need written guidelines to advise us on how to properly handle files in good faith. It's in our nature and it's what we do" and she further testified that Endurance also has ongoing CE and CLE that the professionals have both in-house and attend externally that may have written documents. *See* Plaintiffs Ex. 1, Tr. of Dep. of L. Jacobson at 31:25-32:7.

207.    Endurance admitted that it did not offer any written claim handling training materials to its claim handlers. *See* **Exhibit 1**, Jacobson Tr., at 31:25-32:7.

**ANSWER**: Admitted in part; denied in part. It is admitted only that Endurance has no written claim handling manuals, guidelines or procedures relevant to this line of coverage. Ms. Jacobson testified, however, that Endurance "prides itself on hiring experienced individuals, we pride ourselves on our in-house training. We don't need written guidelines to advise us on how to properly handle files in good faith. It's in our nature and it's what we do" and she further testified that Endurance also has ongoing CE and CLE that the professionals have both in-house and attend externally that may have written documents. *See* Plaintiffs Ex. 1, Tr. of Dep. of L. Jacobson at 31:25-32:7.

208.    Endurance admitted that it did not provide any written materials to its claim handlers regarding how to handle insurance claims in good faith. *See* **Exhibit 1**, Jacobson Tr., at 40:1-7.

**ANSWER**: Admitted in part; denied in part. It is admitted only that Endurance has no written claim handling manuals, guidelines or procedures relevant to this line of coverage. As for "written materials . . . regarding how to handle insurance claims in good faith," Ms. Jacobson

testified that she was not aware of any such written materials. *See* Plaintiffs' Ex. 1, Tr. of Dep. of L. Jacobson at 40:1-7. Ms. Jacobson testified, however, that Endurance "prides itself on hiring experienced individuals, we pride ourselves on our in-house training. We don't need written guidelines to advise us on how to properly handle files in good faith. It's in our nature and it's what we do" and she further testified that Endurance also has ongoing CE and CLE that the professionals have both in-house and attend externally that may have written documents. *See* Plaintiffs Ex. 1, Tr. of Dep. of L. Jacobson at 31:25-32:7.

209.    Continental provided █████████████████████████████. *See* **Exhibit 59**, CCC_01922-31; **Exhibit 41**, Cipriani Tr. at 35:20-36:25.

**ANSWER**: Immaterial; admitted. By way of further response, Continental's ████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████

210.    Continental's ████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████. See **Exhibit 59**, at CCC_01922.

**ANSWER**: Immaterial; admitted. By way of further response, Continental's ████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████

211.    Continental's ████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████████████████████████ *Id.*

**ANSWER**: Immaterial; admitted. ██████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████████████████████

212.    Continental's ████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████ *Id.*

**ANSWER**: Immaterial; admitted. ██████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████████████████████

213.    Continental's ████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████████████████████████████████ *Id.* at, CCC_01929.

**ANSWER**: Immaterial; admitted. ███████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████████████████

214.    Continental testified that it provided ███████████████████████

███████████████████████████ *See* Exhibit 41, Cipriani Tr. at 36:9-17.

**ANSWER**: Immaterial; admitted. By way of further response, to the extent Plaintiffs are implying that ██████████████████████████████████████████████████

████████████████████████████████████████████████████.

215.    Continental provided ██████████████████████████████████

███████████ *See* Exhibit 68, at CCC_01829-913; Exhibit 41, Cipriani Tr. at 45:2-46:4.

**ANSWER**: Immaterial; admitted. By way of further response, to the extent Plaintiffs are implying that ██████████████████████████████████████████████████

████████████████████████████████████████████████████████

█████████████

216.    Continental testified that it provided ██████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████ *See* Exhibit 41, Cipriani Tr. at 45:7-20.

**ANSWER**: Immaterial; admitted in part; denied in part. By way of further response, to the

extent Plaintiffs are implying that ████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████████████

███████████████████████████

                                                HANGLEY ARONCHICK SEGAL PUDLIN
                                                & SCHILLER

Dated:  November 17, 2025        By:   */s/ Ronald P. Schiller*
                                                Ronald P. Schiller
                                                Michael R. Carlson (*pro hac vice*)
                                                  Lily K. Huffman (*pro hac vice*)
                                                  Christopher J. Mauro (*pro hac vice*)
                                                  One Logan Square, 27th Floor
                                                  Philadelphia, PA 19103
                                                  (215) 568-6200
                                                  rschiller@hangley.com
                                                  mcarlson@hangley.com
                                                  lhuffman@hangley.com
                                                  cmauro@hangley.com

                                                *Attorneys for Defendant Endurance American*
                                                *Insurance Company*